## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| GH AMERICA ENERGY LLC<br><br>Plaintiff,<br><br>v.<br><br>ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.; PABLO VEGAS, Chief Executive Officer of the ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.; PAUL FOSTER, BILL FLORES, CARLOS AGUILAR, LINDA CAPUANO, LORI COBOS, JULIE ENGLAND, ROBERT FLEXON, THOMAS GLEESON, PEGGY HEEG, COURTNEY HJALTMAN, and JOHN SWAINSON, Members of the Board of Directors of the ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.<br><br>Defendants. | CASE NO.1:24-CV-00648 |

## COMPLAINT

GH America Energy, LLC ("GHAE") alleges as follows based upon its knowledge with respect to allegations involving it and upon information and reasonable belief with respect to allegations involving others:

### Parties

1.      Plaintiff GHAE is a domestic limited liability company and renewable energy project developer registered and operating in the State of Texas and located at 2800 Post Oak Boulevard, Suite 5115, Houston, Texas 77056.  GHAE is a U.S. subsidiary of Xinjiang Guanghui Industry Investment (Group) Company, Ltd. ("Xinjiang"), located in the People's Republic of China and majority owned by Sun Guangxin, a citizen of the People's Republic of China.

1

2.      Defendant Electric Reliability Council of Texas, Inc. ("ERCOT"), whose executive and administrative center is located at 8000 Metropolitan Drive (Building E), Suite 100, Austin, Texas 78744, manages the flow of electric power to more than 26 million Texas customers representing about 90 percent of the state's electric load.  The Supreme Court of Texas has held that ERCOT is a governmental entity that performs governmental functions.  ERCOT may be served via its registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

3.      Defendant Pablo Vegas leads ERCOT as its President and Chief Executive Officer of the ERCOT.

4.      Defendants Paul Foster, Bill Flores, Carolos Aguilar, Linda Capuano, Lori Cobos, Julie England, Robert Flexon, Thomas Gleeson, Peggy Heeg, Courtney Hjaltman, and John Swainson are Members of the Board of Directors of ERCOT, which selects ERCOT's chief executive officer, sets ERCOT's goals, and guides ERCOT's direction.

## Jurisdiction and Venue

5.      This Court has subject matter jurisdiction over GHAE's claims because they all arise under the U.S. Constitution and are therefore properly before this court pursuant to 28 U.S.C. § 1331 (federal question), and pursuant to 42 U.S.C. § 1983.

6.      There are no administrative remedies for GHAE to exhaust because the Public Utilities Commission, which oversees ERCOT's activities, has no jurisdiction to review constitutional claims.

7.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1) because ERCOT resides in this District, and all other defendants are residents of Texas.  Venue in this district is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to

GHAE's claims occurred here.

## CFIUS

8.     The Committee on Foreign Investment in the United States ("CFIUS") was established by Executive Order 11858(b), issued by President Ford on May 7, 1975. 40 Fed. Reg. 20263 (1975).  This Executive Order directed that CFIUS would have "the primary continuing responsibility within the executive branch for monitoring the impact of foreign investment in the United States, both direct and portfolio, and for coordinating the implementation of United States policy on such investment."  *Id*.

9.     The Secretary of the Treasury chairs CFIUS, which also includes representatives from the Departments of Justice, Homeland Security, Commerce, Defense, State, and Energy, as well as the Office of the U.S. Trade Representative and the Office of Science and Technology Policy.  The Director of National Intelligence and the Secretary of Labor serve as *ex officio* non-voting members of CFIUS.

10.     On August 23, 1988, Congress added section 721 to the Defense Production Act of 1950, commonly known as the Exon-Florio provision, as part of the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, Title V, section 5021, 102 Stat. 1107.  The Exon-Florio provision granted the President authority to block proposed or pending foreign mergers, acquisitions, or takeovers of persons engaged in interstate commerce in the United States that threatened to impair the national security.

11.     By Executive Order 12661, issued by President Reagan on December 27, 1988, President Reagan delegated to CFIUS his authority to administer the Exon-Florio provision.  54 Fed. Reg. 779.

12.     In 1990, President Bush, exercising his authority under the Exon-Florio provision,

directed the China National Aero-Technology Import and Export Corporation ("CATIC") to divest its acquisition of MAMCO Manufacturing, a Seattle-based firm producing metal parts and assemblies for aircraft.  The reason for this direction was concern that CATIC might gain access to technology through MAMCO that it otherwise could obtain only under an export license.

13.     In 1991, the Treasury Department issued final regulations to implement the Exon-Florio provision.  31 C.F.R. Part 800.  Those regulations created an essentially voluntary system of notification by the parties to an acquisition.  However, firms largely complied because the regulations stipulated that foreign acquisitions subject to the Exon-Florio review process that did not notify CFIUS would remain subject indefinitely to possible divestment or other appropriate actions by the President.

14.     Congress amended the Exon-Florio provision with the "Byrd Amendment" to the National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, section 837, 106 Stat. 2315, 2463-2485.  The Byrd Amendment expanded CFIUS' duties to investigate certain foreign investments, particularly those in which the acquirer was controlled or acting on behalf of a foreign government, and those in which the acquisition would result in the control of a person engaged in interstate commerce in the United States that could affect national security.

15.     Subsequently, Congress passed and President Bush signed the Foreign Investment and National Security Act of 2007, Pub. L. No. 110-49, 121 Stat. 246, giving Congress further oversight over CFIUS.  This statute also expanded the national security prerogatives subject to CFIUS review and required CFIUS to engage in even greater scrutiny of foreign direct investments.  It also solidified CFIUS' position as a permanent federal agency by codifying it and granting it statutory authority, including the authority to certify to Congress that a transaction that had been reviewed had no unresolved national security issues and providing Congress with

confidential briefings and annual reports.

16.     On November 8, 2017, Senator John Cornyn of Texas introduced a bipartisan bill that was eventually enacted by Congress as the Foreign Investment Risk Review Modernization Act of 2018 ("FIRMMA").  FIRMMA was signed by President Trump on August 13, 2018, as Title XVII, section 1701 *et seq.* of the John S. McCain Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, 132 Stat. 1636, codified at 50 U.S.C. § 4565.

17.     FIRMMA further broadened the scope of transactions subject to CFIUS review and modernized the review process.  Section 1703 of FIRMMA defined a "covered transaction" to include, subject to regulation, *inter alia* "the purchase or lease by, or a concession to, a foreign person of private or public real estate that … is located in the United States … in close proximity to a United States military installation or another facility or property of the United States Government that is sensitive for reasons relating to national security;" an "investment … by a foreign person in any unaffiliated United States business that … owns, operates, manufactures, supplies, or services critical infrastructure;" and an investment that affords a foreign person access to information that "provides knowledge, know-how, or understanding, not available in the public domain, of the design, location, or operation of critical infrastructure."

18.     The term "critical infrastructure" is defined in the Critical Infrastructure Protection Act, 42 U.S.C. § 5195c(e), to mean: "systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters."  The Cybersecurity Infrastructure Security Agency ("CISA") of the Department of Homeland Security "assesses and analyaze[s] threats to, vulnerabilities of, and consequences to critical infrastructure" which includes the "Energy Sector" and the "Electricity

Subsector."

19.     In remarks at a White House roundtable discussion of FIRMMA on August 23, 2018, Senator Cornyn said: "Mr. President, under your administration, we're finally taking the big steps to address the national security threat posed by China, which has grown dramatically, as others have already said.  And I believe that China represents the foremost national security and economic challenge to our country of any other county in the world in the long term."

20.     Congress legislated in section 1702(c)(1) of FIRMMA that it was "the sense of Congress" that, in reviewing covered transactions, CFIUS may consider "whether a covered transaction involves a country of special concern that has a demonstrated or declared strategic goal of acquiring a type of critical technology or critical infrastructure that would affect United States leadership in areas related to national security."

21.     Notwithstanding FIRMMA's expansion of CFIUS' role, Congress stipulated in section 1702(b)(1)-(3) of FIRMMA that it was "the sense of Congress" that "foreign investment provided substantial economic benefits to the United States, including the promotion of economic growth, productivity, competitiveness, and job creation, thereby enhancing national security;" that "maintaining the commitment of the United States to an open investment policy encourages other countries to reciprocate and helps open new foreign markets for United States businesses;" and that "it should continue to be the policy of the United States to enthusiastically welcome and support foreign investment, consistent with the protection of national security."

22.     Congress also stipulated in section 1702(b)(6)-(7) of FIRMMA that "the President should conduct a more robust international outreach effort to urge and help allies and partners of the United States to establish processes that are similar to [CFIUS] in the United States to screen foreign investments for national security risks and to facilitate coordination."

23.     Under the revised CFIUS regulations issued by the Treasury Department after the enactment of FIRMMA, CFIUS uses a multi-step process for screening covered transactions. Parties to a proposed transaction typically consult CFIUS informally before making a formal filing. The formal process begins with the filing of either a short-form declaration or a formal written notice.  The filing of a formal notice triggers a 45-day review period during which CFIUS conducts a risk assessment and determines whether a statutory-based concern is implicated.  If risks are identified and need to be resolved, CFIUS initiates an investigation which must be completed within 45 days, with a possible 15-day extension.

24.     CFIUS may negotiate with the transaction parties and require agreements to mitigate identified risks.  CFIUS can also require the establishment of a Corporate Security Committee and other mechanisms to ensure compliance with all required actions, including the appointment of a U.S. Government-approved security officer and requirements for security policies, annual reports, and independent audits.  Transaction parties facing unpalatable mitigation measures or possible adverse presidential action often abandon their planned investments and withdraw notices filed with CFIUS to avoid such outcomes.

25.     On September 15, 2022, President Biden issued Executive Order 14083, 87 Fed. Reg. 57369, ensuring robust consideration of evolving national security risks by CFIUS.  The President reiterated that the "United States commitment to open investment is a cornerstone of our economic policy and provides the United States with substantial economic benefits."  However, "[s]ome investments in the United States by foreign persons … present risks to the national security of the United States."  The President specifically endorsed Congress' direction that CFIUS may consider "'the cumulative control of, or pattern of recent transactions involving, any one type of critical infrastructure, energy asset, critical material, or critical technology by a foreign

government or foreign person.'"

26.     According to CFIUS' most recent annual report issued in July 2023, for the period 2018-2021 there were 1,205 formal notices filed, 655 investigations, and 281 (23%) notice withdrawals, as well as three presidential decisions.

27.     In addition to the CFIUS regime, the U.S. Department of the Treasury, through the Office of Foreign Assets Control ("OFAC"), administers and enforces economic and trade sanctions in support of U.S. national security and foreign policy objectives, including those authorized by Congress and the President under the International Emergency Economic Powers Act of 1977, Pub. L. No. 95-223, sections 201-208, 91 Stat. 1625, 1626-1629.  One of OFAC's primary duties is to prevent designated "prohibited transactions."  OFAC administers and enforces economic sanctions programs against countries, businesses, and groups of individuals, using the blocking of assets and trade restrictions to accomplish foreign policy and national security goals.

## The Facts

28.     On December 3, 2015, Xinjiang (on behalf of itself and U.S. affiliates) and GH America Investments Group, Inc., an oil and gas business unit affiliated with Xinjiang (on behalf of itself and U.S. affiliates) (collectively, the "GH Parties"), gave notice to CFIUS regarding a proposed transaction by which the GH Parties, through a subsidiary, would acquire assets of several U.S. companies.  The notice was designated CFIUS Case 15-138.

29.     CFIUS assigned Case 15-138 to the United States Department of Defense ("DoD") as the CFIUS Monitoring Agency.

30.     After reviewing the notice, CFIUS determined that the GH Parties transaction presented a national security risk.

31.     CFIUS informed the GH Parties that, pursuant to the Exion-Florio provision in the

Defense Production Act of 1950, CFIUS would conclude action on the transaction only if they entered into an agreement with DoD to mitigate the national security risks.

32.     On February 29, 2016, the GH Parties submitted a "Letter of Assurance" ("LOA") to DoD to mitigate the national security risks presented by the Case 15-138 transaction.  Under the LOA, the GH Parties agreed to provide DoD with at least 15 days' notice before acquiring any interest in, or executing an agreement with respect to the operation of, an oil or gas well located in the United States, or real property located within the United States for the purpose of oil or gas development.   DoD was accorded 15 days after receiving notice of such an asset purchase to provide a written objection, non-objection, or conditional non-objection to the proposed asset purchase.  In the event of an objection by DoD or the failure of the GH Parties to comply with the conditions in a conditional non-objection, the GH Parties were prohibited from consummating the asset purchase.  If DoD provided a written non-objection or did not respond within 15 days, the proposed asset purchase would be deemed approved.

33.     The LOA also required the GH Parties to appoint a Security Officer acceptable to DoD, who would be responsible for overseeing and reporting on their implementation and compliance with the LOA, and would be authorized to communicate directly and confidentially with DoD.

34.     From 2016 through 2018, the GH Parties, through their land-owning subsidiaries Brazos Highland Properties, LLP ("BHP") and Harvest Texas, LLC ("HT"), acquired approximately 131,290 acres of land in Val Verde County, Texas.

35.     In December 2018, the GH Parties formed GHAE as their renewable energy project development business, and GHAE was registered with the Office of the Texas Secretary of State.

36.     In 2019, GHAE began investing in wind and solar resource, geotechnical, electrical,

and grid connection consulting studies to determine the project development budgets for the construction of wind, solar, battery storage, and electrical transmission interconnection projects on BHP and HT lands.  These investments by GHAE were undertaken because of ERCOT's Grid Interconnection Approval for the Akuo Rocksprings Wind Farm on a parcel of HT's land referred to as "South Rodeo Ranch."

37.     The GH Parties and GHAE informed the Military Aviation and Installation Assurance Siting Clearinghouse branch of DoD that it was entering the wind and solar renewable energy markets through GHAE, BHP and HT.  GHAE officially filed a project notification with the Military Aviation and Installation Assurance Siting Clearinghouse regarding the planned Blue Hills Wind Project on recently acquired 15,000 acres of the Carma Ranch in Val Verde County, Texas.

38.     The Military Aviation and Installation Assurance Siting Clearinghouse objected to the original planned proposal because the proposed developments were located approximately 70 miles from the Laughlin Air Force Base in Val Verde County.

39.     After GHAE and the Department of the Air Force, through Laughlin Air Force Base, conducted an extensive mitigation review, and after multiple meetings and several project scope changes, the parties agreed that, to protect the U.S. national security, the GH Parties', GHAE's, BHP's, and HT's business pursuits and lands would be included in an amendment to the 2016 LOA.  Specifically, DoD, in its capacity as the CFIUS Monitoring Agency, and the GH Parties, agreed that the expansion into the wind, solar, and other renewable energy project markets by the GH Parties (through GHAE and BHP) warranted an amendment to the scope of the 2016 LOA that would include wind energy and other renewable energy projects, as well as the relevant land holdings.

40.     Accordingly, DoD, the GH Parties, GHAE, and BHP executed a First Amendment to the LOA on December 22-23, 2020.  The First Amendment reiterated the mitigation provisions in the LOA but made them applicable to the wind and other renewable energy projects in which Xinjiang, GH America, GHAE, and BHP planned to engage and to their land holding transactions in Val Verde County, Texas.  Specifically, the First Amendment reiterated the requirement in the LOA that Xinjiang, GH America, GHAE, and BHP give at least 15 days' advance notice to DoD before acquiring any interest in, or executing any agreement with respect to the operation of, any oil, gas, wind, or other renewable energy project, any real property for the purpose of oil, gas, wind, and other renewable energy development, or any rights to oil, gas, wind, and other renewable energy, except for the interests exempted in the LOA or listed in an exhibit to the First Amendment. The First Amendment also provided that, if DoD provided a written non-objection or did not respond within 15 days to the GH Parties', GHAE's, or BHP's notice, the proposed asset purchase would be deemed approved

41.     The First Amendment added a new provision, by which the GH Parties, GHAE, and BHP acknowledged that the establishment and the operation of wind and other renewable energy sources near military installations might have a potential impact on U.S. national security interests, and that DoD retained the right to deny any proposed construction by a developer under the control of the GH Parties or GHAE on any BHP or HT land if there was a confirmed national security concern with respect to such construction that could not be successfully mitigated.  The First Amendment did not preclude the separate and standalone requirement that any proposed project must be submitted for project approval or denial to DoD, acting through the Military Aviation and Installation Assurance Siting Clearinghouse and the Department of the Air Force, acting through the Deputy Assistant Secretary of the Air Force for Installations.

42.     With the approval of federal government stakeholders to the First Amendment, GHAE began capital investment in the development of the 276-Megawatt Blue Hills Wind Farm on BHP's parcel of land known as "Carma Ranch" in June 2021.  This investment included the hiring of two project developers for technical and business development.  GHAE also made an upfront payment for an ERCOT Screening Study Application, which produced a report used during land and project due diligence.  These efforts resulted in the award of a Power Purchasing Agreement for Blue Hills' wind power production in early 2022.  The prospect of continuing to develop the Blue Hills Wind Farm was highly lucrative and would have resulted in many millions of dollars of revenue over time.

43.     The next project development step awaited the final approval of the Carma Ranch Blue Hills Wind Turbine siting by DoD and the Department of the Air Force in 2022.

44.     In the final approval by the Department of the Air Force, every one of the project's 51 turbine sitings achieved its own siting approval on BHP's Carma Ranch.  GHAE then applied and paid upfront for the next application, the ERCOT Full Interconnection Study for the Blue Hills Wind Project.

45.     To date, DoD and the Department of the Air Force have not objected to any proposed asset purchase, transaction, or construction project by the GH Parties, GHAE, BHP or HT.

**LSIPA**

46.     On June 7, 2021, Governor Abbott of Texas signed the Lone Star Infrastructure Protection Act, codified at V.T.C.A. Bus. & Co. § 117.01 *et. seq.,* and V.T.C.A. Gov't Code § 2275.0101 *et. seq*. ("LSIPA").

47.     LSIPA prohibits any business or governmental entity from entering "into an

agreement relating to critical infrastructure in this state with a company … if, under the agreement, the company would be granted direct or remote access to or control of critical infrastructure in this state, excluding access specifically allowed by the business [or governmental] entity for product warranty and support purposes, and … if the business [or governmental] entity knows that the company is … owned by or the majority of stock or other ownership interest of the company is held or controlled by …individuals who are citizens of China, Iran, North Korea, Russia, or a designated country, or … a company or other entity, including a governmental entity, that is owned or controlled by citizens of or is directly controlled by the government of China, Iran, North Korea, Russia, or a designated country, or … headquartered in China, Iran, North Korea, Russia, or a designated country."

48.     LSIPA defines "critical infrastructure" to mean "a communication infrastructure system, cybersecurity system, electric grid, hazardous waste treatment system, or water treatment facility."

49.     The sponsor of LSIPA in the Texas Senate was State Senator Donna Campbell, who introduced Texas Senate Bill 2116 that was eventually enacted as LSIPA.  At a closed hearing on this bill, Senator Campbell and a witness, former Congressman Will Hurd, testified that enactment of LSIPA was necessary to deal with the proposed project by GHAE for the Blue Hills Wind Project power generation in Val Verde County, Texas, which they noted was approximately 70 miles from Laughlin Air Force Base.  Without the presence of representatives of GHAE, CFIUS, DoD, and the Department of the Air Force, Senator Campbell and former Congressman Hurd testified that the project would give GHAE access to the Texas electric grid, and that, because GHA, GHAE, and BHP are owned by a prominent Chinese citizen, the GHAE wind generation project posed a national security risk.

13

50.     In response to an inquiry from Senator Campbell, Texas Attorney General Ken Paxton issued Opinion No. KP-0388 on September 23, 2021, concluding that an agreement by which a Chinese owned or controlled company that generates electric energy connects to the transmission system of the Texas electric grid would constitute an "agreement relating to critical infrastructure" and violate LSIPA.

### ERCOT Applies LSIPA to Cancel GHEA's Projects

51.     Pursuant to ERCOT Planning Guide, section 5, an "Interconnecting Entity" that wants to interconnect with the Texas grid system must submit a completed interconnection request to ERCOT.  This request is designed to facilitate studies and provide relevant information to ERCOT.

52.     At the time LSIPA was signed into law in June 2021, GHAE had three separate interconnection requests pending with ERCOT.

53.     On December 6, 2021, ERCOT sent a "request for information" ("RFI") to all "interconnecting entities" that had proposed generation resources projects for access to the Texas electric grid pending in ERCOT's interconnection process.  One of the interconnecting entities that received this RFI from ERCOT was GHAE.  The RFI asked GHAE to execute an attestation form regarding compliance with LSIPA as to the three interconnection requests.

54.     On January 12, 2022, GHAE responded to ERCOT's RFI, stating that Xinjiang had a majority ownership interest in GHAE and that, as the GH Parties and GHAE had informed CFIUS, DoD, and the Department of the Air Force, Xinjiang was located in China.

55.     On October 3, 2022, ERCOT sent a "notice of cancelation" to GHAE, cancelling GHAE's interconnection request called the Generation Project Blue Star Solar 24NR0146.  In anticipation of the upcoming ERCOT cancellation, GHAE sold its two other then-pending

interconnection requests to third parties at a substantial loss.

56.     On April 26, 2024, GHAE asked ERCOT whether it could pursue a screening study for the Blue Star Solar project again.  ERCOT had been allowing interconnection requests made by a third-party lessee of BHP land and had provided that third party with ERCOT screening study reports.  Because of this allowance, GHAE wanted to establish that the HT land for the Blue Star Solar project was interconnectable and saleable to potential customers who would be in compliance with the citizenship requirements of LSIPA.  GHAE expressly requested upfront confirmation from ERCOT as to whether ERCOT would approve such a screening study application for the HT property.

57.     On May 2, 2024, ERCOT responded that GHAE was not permitted to pursue a screening study for the Blue Star Solar project.  ERCOT said that GHAE did not meet the citizenship requirements of LSIPA and that, therefore, GHAE was barred from initiating or maintaining any stage of a generator interconnection or modification.

58.     In rejecting GHAE's request, ERCOT relied on the provisions of LSIPA incorporated in Sections 5.2.2(2)-(3) of ERCOT's Planning Guide.  Section 5.2.2(2) states:

> As Entity is not eligible to initiate or maintain a GIM (Generator Interconnection or Modification) if the Entity or any other owner of the project meets any of the company ownership (including affiliations) or headquarters criteria listed in Texas Business and Commerce Code, Sections 113.002(a)(2)(A)-(b)(2)(B) or 2274.0102(a)(2)(A)-(b)(2)(B), added by Act of June 18, 2021, 87th Leg., R.S., Ch. 975 (S.B. 2116).  Any Entity that seeks to initiate a GIM shall submit an Attestation Section 8, Attachment D, Attestation Regarding Compliance with the Lone Star Infrastructure Protection Act, confirming that Entity does not meet any of the company ownership (including affiliations) or headquarters criteria listed in Texas Business and Commerce Code, Sections 113.002(a)(2)(A)-(b)(2)(B) or 2274.0102(a)(2)(A)-(b)(2)(B).

Section 5.2.2(3) states:

> An Entity is not eligible to initiate or maintain a GIM if the real property to be utilized by or for the project is owned or controlled, in whole or in part, by an

Entity that meets any of the company ownership (including affiliations) or headquarters criteria listed in Texas Business and Commerce Code, Sections 113.002(a)(2)(A)-(b)(2)(B) or 2274.0102(a)(2)(A)-(b)(2)(B), added by Act of June 18, 2021, 87th Leg., R.S., Ch. 975 (S.B. 2116).  The Interconnecting Entity (IE) must provide an attestation Section 8, Attachment D, confirming that such prohibited ownership or control does not apply to the real property.

### FIRST CAUSE OF ACTION

#### *VIOLATION OF THE SUPREMACY CLAUSE*

59.     The allegations in paragraphs 1 through 58 are incorporated by this reference and realleged in this paragraph.

60.     The Supremacy Clause in Article VI, Paragraph 2 of the U.S. Constitution provides that "the Laws of the United States which shall be made in Pursuance thereof … shall be the Supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

61.     The Supremacy Clause establishes the doctrine of federal preemption, which mandates that federal law preempts state law in any area or field over which Congress has expressly or impliedly reserved exclusive authority, or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with, or creates an obstacle to the achievement of, federal law or objectives.

62.     Foreign relations, the power to deal with national security threats posed by foreign investments that affect critical infrastructure and military installations, and the power to regulate foreign commerce, are the domain of the federal government.   The federal government, through such instrumentalities as CFIUS and OFAC, has long occupied the fields of foreign affairs, foreign investment, and national security, as well as foreign relations with the People's Republic of China.

63.     CFIUS has a long history of reviewing and recommending the blocking of foreign investments and real estate transactions that raise national security concerns, including transactions

related to critical infrastructure or in close proximity to military installations and other U.S. government facilities or properties of national security sensitivity. OFAC is responsible for administering and enforcing economic regulations.

64. CFIUS has carefully reviewed and not objected to asset purchases, land holdings transactions, and wind and renewable energy projects by GHAE and its affiliates, including transactions and projects in Val Verde County, Texas, in close proximity to a military installation, and CFIUS' Monitoring Agency, the U.S. Department of Defense, has entered into agreements with GHAE and its affiliates to mitigate national security risks presented by those transactions and projects.

65. LSIPA is preempted under the Supremacy Clause by this federal regime because it purports to regulate foreign investments related to critical infrastructure that is an area comprehensively occupied by the President, CFIUS, and OFAC, and because it interferes with and creates an obstacle to the achievement of federal law or objectives in this area.

66. ERCOT'S decision, based solely on LSIPA as incorporated into ERCOT Planning Guide Sections 5.2.2(c)-(d), to cancel and deny GHAE's applications to interconnect with the Texas electric grid or to embark on a screening study with respect to such interconnection violates GHAE's rights under the Supremacy Clause and is null and void.

**SECOND CAUSE OF ACTION**

***VIOLATION OF THE DORMANT COMMERCE CLAUSE***

67. The allegations in paragraphs 1 through 58 are incorporated by this reference and realleged in this paragraph.

68. The Commerce Clause in Article I, Section 8, Clause 3 of the U.S. Constitution provides that "The Congress shall have Power … To regulate Commerce with foreign Nations,

and among the several States, and with the Indian Tribes."

69.     The Dormant Commerce Clause refers to the prohibition, implicit in the Commerce Clause, against states passing legislation that excessively burdens or is not narrowly tailored to avoid infringing unnecessarily on interstate commerce, or that directly discriminates against commerce with a foreign nation.

70.     LSIPA violates the Dormant Commerce Clause by overbroadly prohibiting entities organized under the laws of U.S. states, such as GHAE, with a Chinese parent or having majority Chinese shareholders, from engaging in commerce with the Texas electric grid, and by directly discriminating against commerce with the People's Republic of China.

71.     ERCOT'S decision, based solely on LSIPA as incorporated into ERCOT Planning Guide Sections 5.2.2(c)-(d), to cancel and deny GHAE's applications to interconnect with the Texas electric grid or to embark on a screening study with respect to such interconnection, violates GHAE's rights under the Dormant Commerce Clause and is null and void.

## THIRD CAUSE OF ACTION

### *VIOLATION OF THE EQUAL PROTECTION CLAUSE (42 U.S.C. § 1983)*

72.     The allegations in paragraphs 1 through 58 are incorporated by this reference and realleged in this paragraph.

73.     The Equal Protection Clause of the 14th Amendment to the U.S. Constitution provides that "No State shall … deny to any person within its jurisdiction the equal protection of the laws."

74.     The Equal Protection Clause prohibits the states from denying any person equal protection of the laws based on the person's race, ethnicity, color, alienage, or national origin. This includes laws that are motivated by discriminatory intent and result in discriminatory

practices or disparate treatment due to race, ethnicity, color, alienage, or national origin.

75.     LSIPA violates the Equal Protection Clause because it was enacted with the direct purpose and intent to discriminate against persons based on race, ethnicity, alienage, and national origin, and in particular entities owned or controlled by Chinese persons such as GHAE; because it makes impermissible classifications based on race, ethnicity, alienage, and national origin that are not justified by a compelling state interest; and because it is not narrowly tailored to meet a compelling state interest.

76.     ERCOT'S decision, based solely on LSIPA as incorporated into ERCOT Planning Guide Sections 5.2.2(c)-(d), to cancel and deny GHAE's applications to interconnect with the Texas electric grid or to embark on a screening study with respect to such interconnection, violates GHAE's rights under the Equal Protection Clause and is null and void.

77.     42 U.S.C. § 1983 provides that "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

78.     ERCOT, acting under the color of LSIPA and ERCOT Planning Guide Sections 5.2.2(c)-(d), has subjected GHAE, a person within the jurisdiction of the United States, to a deprivation of rights, privileges and/or immunities under the Equal Protection Clause. GHAE has been damaged at an amount to be proven at trial, but including, without limitation, a complete loss in value of GHAE's investments in project development, consulting studies, and investment costs.

**<u>PRAYER FOR RELIEF</u>**

19

GHAE respectfully requests that the Court enter judgment in their favor and:

A.   Declare LSIPA, and all ERCOT Planning Guide sections incorporating LSIPA, unconstitutional under the Supremacy Clause and preempted by federal law, and declare ERCOT's decision to deny GHAE's past and future applications to interconnect with the Texas electric grid network or to embark on a screening study with respect to such an interconnection null and void.

B.   Declare LSIPA and all ERCOT Planning Guide sections incorporating LSIPA, unconstitutional under the Dormant Commerce Clause, and declare ERCOT's decision to deny GHAE's past and future applications to interconnect with the Texas electric grid network or to embark on a screening study with respect to such an interconnection null and void.

C.   Declare LSIPA and all ERCOT Planning Guide sections incorporating LSIPA, unconstitutional under the Equal Protection Clause, and declare ERCOT's decision to deny GHAE's past and future applications to interconnect with the Texas electric grid network or to embark on a screening study with respect to such an interconnection null and void.

D.   Preliminarily and permanently enjoin ERCOT from implementing and enforcing LSIPA against GHAE.

F.   Award GHAE damages in an amount to be determined at trial for losses incurred as a result of ERCOT's unconstitutional decisions, including, without limitation, loss of GHAE investments in project development, consulting studies, and investment costs.

G.   Award GHAE its reasonable attorneys' fees.

H.   Grant GHAE such other and further relief as the Court deems just and proper.

Respectfully Submitted,

NESS PLLC

*/s/ Eliyahu Ness*_____

Eliyahu Ness
eness@nesslegal.com
State Bar No. 24119651
3232 McKinney Ave, Suite 500
Dallas, TX 75204
Telephone: (469) 319-1355

Neil Koslowe
nkoslowe@nesslegal.com
*Pro Hac Vice Application Forthcoming*
445 Park Ave.
9th Floor
New York, NY 10022
cnicks@nesslegal.com