IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| GH AMERICA ENERGY LLC<br>    *Plaintiff,*<br><br>v.<br><br>ELECTRIC RELIABILITY COUNCIL OF<br>TEXAS, INC.; PABLO VEGAS, Chief<br>Executive Officer of the ELECTRIC<br>RELIABILITY COUNCIL OF TEXAS,<br>INC.; PAUL FOSTER, BILL FLORES,<br>CARLOS AGUILAR, LINDA<br>CAPUANO, LORI COBOS, JULIE<br>ENGLAND, ROBERT FLEXON,<br>THOMAS GLEESON, PEGGY HEEG,<br>COURTNEY HJALTMAN, and JOHN<br>SWAINSON, Members of the Board of<br>Directors of the ELECTRIC<br>RELIABILITY COUNCIL OF TEXAS,<br>INC.<br>    *Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO.1:24-CV-00648 |

### DEFENDANTS' MOTION TO DISMISS

Defendants Electric Reliability Council of Texas, Inc. ("ERCOT"), and Paul Foster, Bill

Flores, Carlos Aguilar, Linda Capuano, Julie England, Robert Flexon, Peggy Heeg, John Swainson,

Pablo Vegas, Thomas Gleeson, Courtney Hjaltman, and Lori Cobos ("ERCOT Board Defendants")

(together, "Defendants"), move to dismiss Plaintiff GH America Energy LLC's ("GHAE") claims

pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Subject to the Court's availability, Defendants request oral argument on this Motion.

# TABLE OF CONTENTS

**Page**

SUMMARY ..................................................................................................................1

BACKGROUND ..........................................................................................................2

   I.    The ERCOT intrastate grid. ...........................................................................2

   II.   ERCOT performs essential government services using delegated State rulemaking power.....3

   III.  The Lone Star Infrastructure Protection Act. ................................................4

   IV.  GHAE's Lawsuit. ............................................................................................5

ARGUMENT ...............................................................................................................8

   I.    GHAE fails to state any claim against the ERCOT Board Defendants. ...................8

       A.   GHAE pleads neither standing to sue nor a claim against the ERCOT Board Defendants.................................................................................8

       B.   The State Officer Defendants enjoy sovereign immunity...........................8

   II.   ERCOT has absolute immunity from suit......................................................9

   III.  GHAE fails to state a claim related to the Blue Hills and Blue Valley Projects, and lacks standing in any event. ..............................................................11

   IV.  GHAE's equitable claims fail as a matter of law. .......................................12

       A.   GHAE has no cause of action. .........................................................12

       B.   GHAE's Supremacy Clause claim fails. ...........................................13

           1.   GHAE has no federal rights under the Supremacy Clause. ...............13

           2.   GHAE's Supremacy Clause claim is meritless. ...........................14

               a.   There is no conflict preemption. .....................................15

               b.   There is no field preemption..........................................18

       C.   GHAE's dormant Commerce Clause claim fails....................................20

           1.   GHAE's dormant Foreign Commerce Clause claim fails....................20

           2.   GHAE's dormant Interstate Commerce Clause claim fails...................24

       D.   GHAE's equitable claims for retrospective relief fail.............................25

   V.   GHAE's § 1983 equal protection claim fails as a matter of law .....................25

       A.   ERCOT is not a "person" when it acts for the State. .............................25

       B.   GHAE fails to adequately allege *Monell* liability. .............................27

           1.   GHAE alleges that ERCOT implemented state law, for which it cannot be liable under § 1983. ................................................................28

           2.   GHAE fails to identify a final policymaker. ...............................29

       C.   GHAE's equal-protection claim fails on its merits..................................29

           1.   GHAE is not a member of a protected class. ..............................30

2.   LSIPA easily passes rational-basis review. ...................................................33

VI.  ERCOT has sovereign immunity from suit. ..........................................................35

PRAYER ...........................................................................................................................35

CERTIFICATE OF SERVICE ........................................................................................37

# SUMMARY

Plaintiff GHAE is a domestic, Texas-organized limited liability company that is controlled by a non-resident, non-citizen Chinese billionaire. Defendant ERCOT is an instrumentality of the State of Texas that regulates the State's intrastate power grid using State-delegated rulemaking authority. GHAE wishes to develop a solar power facility that would be interconnected to the ERCOT grid. GHAE alleges that ERCOT denied its interconnection request because a Texas law prohibits entities controlled by citizens of certain foreign adversaries, including China, from accessing or controlling Texas's critical infrastructure, including the ERCOT grid. Seeking to invalidate that law, GHAE sued ERCOT, its CEO, and the remainder of its then-current board members.[1]

GHAE's claims fail for numerous reasons. As a threshold matter, GHAE alleges *no facts whatsoever* against the individual defendants, who are thus entitled to dismissal. Several of those officials are also entitled to sovereign immunity because they serve on ERCOT's board solely by virtue of their executive roles in Texas agencies. ERCOT itself enjoys absolute immunity from suit under a line of cases extending immunity to privately organized entities, like ERCOT, that regulate markets or industries using delegated lawmaking authority under an immune agency's control and supervision.

Each claim GHAE asserts is also defective. GHAE's Supremacy and Commerce Clause claims seek declaratory and injunctive relief, but it fails to identify any underlying cause of action. If GHAE intended to plead an *Ex Parte Young* claim, it has failed to do so. GHAE's § 1983 claim fails because: (1) ERCOT stands in the State's shoes when it enforces state law; (2) GHAE has not adequately pleaded a *Monell* claim; and, (3) ERCOT cannot be liable for complying with mandatory Texas law.

On the merits, GHAE's Supremacy Clause claim fails because the federal regime on which that claim is based—the Committee of Foreign Investment in the United States ("CFIUS")—has no

---

[1] Texas's Public Utility Regulatory Act ("PURA"), Tex. Util. Code §§ 11.001–66.016, makes ERCOT's CEO a nonvoting Board Member. PURA § 39.151(g-1)(3).

jurisdiction over the intrastate transaction at issue here, and no pervasive regulatory scheme occupies the field. GHAE's dormant Commerce Clause claims fail because the economic activity at issue is purely *intra*state: the generation of power in Texas, for sale only within Texas's border. Neither the Interstate nor Foreign Commerce Clauses have anything to say about such a law. Finally, GHAE's equal-protection claim fails because GHAE—a Texas LLC—belongs to no protected class. And GHAE cannot share the identity of its nonresident, foreign owner—who has no constitutional rights—and the law is nevertheless neutral as to race, national origin, and alienage. The law, moreover, easily survives rational basis review.

This Court should dismiss all of GHAE's claims.

## BACKGROUND[2]

## I.     The ERCOT intrastate grid.

"In its electrical grid, as in so many things, Texas stands alone." *CPS Energy v. ERCOT*, 671 S.W.3d 605, 611 (Tex. 2023) (quoting *Texas v. Env't Prot. Agency*, 829 F.3d 405, 431 (5th Cir. 2016)). "While all the other states in the Union have extensive interconnections with neighboring states, nearly 90% of Texas is covered by a single isolated grid with limited connections to external power supplies," *Texas*, 829 F.3d at 431, making it "the U.S. mainland's only *intra*state electrical grid," *CPS Energy*, 671 S.W.3d at 611. Unlike in the U.S. mainland's two other grids, "electricity is distributed entirely within a single State" in the Texas Interconnection. *New York v. F.E.R.C.*, 535 U.S. 1, 6 (2002).

---

[2] In ruling on a Rule 12(b)(1) motion to dismiss, the Court may find that subject-matter jurisdiction is lacking based on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001). In ruling on a Rule 12(b)(6) motion to dismiss, the Court may, in addition to the pleadings, consider matters of which it may take judicial notice, including matters of public record. *Hall v. Hodgkins*, 305 Fed. Appx. 224, 227–28 (5th Cir. 2008).

The "isolat[ion]" of Texas's grid "from the nation's electricity system" reflects a "conscious decision" by generations of Texas policymakers to ensure "independence from federal regulation," thus maintaining Texas's sovereignty in an area of traditional state control. *Phillips v. ERCOT (In re Entrust Energy, Inc.)*, 101 F.4th 369, 391 (5th Cir. 2024); *ERCOT v. Just Energy Tex., L.P. (In re Just Energy, Inc.)*, 57 F.4th 241, 251 (5th Cir. 2023) ("Utility regulation is one of the most important functions traditionally associated with the police power of the States." (cleaned up)). Texas's grid is thus generally exempt from federal regulation and the jurisdiction of the Federal Electric Regulatory Commission ("FERC"). *PUCT v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 312 (Tex. 2001); *see also* Federal Power Act ("FPA"),[3] 16 U.S.C. § 824(a) (providing that FERC "shall not have jurisdiction . . . over facilities used for the generation of electric energy or over facilities used . . . only for the transmission of electric energy in intrastate commerce").

## II.   ERCOT performs essential government services using delegated State rulemaking power.

In Texas, the generation, transmission, and retail distribution of energy have been "unbundled," and (with a few exceptions not relevant here) energy is generated, transmitted and/or distributed, and sold for retail use by distinct entities. *Texas*, 829 F.3d at 432. ERCOT does not generate, transmit, distribute, or sell electricity. Instead, ERCOT is the entity that Texas—in the absence of federal regulatory control—selected to regulate Texas's intrastate grid and wholesale electricity market, subject to plenary control by the Public Utility Commission of Texas ("PUCT"). PURA §§ 39.151(a), (g); 16 Tex. Admin. Code ("TAC") § 25.361(b); *see CPS Energy*, 671 S.W.3d at 611–12 (discussing ERCOT's history).

Today, ERCOT manages the intrastate grid and wholesale electricity market using statutory authority delegated to it by the PUCT to "establish, adopt, and enforce a variety of policies, rules,

---

[3] The FPA is codified at 16 U.S.C. §§ 824–824w.

guidelines, standards, procedures, protocols, and other requirements to govern the operations of market participants." *CPS Energy*, 671 S.W.3d at 626 (citing PURA §§ 39.151(d), (i), (j), (*l*)). All aspects of ERCOT's finances and operations are subject to the PUCT's control, and the State of Texas selects ERCOT's governing board. *Id.* at 623–26. As the Texas Supreme Court recently put it, "ERCOT and the PUC[T] are uniquely situated as legislatively endorsed joint participants in a complex regulatory scheme—each serving its own distinct and essential purposes." *PUCT v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 490 (Tex. 2024).

## III.    The Lone Star Infrastructure Protection Act.

In June 2021, the Texas Legislature enacted the Lone Star Infrastructure Protection Act ("LSIPA," or the "Act") to defend Texas's critical infrastructure—especially the ERCOT grid—from control or attack by hostile nations. *See* **Ex. A** (SB 2116 Bill Analysis). Relevant here, LSIPA prohibits entities from (1) entering into an agreement that would grant "direct or remote access to or control of critical infrastructure in this state"; with (2) any company that is (a) majority owned by individuals who are citizens of China, Iran, North Korea, Russia, or a designated country; (b) majority owned by a company that is owned or controlled by citizens of, or the government of, China, Iran, North Korea, Russia, or a designated country; or (c) headquartered in China, Iran, North Korea, Russia, or a designated country. Tex. Bus. & Com. Code § 117.002; *see also* Tex. Gov't Code § 2275.0102.[4] "Critical infrastructure" includes the "electric grid." Tex. Bus. & Com. Code § 117.001. Using its delegated rulemaking authority, *see* PURA § 39.151(d), ERCOT revised its Planning Guide in April 2022 to comply with LSIPA. Compl. ¶ 58; *see* ERCOT Planning Guide § 5.2.2(c)–(d).[5]

---

[4] LSIPA was originally enacted as Chapter 113 of the Business and Commerce Code and Chapter 2274 of the Government Code, but it was renumbered in 2023 as Chapters 117 and 2275 of those codes. Act of May 17, 2023 (H.B. 4595), 88th Leg., R.S., ch. 768, § 24.001(2).

[5] ERCOT's         Planning         Guide         is         available         here (https://www.ercot.com/mktrules/guides/planning/current). *See KVUE, Inc. v. Austin Broad. Corp.*, 709 F.2d 922, 929 (5th Cir. 1983) (taking judicial notice of state administrative materials).

In 2023, the Legislature—recognizing the need "to protect our grid from hostile foreign powers" and "harden[] the security of the Texas power grid . . . to prevent exposure from attacks on the electric grid," **Ex. A** (SB 2013 Bill Analysis)—specifically commanded ERCOT to ensure that Market Participants and would-be Market Participants meeting any of LSIPA's criteria are not granted access to the ERCOT grid. PURA § 39.360.

## IV.   GHAE's Lawsuit.

Plaintiff GHAE is a Texas LLC operating in Texas. Compl. ¶ 1; *see also* **Ex. B** (Cert. of Formation). GHAE's parent company and majority owner, Xinjiang Guanghui Industry Investment (Group) Company, Ltd. ("Xinjiang"), is a Chinese company located in the People's Republic of China. *Id.* ¶¶ 1, 54. Xinjiang, in turn, is majority owned by Sun Guangxin, a Chinese citizen. *Id.* ¶ 1.

This case concerns ERCOT's cancellation, pursuant to LSIPA and ERCOT's Planning Guide, of GHAE's application to interconnect a proposed solar project, called the Blue Star Solar Project, to the ERCOT Transmission Grid. *See* ERCOT Protocols § 3.11.6. GHAE spends much of its complaint recounting the details of two other projects—the Blue Hills Wind Project and Blue Valley Solar Project—that ERCOT did not cancel, and which GHAE voluntarily sold. Compl. ¶¶ 28–45, 55; **Ex. C** (Deeds). Because GHAE has not shown standing or stated a claim regarding these projects, *infra* Arg. § III, Defendants focus here on the Blue Star Solar Project, though any claims related to the other two projects fail for at least the same reasons as the Blue Star Solar Project.

Before a proposed generation resource may connect to the ERCOT Transmission Grid,[6] it must comply with the Generator Interconnection or Modification ("GIM") process established in Section 5 of the ERCOT Planning Guide. The GIM process requires that, among other things, the

---

[6] Any capitalized terms not defined herein have the meaning ascribed to them under ERCOT Protocols § 2.1. ERCOT's Protocols can be found here. (https://www.ercot.com/mktrules/nprotocols/current).

Interconnecting Entity submit certain information and documentation, undergo studies of how the proposed project will affect the ERCOT Transmission Grid, and successfully complete performance testing before the project may commence commercial operations. *See* ERCOT Planning Guide § 5; *see also* ERCOT Protocols § 3.11.6. Some of the required documentation includes an Interconnection Agreement with the interconnecting Transmission and Distribution Service Providers ("TDSP") that will serve the project, a Standard Form Market Participant Agreement (SFA) with ERCOT, and an attestation that the project complies with LSIPA. *See* ERCOT Planning Guide §§ 5.2.2(2)–(3), 5.3.2.5(7), 6.8(1)*; see also id.* § 5.2.2 (describing other information that must be submitted to initiate a GIM); *id.* § 5.2.8 (Interconnection Agreement); ERCOT Protocols § 22 (SFA).

When LSIPA took effect, GHAE had a pending interconnection request for the Blue Star Solar Project. Compl. ¶ 52; *see also* **Ex. D** (RFI Responses). Had that interconnection request been granted, GHAE would have had access to the ERCOT grid—"critical infrastructure," as defined by LSIPA. Tex. Bus. & Com. Code § 117.001(2). In December 2021, ERCOT—in compliance with LSIPA—required that all entities with pending interconnection requests, including GHAE, confirm whether "any of [LSIPA's] criteria apply." Compl. ¶¶ 53, 58; ERCOT Planning Guide § 5.2.2; *see also* **Ex. D**. In its January 2022 RFI response, GHAE confirmed that it was a majority-owned subsidiary of Xinjian but represented that it was "in the process of divesting," i.e., selling, the Blue Star Solar Project (as well as its two other projects). **Ex. D**;[7] *see* Compl. ¶¶ 54–55.

Based on its RFI response, GHAE was prohibited under LSIPA from connecting to the ERCOT grid, and ERCOT accordingly cancelled GHAE's Blue Star Solar Project interconnection request on October 3, 2022. Compl. ¶ 55. Nearly two years later, in April 2024, GHAE again asked to

---

[7] Defendants cite these RFI responses primarily in support of their Rule 12(b)(1) motion to dismiss. *See supra* note 2. However, GHAE incorporated these documents into its complaint by reference, *see* Compl. ¶¶ 54, and this Court may therefore also consider them as part of Defendants' Rule 12(b)(6) motion. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

perform a screening study so it could better market its project to potential buyers, and ERCOT denied that request. *Id.* ¶¶ 56–57.

Shortly thereafter, GHAE sued ERCOT, its CEO, and the remainder of its then-board members,[8] claiming that LSIPA is unconstitutional, and that ERCOT's denial of GHAE's Blue Star Solar Project interconnection request—"based solely on LSIPA as incorporated into [the] ERCOT Planning Guide"—was "null and void." *Id.* ¶¶ 65–66; 70–71; 75–76. GHAE brings three claims for relief. First, it contends that LSIPA "violates GHAE's rights under the Supremacy Clause" and that the federal government comprehensively "regulate[s] foreign investments related to critical infrastructure," which it claims preempts LSIPA. *Id.* ¶ 65–66. Next, GHAE claims that LSIPA "violates GHAE's rights under the Dormant Commerce Clause" because it "excessively burdens or is not narrowly tailored to avoid infringing unnecessarily on interstate commerce," and also directly discriminates against commerce with a foreign nation. *Id.* ¶ 69–71. Finally, GHAE contends that LSIPA violates the Equal Protection Clause because it was "enacted with the direct purpose and intent to discriminate against persons based on race, ethnicity, alienage, and national origin." *Id.* ¶ 75.

GHAE asks this Court to (1) declare that LSIPA, the ERCOT Planning Guide sections incorporating LSIPA, and ERCOT's decision to "deny GHAE's past and future applications to interconnect with the Texas electric grid" are unconstitutional and, thus, null and void; (2) enjoin ERCOT "from implementing and enforcing LSIPA against GHAE" (thereby granting GHAE and its ultimate owner direct or remote access to Texas's intrastate ERCOT grid); and (3) award GHAE

---

[8] At the time GHAE filed this lawsuit, Ms. Hjaltman served as the Chief Executive and Public Counsel for the Office of Public Utility Counsel ("OPUC") and, in that role, sat on the ERCOT Board in an *ex officio* capacity. Shortly after suit was filed, however, Ms. Hjaltman was appointed as a Commissioner of the PUCT and, thus, no longer serves on the ERCOT Board. *See* https://www.puc.texas.gov/agency/about/commissioners/hjaltman/default.aspx. Additionally, Paul Foster is no longer an ERCOT Board Member, his term having ended on June 24, 2024. *See* https://www.ercot.com/about/governance/directors.

damages for "losses incurred as a result of ERCOT's unconstitutional decisions." *See* Compl. (Prayer for Relief). For the reasons set forth herein, these claims must be dismissed.

## ARGUMENT

### I.    GHAE fails to state any claim against the ERCOT Board Defendants.

#### A.    GHAE pleads neither standing to sue nor a claim against the ERCOT Board Defendants.

GHAE sued each then-member of ERCOT's board. But apart from listing these individuals in the caption and defining them as parties, Compl. ¶¶ 3–4, GHAE alleges no facts related to these individuals.[9] GHAE does not assert that the ERCOT Board Defendants caused GHAE's alleged injuries, nor does GHAE seek any relief against them. *Id.* (Prayer for Relief). GHAE has thus failed to state any claim against the Board Defendants, all of whom should be dismissed. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions.").[10] For much the same reason, GHAE has failed to allege standing. In particular, GHAE fails to plead that its alleged injuries are traceable to the ERCOT Board Defendants, or that those injuries would be redressed by the (non-existent) relief sought against them. Its claims should be dismissed on this ground as well.

#### B.    The State Officer Defendants enjoy sovereign immunity.

Defendants Cobos, Gleeson, and Hjaltman are also protected by sovereign immunity. Cobos and Gleeson are PUCT Commissioners. At the time GHAE sued her, Hjaltman was the head of

---

[9] GHAE fails to specify the capacity in which the ERCOT Board Defendants are sued. The course of proceedings, however, suggest they are sued only in their official capacities: GHAE requested that a summons be issued *only* as to ERCOT, ECF No. 2; even after only *some* of the individuals agreed to waive summons, *see* ECF No. 6, GHAE made no effort to serve the remaining individual defendants.
[10] GHAE's official-capacity § 1983 claims against the ERCOT Board Defendants should be dismissed for the additional reason that they are redundant of the claims against ERCOT. *LULAC v. Texas*, No. 5:15-CV-00219-RP, 2015 WL 3464082, at *2 (W.D. Tex. May 29, 2015).

OPUC.[11] All three—collectively, the State Officer Defendants—serve or served on ERCOT's governing board *solely* by virtue of their positions as officials of the PUCT or OPUC, which are agencies of the State of Texas. *See* PURA §§ 39.151(g-1)(1), (6) (making the PUCT Chair, an additional Commissioner chosen by the Chair, and the head of OPUC "ex officio" board members); *Ex officio*, Black's Law Dictionary (12th ed. 2024) ("By virtue or because of an office").

Because the State Officer Defendants serve on the ERCOT Board as part of their duties as officials of Texas administrative agencies, they share the State of Texas's immunity from suit. *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). They are thus immune in their official capacities from GHAE's § 1983 claims. *Green Valley Special Util. Dist. v. City of Schertz, Tex.*, 969 F.3d 460, 475 (5th Cir. 2020) (en banc) (holding that "PUC Officials are not proper § 1983 defendants"). Likewise, to the extent that GHAE asserts an *Ex Parte Young* claim against these officials, *see infra* Arg. § IV.A, the State Officer Defendants' immunity has not been waived because GHAE has not pleaded that they were "engaged in an ongoing violation of federal law" and does not seek prospective relief against them. *Green Valley*, 969 F.3d at 471 (cleaned up). GHAE's equitable claims against the State Officer Defendants, as well as its official-capacity § 1983 claims, should therefore be dismissed. *Carver v. Atwood*, 18 F.4th 494, 498–99 (5th Cir. 2021).

## II.   ERCOT has absolute immunity from suit.

Federal courts uniformly hold that "self-regulatory organizations"—privately organized entities that regulate a market or industry using authority delegated by an agency, subject to that agency's oversight—are absolutely immune from damages claims arising from their "statutorily delegated adjudicatory, regulatory, and prosecutorial functions." *Weissman v. NASD*, 500 F.3d 1293, 1296 (11th Cir. 2007) (en banc); *Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d 112, 114 (2d Cir. 2011);

---

[11] Hjaltman is now a PUCT Commissioner, and she no longer serves on ERCOT's governing board. *See supra* note 8.

*Austin Mun. Sec., Inc. v. NASD*, 757 F.2d 676, 692 (5th Cir. 1985). This immunity derives from the entities' exercise of quasi-judicial functions, *see Austin*, 757 F.2d at 688, 692 (citing *Butz v. Economou*, 438 U.S. 478 (1978)), and also recognizes that the SRO is "stand[ing] in the shoes of," and should enjoy the same immunity as, the delegating agency, *D'Alessio v. NYSE*, 258 F.3d 93, 105 (2d Cir. 2001).

ERCOT enjoys this same immunity. As "part of [Texas's] broader electricity-regulation system," ERCOT "performs the uniquely governmental function of utilities regulation" using statutorily delegated rulemaking authority, *CPS Energy*, 671 S.W.3d at 616, subject to the PUCT's "complete authority," PURA § 39.151(d). In its powers and oversight, ERCOT thus resembles stock exchanges—the quintessential SROs. *See Standard Chartered*, 637 F.3d at 114; *Austin*, 757 F.2d at 692.

It should be of no moment that, unlike a stock exchange, ERCOT derives its authority from state law and a state agency, or that this case involves a § 1983 claim. After all, the entity in whose shoes ERCOT stands—the PUCT—would be immune from suit. And *Butz*-type absolute immunity, of which SRO immunity is a variety, applies to § 1983 claims premised on the defendant's exercise of delegated state-law authority. *E.g.*, *Capra v. Cook Cnty. Bd. of Review*, 733 F.3d 705, 709 (7th Cir. 2013).

Finally, GHAE's claims arise entirely from ERCOT's regulatory and adjudicatory functions. *See In re NYSE Specialists Secs. Litig.*, 503 F.3d 89, 96 (2d Cir. 2007) (looking at "the nature of the function performed, not the identity of the actor who performed it" (internal quotation marks omitted)). GHAE seeks damages for "ERCOT's decision . . . to cancel or deny GHAE's applications to interconnect with the Texas electric grid or to embark on a screening study with respect to such interconnection." Compl. ¶ 76. GHAE alleges that ERCOT made that decision by applying "LSIPA as incorporated into" ERCOT's legally binding rules. *Id.* That was a regulatory and/or quasi-

adjudicatory act, for which ERCOT is entitled to immunity. *See Weissman*, 500 F.3d at 1296.[12] GHAE's § 1983 claim against ERCOT should accordingly be dismissed.

### III.   GHAE fails to state a claim related to the Blue Hills and Blue Valley Projects, and lacks standing in any event.

This case centers on ERCOT's denial of GHAE's Blue Star Solar Project interconnection request. *See* Compl. ¶¶ 55–58. Yet GHAE dedicates most of its Complaint to recounting two completely different projects—the Blue Hills Wind Project and Blue Valley Solar Project—that ERCOT did not cancel and GHAE voluntarily sold. *See* Compl. ¶¶ 37–44, 49, 52–55; *see also* **Ex. C** (Deeds). While GHAE alleges it sold the Blue Hills and Blue Valley Projects "at a substantial loss," Compl. ¶ 55,[13] it fails to state a claim with respect to those sales. In particular, each of GHAE's three constitutional claims is premised on an injury GHAE allegedly suffered as a result of "ERCOT's decision . . . to cancel and deny GHAE's applications to interconnect . . . or to embark on a screening study with respect to such interconnection." *Id.* ¶¶ 66, 71, 76. But GHAE does not (and cannot) allege that ERCOT canceled either the Blue Hills Wind or Blue Valley Solar Projects, nor does it allege that ERCOT refused it permission to engage in a screening study for them. GHAE sold those projects, which have never been cancelled. GHAE has thus failed to state a claim as to these projects.

GHAE also lacks standing to assert claims for damages and/or equitable relief concerning the Blue Hills Wind Project and Blue Valley Solar Project. In the first place, GHAE cannot demonstrate that it suffered any injury "traceable to the challenged conduct of" ERCOT. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The challenged conduct here is ERCOT's allegedly unconstitutional

---

[12] If GHAE sued ERCOT's CEO and board members for the same conduct, they would also be entitled to absolute immunity. *Standard Inv. Chartered*, 637 F.3d at 115. However, GHAE does not allege a claim against the individual defendants. *See* Arg. § I, *supra*.

[13] GHAE suggests that, *after* ERCOT canceled the Blue Star Project, it sold the Blue Valley and Blue Hills Projects "[i]n anticipation of the upcoming ERCOT cancellation." Compl. ¶ 55. But *nine months* before the Blue Star Project was canceled, GHAE told ERCOT it was already "in the process of divesting" these projects. **Ex. D** (RFI Responses).

"decision . . . to cancel and deny GHAE's application**s** to interconnect." Compl. ¶¶ 66, 71, 76. But as GHAE admits, the only interconnection request ERCOT canceled was the Blue Star Solar Project's. *Id.* ¶ 55.

Further, the Court cannot grant GHAE equitable relief as to projects it no longer owns, as such relief would not redress any injury *to GHAE. See Id.* (Prayer for Relief). Any claims concerning the Blue Hills Wind Project and Blue Valley Solar Project must, therefore, be dismissed for lack of standing.

## IV.   GHAE's equitable claims fail as a matter of law.

### A.   GHAE has no cause of action.

GHAE's first and second claims seek declaratory and injunctive relief based on alleged violations of "GHAE's rights under" the Supremacy and Commerce Clauses of the United States Constitution. Compl. ¶¶ 66, 71. Unlike its equal protection claim, GHAE does not bring these claims under § 1983. Nor do these constitutional provisions themselves create a cause of action. *Armstrong v. Exceptional Child Care Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) ("[T]he Supremacy Clause is not the 'source of any federal rights' . . . and certainly does not create a cause of action."); *Daniels v. Church of the Living Word #4 PGT Ass'n*, No. Civ.A. 301CV1318D, 2001 WL 1445407, at *2 (N.D. Tex. Nov. 14, 2001) ("[T]he *commerce clause itself* does not give rise to any such cause of action.").

It is thus not clear what cause of action GHAE is asserting. One option might be *Ex Parte Young*, 209 U.S. 123 (1908), which in some instances provides a right to equitable relief to enjoin a state official's ongoing violations of federal law. *See Green Valley*, 969 F.3d at 467; *id.* at 494–95 (Oldham, J., concurring). However, GHAE has not pleaded a *Young* claim, which must "be brought against state officers who are acting in their official capacities," *Williams v. Reeves*, 954 F.3d 729, 736 (5th Cir. 2020), and who have a "sufficient[ly]" close "connection with the enforcement of the law being challenged," *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024).

What's more, given the Fifth Circuit's holding that ERCOT is not an arm of the State for Eleventh Amendment purposes, *Entrust*, 101 F.4th at 387, it is doubtful that *any* ERCOT employees or non-*ex officio* board members could qualify as state officers subject to a *Young* claim. *See Freedom from Religion Found., Inc. v. Mack*, 4 F.4th 306, 312 (5th Cir. 2021) (holding that *Young* claim could not be asserted against a county official because he was not employed by an arm of the State), *vacated in part*, 49 F.4th 941, 948 n.4 (5th Cir. 2022).[14] Because no cause of action underlies GHAE's allegations related to the Supremacy and Commerce Clauses, those claims should be dismissed.

**B.    GHAE's Supremacy Clause claim fails.**

**1.    GHAE has no federal rights under the Supremacy Clause.**

Notwithstanding *Ex Parte Young*, an equitable preemption claim is unavailable if the statute allegedly having the preemptive effect "implicitly precludes private enforcement." *Armstrong*, 575 U.S. at 328. In its recent *Armstrong* decision, the Supreme Court held that a *Young* claim was unavailable to enforce the Medicaid Act because the relevant statute: (1) provided the "sole remedy . . . for a State's failure to comply with Medicaid's requirements"; and (2) was "judicially unadministrable" because it conferred "judgment-laden" authority on the Secretary of Health and Humans Services. *Id.* at 328–29; *accord Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73–74 (1996) (holding that *Young* claim was rendered unavailable by the relevant statute's "carefully crafted and intricate remedial scheme").

GHAE's preemption claim is premised on the CFIUS regime, enforcement of which is invested in the President, 50 U.S.C. §§ 4565(d)(1), (4), whose actions are not subject to judicial review, *id.* § 4565(e)(1). Instead, only the Attorney General, at the President's direction, may sue to enforce the regime. *Id.* § 4565(d)(3). To that end, the President may sue even a State that violates the statutory framework. *Id.* §§ 4556(a), 4552(15). Congress's grant of exclusive enforcement authority to the

---

[14] The merits panel in *Mack* vacated the motions panel's discussion of the plaintiff's official-capacity claim because the district court's order on that claim had not been appealed. Nevertheless, the Fifth Circuit's reasoning remains persuasive.

President and Attorney General precludes private enforcement of CFIUS's alleged preemptive effects. *Armstrong*, 575 U.S. at 328; *see also Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons."). And the statute's standard for assessing the effects of a covered transaction on U.S. national security, *see infra* Arg. § IV.B.2, is not judicially administrable because it is obviously a "judgment-laden" standard, *Armstrong*, 575 U.S. at 328.

### 2.     GHAE's Supremacy Clause claim is meritless.

GHAE asserts that LSIPA is preempted by federal law. There are three types of preemption: (1) express preemption; (2) conflict preemption; and (3) field preemption. *See Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 311 (5th Cir. 2023). Absent express preemption, which is not alleged here, a federal law may impliedly preempt a state law by either "directly conflicting with it or by occupying a field so pervasively as to naturally exclude it." *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry,* 476 F.3d 326, 333 (5th Cir. 2007). In all instances, "[p]re-emption is not to be lightly presumed." *Cal. Fed. Sav. & Loan v. Guerra*, 479 U.S. 272, 281 (1987); *English v General Elec. Co.*, 496 U.S. 72, 90 (1990) ("The teaching of this Court's decisions enjoins seeking out conflicts between state and federal regulation where none clearly exists." (cleaned up)).

In determining whether a state law is preempted, a court's "sole task is to ascertain the intent of Congress." *Empacadora*, 476 F.3d at 333. This requires an "examin[ation] of the explicit statutory language and the structure and purpose of the statute." *Smatresk*, 73 F.4th at 311 (cleaned up). Because the preemption analysis turns on the language of the allegedly preempting federal law, preemption claims may be resolved under Rule 12(b)(6). *See, e.g.*, *Nat'l Press Photographers Assoc. v. McCraw*, 90 F.4th 770, 796 (5th Cir. 2024).

GHAE alleges that LSIPA is impliedly preempted because it (1) "purports to regulate foreign investments related to critical infrastructure that is an area comprehensively occupied by the President,

CFIUS, and OFAC"; and (2) " interferes with and creates an obstacle to the achievement of federal law or objectives in this area." Compl. ¶ 65. Neither of these claims has merit.

### a.      There is no conflict preemption.

Conflict preemption exists where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English*, 496 U.S. at 79.[15] But while GHAE invokes this principle, Compl. ¶ 65, it never identifies the federal objectives with which LSIPA purportedly interferes. The reason is simple: the CFIUS regime on which GHAE's arguments are premised does not govern the interconnection agreements at issue in this case. Because the laws are complementary, there can be no conflict or obstacle preemption.

CFIUS is an "interagency committee . . . that is authorized to review **certain transactions** involving foreign investments in the United Stated to determine [their] effect . . . on the national security of the United States."[16] Congress established CFIUS in a 1988 amendment to the Defense Production Act of 1950 ("DPA"). *See* 50 U.S.C. § 4565. The DPA vests the President with general authority to "provide for the national security" by "ensur[ing] the vitality of the domestic industrial base." 50 U.S.C. §§ 4502(a)(1), (2). Via CFIUS, the President is directed "to review a 'covered transaction to determine the effect of the transaction on the national security of the [U.S].'" *Ralls Corp. v. CFIUS*, 758 F.3d 296, 302 (D.C. Cir. 2014) (quoting 50 U.S.C. § 4565(b)(1)(A)).

CFIUS may review *only* "covered transactions." 50 U.S.C. § 4565(a)(4). For most of its existence, CFIUS's jurisdiction was limited to "covered control transactions," or transactions resulting in foreign control of an *existing* U.S. business. 31 C.F.R. § 800.210. Beginning in 2020, CFIUS's

---

[15] Conflict preemption may also exist where "it is impossible for a private party to comply with both state and federal requirements." *English*, 496 U.S. at 79. GHAE does not allege this form of conflict preemption here.

[16] Fact Sheet: Final CFIUS Regulations Implementing FIRRMA, U.S. Dept. of the Treasury (Jan. 13, 2020), *available at* https://home.treasury.gov/system/files/206/Final-FIRRMA-Regulations-FACT-SHEET.pdf (emphasis added).

jurisdiction was expanded to also include (as relevant here): (1) foreign acquisition of real estate located in close proximity to U.S. military installations ("covered real estate transactions"); and (2) certain *non*-controlling investments that afford foreign persons either (a) access to material nonpublic information concerning critical infrastructure; or (b) "involvement, other than through voting of shares, in substantive decision making" regarding the "management, operation, manufacture, or supply of covered investment critical infrastructure," ("covered investments"). *See* 50 U.S.C. §§ 4565(a)(4)(B)(ii)–(iii)(I), (a)(4)(i)(I), (a)(4)(D)(ii)(I)(aa); 31 C.F.R. §§ 802.203, .211–.212, .217.

Critically, however, CFIUS *may not* review "greenfield" investments, in which a foreign person builds a new U.S. business from the ground up. Thus, if a foreign corporation "incorporat[es] a newly formed subsidiary" and "construct[s] . . . a plant to make a new product," it "will not have acquired a U.S. business, and its greenfield investment *is not* a covered control transaction" or covered investment. 31 C.F.R. § 800.301(e)(7) (emphasis added).[17]

The Blue Star Solar Project is precisely such a greenfield investment: a foreign corporation, Xinjiang, caused GHAE to be created as a Texas LLC to develop a new solar energy project. Compl. ¶ 35. Tellingly, GHAE nowhere alleges that *this* project was subject to CFIUS review, let alone that it has actually undergone such a review.[18] Because CFIUS does not apply to GHAE's Blue Star Solar

---

[17] While CFIUS may still review certain real estate transactions related to greenfield investments, *see* 31 C.F.R. § 800.301(e)(7), GHAE does not allege that ERCOT applied LSIPA with respect to any (let alone a covered) real estate transaction.

[18] Instead, GHAE spends substantial time recounting the federal government's national-security review (under both CFIUS and a non-CFIUS statute) of *different* projects that ERCOT did not cancel and GHAE sold. Compl. ¶¶ 28–31, 35–40, 44. These include GHAE's allegations regarding a Department of Defense mitigation agreement executed under 10 U.S.C. § 183a—*not* CFIUS. *Id.* ¶ 44; **Ex. E** (mitigation agreement).

Project, there can be no conflict between CFIUS and LSIPA.[19] *English*, 496 U.S. at 90 ("The Court has observed repeatedly that pre-emption is ordinarily not to be implied absent an actual conflict.").

LSIPA, moreover, does not impede CFIUS's goals. In the first place, CFIUS is not concerned with greenfield investments or intrastate businesses like GHAE's. As important, LSIPA, as applicable here, is narrowly concerned with protecting Texas's intrastate electric grid, the isolation of which make it "uniquely vulnerable to sudden power shortages." *Texas*, 829 F.3d at 432. Texas's regulation of its grid is an exercise of its "historic police powers," which are "not to be curtailed by federal law unless Congress indicates a clear and manifest purpose to do so." *Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 210 (5th Cir. 2010) (cleaned up); *see Just Energy*, 57 F.4th at 251–52 (holding that utility regulation through ERCOT is an exercise of such a traditional state power). Because LSIPA, as applied here, merely controls who may access or control Texas's grid—a wholly intrastate activity, in an area of traditional state power—there is no obstacle preemption.

Because of LSIPA's focus on control of intrastate economic activity, as well its application here to a transaction outside of CFIUS's jurisdiction, *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), is readily distinguishable. The law struck down in *Crosby* imposed economic sanctions on Burma by barring "state entities from buying goods or services from any person . . . doing business with Burma." *Id.* at 367. In other words, the law was designed to penalize foreign commerce with Burma in order to influence Burma's government. The Court held that the law was an obstacle to, and "undermine[d] the intended purpose and 'natural effect' of," Congress's own sanctions regime targeting Burma. *Id.* at 373–74. Here, by contrast, LSIPA's goal is to protect the stability of Texas's critical infrastructure, including the ERCOT grid. And unlike in *Crosby*, Texas's regulation of these

---

[19] CFIUS would also not apply because it only covers investments in a "US Business," which is defined as a business "engaged in interstate commerce." 50 U.S.C. §§ 4565(a)(13); 31 C.F.R. § 802.241. GHAE alleges only that it engages in *intra*state commerce, so it would not be a "US business" in any event. Compl. ¶¶ 1, 34–36, 53, 56, 70–71.

intrastate matters, in an area of traditional state authority, *see Entrust*, 101 F.4th at 391; *Just Energy*, 57 F.4th at 251, in no way impedes CFIUS's jurisdiction.

Finally, GHAE's complaint includes several stray references to the Office of Foreign Asset Control as an alleged source of preemption. Compl. ¶¶ 27, 63, 65. But GHAE fails to identify any OFAC-enforced *law* that might preempt LSIPA. *See Tex. Midstream*, 608 F.3d at 210. The one it does mention—the International Emergency Economic Powers Act—gets GHAE nowhere because (1) it concerns the President's authority after declaring a national emergency,[20] which is not implicated on these facts; (2) like CFIUS, does not grant GHAE any substantive federal rights; and (3) in any event, GHAE fails to point to any part of that Act that evidences "clear and manifest congressional intent" to preempt state law. The Court should dismiss GHAE's conflict-preemption claims.

### b.      There is no field preemption.

Field preemption exists only where a federal statutory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or that it "touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *McCraw*, 90 F.4th at 796. "Field preemption of state law is disfavored," and "courts should hesitate to infer field preemption unless plaintiffs show that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress." *Id.* at 795–96 (quoting *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018)); *accord Empacadora*, 476 F.3d at 334 ("Field preemption requires a clear congressional intent."). Even where it applies, the "field" must be narrowly construed, and the States' power to regulate in fields of traditional authority respected.

---

[20] *See* 50 U.S.C. § 1701 ("The authorities granted to the President by . . . this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose.").

Nothing in the statutes authorizing CFIUS suggests an intent to create a pervasive regulatory scheme. CFIUS is merely authorized to conduct a national-security review of a narrow class of transactions, during a short time frame, after which the case is either closed or, if there exists an unmitigated national-security risk, the case is transferred to the President for final action. 50 U.S.C. §§ 4565(b)(1)(A), (b)(2)(A)–(B), (f); *Ralls*, 758 F.3d at 303.

The CFIUS regime certainly expresses no intent to preempt a State's regulation of intrastate economic activity to secure its critical intrastate infrastructure. *Cf. Chamber of Commerce v. Whiting*, 563 U.S. 582, 604 (2011) (refusing to find preemption over state law "[r]egulating in-state businesses through licensing"); *DeCanas v. Bica*, 424 U.S. 351, 355 (1976). To the contrary, Congress has expressly conceded that the CFIUS regime is *not* comprehensive: it neither alters nor affects "any other authority, process, [or] regulation . . . provided by or established under any other provision of Federal law." 50 U.S.C. § 4565(i); 31 C.F.R. §§ 800.103, 802.103. Among the laws CFIUS does not alter is the FPA, which both recognizes the uniquely intrastate nature of the Texas grid and disclaims any intent to preempt state grid regulations. FPA §§ 824(a), 824o(i)(3) ("Nothing in this section shall be construed to preempt any authority of any State to take action to ensure the safety, adequacy, and reliability of electric service within that State . . . ."); *see McCraw*, 90 F.4th at 796 ("[I]mportantly, field preemption is not to be found where federal regulations . . . appear to contemplate some concurrent state regulation." (cleaned up)).

Where, as here, "the field which Congress is said to have preempted includes areas that have been traditionally occupied by the states," courts generally "should not infer field preemption." *English*, 496 U.S. at 79; *McCraw*, 90 F.4th at 796 (further explaining that "States' police powers, including those necessary to safeguard the protection of citizens, fall into this category."). And "utility regulation is one of the most important of the functions traditionally associated with the police power of the States." *Just Energy*, 57 F.4th at 252 (cleaned up). Nothing in CFIUS overcomes this presumption, and

GHAE's field-preemption claim should therefore be rejected.[21]

### C.      GHAE's dormant Commerce Clause claim fails.

The Constitution grants Congress the power to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. However, "it has long been understood that there is a dormant or negative aspect of the Commerce Clause that limits the power of the states to regulate commerce." *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 749 (5th Cir. 2006). These aspects of the Commerce Clause are concerned only with preventing state economic protectionism. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369-70 (2023).

GHAE appears to bring claims under both the dormant Interstate and Foreign Commerce Clauses. But LSIPA, as allegedly applied here, regulates only *intra*state economic activity, and GHAE's claims consequently fail.

### 1.      GHAE's dormant Foreign Commerce Clause claim fails.

GHAE invokes the dormant Foreign Commerce Clause, alleging that LSIPA "discriminat[es] against commerce with the People's Republic of China." Compl. ¶ 70. The Fifth Circuit's recent decision in *NextEra Energy Capital Holdings, Inc. v. Lake*, 48 F.4th 306 (5th Cir. 2022), illustrates how such a claim must be assessed in the context of ERCOT's intrastate grid. There, the Fifth Circuit reversed the dismissal of a dormant Commerce Clause challenge to a Texas electricity regulation— but only as applied to *non*-ERCOT regions of the State, in which electricity moves on an *inter*state grid.

---

[21] If GHAE intended to allege preemption under the moribund foreign affairs field preemption doctrine, *see* Compl. ¶ 62, that claim fails for the same reason. After first recognizing this doctrine almost 60 years ago in *Zschernig v. Miller*, 389 U.S. 429 (1968), the Supreme Court "has never again applied" it. Jack Goldsmith, *Statutory Foreign Affairs Preemption*, 2000 Sup. Ct. Rev. 175, 210 n.131. And the doctrine's focus on a law's court-predicted effects on foreign affairs, *see id.* at 203, is out of step with more recent, text-first preemption cases, which disclaim "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Whiting*, 563 U.S. at 607. In any event, this doctrine applies only to a state law that "has no serious claim to be addressing a traditional state responsibility." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1071, 1075 (9th Cir. 2012). LSIPA, as applied to regulation of the ERCOT grid, is exactly the opposite. *See Just Energy*, 57 F.4th at 252.

*Id.* at 318, 326. But both the *NextEra* panel and parties acknowledged Texas's right to enact identical regulations *within* the ERCOT region—because, in that event, their effect would be entirely *intra*state. *Id.* at 310, 318, 321 n.6; *id.* at 329 (Elrod, J., concurring in part and dissenting in part) (joining the Court's opinion in part only because its analysis "specifically excludes the intrastate ERCOT grid").

Properly considered in this context, GHAE's Foreign Commerce Clause claim fails. First, GHAE's claims do not "fall within the 'zone of interests' protected by the dormant [Foreign] Commerce Clause," [22] meaning GHAE "lack[s] standing to bring [its] claims in federal court." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 474–76 (5th Cir. 2013). "The critical inquiry is whether [GHAE] is engaged in [foreign] commerce and, if so, whether [its foreign] commerce is burdened by" LSIPA. *Id.* GHAE's pleading refutes the existence of such a burden. GHAE *does not allege* that it is engaged in foreign (or interstate) commerce. *See, e.g.*, *Empacadora*, 467 F.3d at 335 (holding that statute "does not implicate the Foreign Commerce Clause" where it imposed potential liability "for sales and activity that take place directly in Texas"). Instead, GHAE, a Texas "renewable energy project development business," alleges a desire to interconnect a solar project to the intrastate ERCOT grid. Compl. ¶¶ 1, 34–36, 53, 56, 70–71. It is incontrovertible that the business in which GHAE seeks to engage is solely a matter of *intra*state commerce. *E.g.*, *Entrust*, 101 F.4th at 391; *PUCT*, 53 S.W.3d at 312; FPA §§ 824(a), 824o(i)(3); *see also NextEra*, 48 F.4th at 321 n.6.

Because GHAE's proposed "business is purely intrastate," it is therefore outside "the zone of interests protected by the dormant [Foreign] Commerce Clause." *Cibolo*, 718 F.3d at 475; *Alliant Energy Corp. v. Brie*, 330 F.3d 904, 915 (7th Cir. 2003) ("If a piece of equipment is only useful in providing a utility in Wisconsin, the sale of the equipment is not an interstate transaction, even if the buyer is a foreign corporation. If WPLC sells a power plant located in and immovable from Wisconsin to any

---

[22] The Foreign Commerce Clause refers to that part of the Commerce Clause that vests Congress with the power to regulate commerce "with Foreign nations." U.S. Const. art. I, § 8, cl. 3.

buyer, that is an intrastate transaction."). More broadly, the ERCOT conduct at issue was likewise a regulation of *intra*state commerce: the denial of a request to interconnect an intrastate generation project to the Texas grid, where the energy produced would have been transmitted and sold entirely in Texas. That issue, too, is outside the zone of interest protected by the dormant Foreign Commerce Clause. *See NextEra*, 48 F.4th at 321 n.6.

LSIPA, moreover, has nothing to do with commerce with China, or any other country, and it is not an example of state "economic protectionism." *Nat'l Pork*, 598 U.S. at 369. LSIPA does not prohibit Chinese or other foreign investment in Texas energy companies (much less has ERCOT done so through its challenged actions). Instead, LSIPA's concern in this case is Texas's domestic security: whether instruments of a few foreign adversaries may access or control Texas's uniquely intrastate grid. In refusing GHAE's interconnection request, LSIPA and ERCOT acted in an area of traditional state power (utility regulation) with respect to a grid that Texas has jealously guarded from federal jurisdiction. *See Entrust*, 101 F.4th at 391; *Just Energy*, 57 F.4th at 251. A state's regulation of its own grid system does not implicate the Foreign Commerce Clause at all. Access to or control of Texas's intrastate grid is not a matter of international commerce. Nothing in LSIPA seeks to protect and promote U.S. business interests by discriminating against foreign businesses. GHAE's Foreign Commerce Clause claim thus fails on its merits.

LSIPA is thus distinguishable from the law struck down in *Piazza's*, which was a "protectionist measure" prohibiting seafood sellers from labeling and marketing imported catfish as "catfish." 448 F.3d at 745–47, 749 (cleaned up). The law thus facially discriminated against foreign *commerce*— imported foreign goods—and was consequently struck down. *Id.* at 749. Here, by contrast, LSIPA was applied to purely intrastate economic activity, i.e., the proposed interconnection of an intrastate generation project to Texas's wholly intrastate grid. Its classifications regarding who may access critical

infrastructure on that intrastate grid do not discriminate against foreign commerce; it preserves the security and reliability of Texas's grid.

Finally, LSIPA does not impede the federal government's ability to speak with one voice in matters of international commerce with foreign nations. *See Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 449 (1979) (striking down a California tax applied to large cargo containers owned by Japanese shipping companies engaged in international commerce because it "prevent[ed] the Federal Government from 'speaking with one voice' in international trade"). The federal government has never sought to speak with one voice regarding who may interconnect with, and thus gain access to or control of, the Texas grid; on the contrary, it has explicitly left such questions to Texas policymakers. *PUCT*, 53 S.W.3d at 312; FPA §§ 824(a), § 824o(i)(3); *see also Just Energy*, 57 F.4th at 252 (acknowledging Texas's uniquely powerful interest in this matter).

Moreover, because neither CFIUS nor FERC[23] has jurisdiction over GHAE's greenfield investment in an intrastate renewable-energy project seeking to interconnect to the ERCOT grid, there is "no specific indication of congressional intent to preempt" LSIPA, indicating that—for purposes of the dormant Foreign Commerce Clause—Congress has acquiesced in the States' power to enact "otherwise constitutional" laws in this area. *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 323–24 (1994); *see Mabey Bridge & Shore, Inc. v. Schoch*, 666 F.3d 862, 873 n.5 (3d Cir. 2012) (recognizing *Barclays*'s holding "that in the case of foreign commerce, unmistakable clarity is not required" to show congressional acquiescence or authorization). GHAE's dormant Foreign Commerce Clause claim should be dismissed.

---

[23] FPA § 824(a) (providing that FERC "shall not have jurisdiction . . . over facilities used for the generation of electric energy or over facilities used . . . only for the transmission of electric energy in intrastate commerce").

##### 2.   GHAE's dormant Interstate Commerce Clause claim fails.

The dormant Interstate Commerce Clause is not "a roving license for federal courts to decide what activities are appropriate for state and local government to undertake." *Nat'l Pork*, 598 U.S. at 380. Rather, a dormant Commerce Clause challenge is stated only where the challenged law discriminates against interstate commerce, either facially, by purpose, or by effect, *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007); or, in the absence of such overt discrimination against interstate commerce, where the state law imposes a "substantial burden on interstate commerce" that "is clearly excessive in relation to its putative local benefits." *Nat'l Pork*, 598 U.S. at 383–85; *Allstate*, 495 F.3d at 160. The latter category—generally referred to as a *Pike* claim—is simply another "way to test for purposeful discrimination against out-of-state economic interests." *Nat'l Pork*, 598 U.S. at 380; *id.* at 379 ("*Pike* serves to smoke out hidden protectionism." (cleaned up)).

Once again, GHAE's claim fails at the prudential-standing stage. GHAE does not (and cannot) allege that it is engaged in interstate commerce. Instead, its proposed "business is purely intrastate," *Cibolo*, 718 F.3d at 475: GHAE wishes "to interconnect with the Texas electric grid," Compl. ¶ 71. GHAE's pleading thus places its claim squarely outside "the zone of interests protected by the dormant Commerce Clause." *Cibolo*, 718 F.3d at 475. Its claims should be dismissed for that reason.

On the merits, GHAE does not allege that LSIPA, which says nothing about in-state versus out-of-state commerce, facially discriminates against *interstate* commerce, i.e., "benefit[s] in-state economic interests by burdening out-of-state competitors." *Nat'l Pork*, 598 U.S. at 369. Instead, GHAE alleges a *Pike* claim: LSIPA "excessively burdens . . . interstate commerce." Compl. ¶ 69. But GHAE fails to allege any "facts plausibly suggesting a substantial harm to *inter*state commerce." *Nat'l Pork*, 598 U.S. at 385 (emphasis added); *id.* at 393 (Sotomayor, J., concurring) ("Alleging a substantial burden on interstate commerce **is a threshold requirement** that plaintiffs must satisfy **before courts need even engage in *Pike*'s balancing and tailoring analysis**." (emphasis added)). GHAE alleges

a wholly intrastate burden: its inability to "interconnect" and "engag[e] in commerce with the Texas electric grid." Compl. ¶¶ 70–71 (claiming only that LSIPA has prevented GHAE from "engaging in commerce with the Texas electric grid").

GHAE's dormant Interstate Commerce Clause claim should therefore be dismissed. *See Nat'l Pork*, 598 U.S. at 385; *On the Green Apartments, LLC v. City of Tacoma*, 241 F.3d 1235, 1242 (9th Cir. 2001) ("Where, as here, a plaintiff alleges only an intrastate burden, a court cannot manufacture an interstate burden to implicate the Commerce Clause.").

### D.    GHAE's equitable claims for retrospective relief fail.

Assuming that GHAE is asserting an *Ex Parte Young* claim, it seeks relief beyond what such a claim permits. GHAE asserts that ERCOT's prior decisions cancelling its interconnection applications and refusing to permit it to embark on a screening decision are "null and void." Compl. (Prayer for Relief). GHAE thus seeks declaratory and injunctive relief invalidating ERCOT's final actions. *Id.* "That relief—the voiding of a final state agency order—is quintessentially retrospective and thus out of bounds under *Young*." *Green Valley*, 969 F.3d at 473 (cleaned up). GHAE's claims for retrospective injunctive relief should be dismissed.

## V.    GHAE's § 1983 equal protection claim fails as a matter of law.

### A.    ERCOT is not a "person" when it acts for the State.

Section 1983 imposes liability only on "persons." 42 U.S.C. § 1983. A corporation or political subdivision typically qualifies as a person, while a State does not. *See Daves v. Dallas County*, 22 F.4th 522, 532 (5th Cir. 2022) (en banc). But there is a nuance: determining a § 1983 defendant's personhood depends not on its corporate status or employer's identity, but on a state-law analysis of the function at issue. *Id.* If a defendant is sued for actions performed on the behalf of the State, it is not a "person" under § 1983 and "there is no case or controversy[], and no Article III jurisdiction." *Id.*

Whether ERCOT qualifies as a § 1983 "person" is thus a question of *state law* distinct from whether ERCOT is an "arm of the State" under the Eleventh Amendment. *Id.* at 532–33 ("For purposes of Section 1983 personhood, it is state law that determines whether an official with final policymaking authority as to the specific function involved in the litigation is acting for a local government unit or the state."); *id.* at 533 ("[W]e examine function, not funding, when deciding whether an official is acting for the state or local government in a case brought pursuant to Section 1983."). Thus, GHAE's pleadings establish this Court's lack of jurisdiction over its § 1983 claim because "the act that is being challenged in the litigation" was taken on behalf of the State of Texas, and the individuals carrying it out were therefore not "persons" under § 1983. *Id.*

GHAE alleges that ERCOT denied its interconnection applications, and refused to let it embark on a screening study, "based solely on LSIPA as incorporated into ERCOT Planning Guide Sections 5.2.2(c)–(d)." Compl. ¶¶ 66, 71, 76. Thus, the function at issue was ERCOT's compliance with state law through enforcement of ERCOT's binding rules.[24]

Under Texas law, these functions were carried out on the State's behalf. As GHAE pleads, "ERCOT is a governmental entity that performs governmental functions." *Id.* ¶ 2. ERCOT's Planning Guide is a binding document promulgated using rulemaking authority delegated to ERCOT from the PUCT. *See CPS Energy*, 671 S.W.3d at 626 (holding that ERCOT is "statutorily authorized to establish, adopt, and enforce a variety of policies, rules, guidelines, standards, procedures, protocols, and other requirements" (citing PURA §§ 39.151(d), (i), (j), (*l*)). ERCOT's rules, including the Planning Guide provisions at issue, cannot take effect without the PUCT's approval. PURA § 39.151(g-6). Likewise, when ERCOT enforces its rules—as occurred here—it utilizes *state* power delegated to it from the PUCT. PURA §§ 39.151(d), (g-6); *CPS Energy*, 671 S.W.3d at 616 And PURA requires ERCOT to

---

[24] That GHAE considers ERCOT to be acting for the State is evidenced by its choice not to file and serve notice on the Attorney General. *See* Fed. R. Civ. P. 5.1(a)(1)(B) (providing that no notice is required if a state agency is sued).

enforce LSIPA with respect to participants and would-be participants in the ERCOT grid and market. PURA § 39.360(b).

More broadly, "Texas caselaw says unequivocally that ERCOT is an organ of government that performs a uniquely governmental function." *Entrust*, 101 F.4th at 383 (cleaned up). "ERCOT operates as part of [Texas's] broader electric-regulation system under PURA and performs the uniquely governmental function of utilities regulation." *CPS Energy*, 671 S.W.3d at 616. "ERCOT and the PUC[T] are uniquely situated as legislatively endorsed joint participants in a complex regulatory scheme—each serving its own distinct and essential purpose." *RWE*, 691 S.W.3d at 490. ERCOT is thus "an arm of the State government" that Texas "utilize[s] . . . to achieve its objectives for the Texas power region." *CPS Energy*, 671 S.W.3d at 623, 626 (cleaned up). "There is no evidence that ERCOT performs any functions outside its role" as an arm of the State. *Id.* at 628.

Because ERCOT solely acts on behalf of the State of Texas, and was doing so here in enforcing its rules and complying with Texas law, it is not a "person" for § 1983 purposes, and this Court lacks jurisdiction over GHAE's § 1983 claim against it. *Daves*, 24 F.4th at 533. For the same reason, the Court would lack jurisdiction over any official-capacity § 1983 damages claim against the ERCOT Board Defendants, had one been pleaded. *Green Valley*, 969 F.3d at 475.

**B.    GHAE fails to adequately allege *Monell* liability.**

GHAE asserts a § 1983 equal protection claim directly against ERCOT. An entity like ERCOT can be liable only if the plaintiff proves that the entity's official policy was the "moving force" behind the constitutional violation at issue. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). For two reasons, this reality is not altered by ERCOT's corporate status. First, the Fifth Circuit applies *Monell* even to private entities. *E.g.*, *Martinez v. Nueces County*, 71 F.4th 385, 391 (5th Cir. 2023) (applying *Monell* to a "nationwide corporation"); *accord Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (reaching the same result, and citing cases from the 2nd, 4th, 7th, 8th, and 11th

Circuits). Second, like the political subdivisions to which *Monell* typically applies, Texas considers ERCOT to be an arm of the State. *CPS Energy*, 671 S.W.3d at 626 ("The fact that ERCOT is organized as a membership-based nonprofit corporation does not make it any less an arm of the state."); *cf. Daves*, 22 F.4th at 533 (holding that state law determines a § 1983 defendant's status).

To state a *Monell* claim, GHAE had to "identify: (1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom." *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (cleaned up). In two distinct ways, GHAE fails to adequately plead *Monell* liability.

### 1. GHAE alleges that ERCOT implemented state law, for which it cannot be liable under § 1983.

As the "moving force" behind its alleged injuries, GHAE identifies LSIPA, a Texas statute, and ERCOT's Planning Guide, which, as GHAE alleges, merely incorporates LSIPA's critical infrastructure access restrictions. Compl. ¶ 76. According to GHAE, ERCOT's decision to deny its interconnection request was "based *solely* on LSIPA." *Id.* (emphasis added). GHAE further alleges that ERCOT's application of LSIPA to GHAE's interconnection request followed a formal interpretation of LSIPA by Texas's Attorney General. *Id.* ¶ 50 (alleging that Texas's Attorney General concluded that a Chinese-owned or -controlled company entering into an interconnection agreement would "violate LSIPA" (citing Tex. Att'y Gen. Op. KP-0388, 2021 WL 4447075 (2021)); *see also* PURA § 39.360(b) (requiring ERCOT to enforce LSIPA with respect to would-be Market Participants).

In short, GHAE alleges that ERCOT acted in compliance with mandatory state law, as authoritatively construed by the Attorney General. Such an allegation cannot be the basis for § 1983 liability under *Monell*. In *Society of Separationists, Inc. v. Herman*, for instance, the Fifth Circuit held that a county was not "susceptible to liability under § 1983" where the relevant policymaker had only "effectuated a policy of the State of Texas." 939 F.2d 1207, 1215 n.31 (5th Cir. 1991); *see also Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) (holding that county official's enforcement of a state

law "may more fairly be characterized as the effectuation of the policy of the State of Texas," for which reason the county was "not susceptible to liability under section 1983"). District courts in this Circuit have thus held that imposing *Monell* liability based on the enforcement of state law would be "inconsistent with *Monell*'s requirement that a *municipal policy* be the 'moving force' behind the constitutional violation." *Cain v. City of New Orleans*, No. 15-4479, 2016 WL 2849498, at *8 (E.D. La. May 13, 2016).

As in these cases, GHAE seeks to impose liability on ERCOT for its compliance with a Texas statute. That effort fails, and its § 1983 claims should be dismissed.

## 2.      GHAE fails to identify a final policymaker.

GHAE also failed to plead the existence of a final ERCOT policymaker. While GHAE sued ERCOT's board members, it failed to allege that they—or anyone else—engaged in any conduct with respect to GHAE. And GHAE's allegations that LSIPA was a state law enacted *by the Legislature* demonstrate any attempt to replead would be futile. GHAE therefore fails to state a claim, and its § 1983 claim against ERCOT should be dismissed. *Arnone v. Dallas County*, 29 F.4th 262, 266 (5th Cir. 2022) (affirming dismissal of § 1983 claim where plaintiff failed to identify a proper policymaker). A § 1983 claim against the ERCOT Board Defendants in their official capacities would have to be dismissed for the same reason. *Guillot v. Russell*, 59 F.4th 743, 751 (5th Cir. 2023).

## C.      GHAE's equal-protection claim fails on its merits.

"In areas of social . . . policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). This highly deferential standard is "a paradigm of judicial restraint," as "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313–14. Accordingly, a non-suspect classification, like

LSIPA's, "bear[s] a strong presumption of validity," which GHAE can defeat only by "negat[ing] every conceivable basis which might support" it. *Id.*

Even at the pleading stage, this bar is high. When courts "**apply rational basis at the failure-to-state-a-claim stage, [they] must treat a legislative classification as valid if a court is able to hypothesize a legitimate purpose to support the action.**" *Hines v. Quillivan*, 982 F.3d 266, 273 (5th Cir. 2020) (emphasis added). That hypothetical legitimate purpose may be determined post-hoc, *id.* at 274, as it is "entirely irrelevant for constitutional purposes whether the conceived reasons for the challenged distinction actually motivated the [L]egislature," *Beach Commc'ns*, 508 U.S. at 315. A legitimate purpose is simply one that is not pure fantasy or fiction. *Hines*, 982 F.3d at 273.

Because (1) GHAE is not part of a suspect class; and (2) LSIPA's grid access limitations serve a legitimate purpose, GHAE fails to state a claim under the Equal Protection Clause.

### 1. GHAE is not a member of a protected class.

Hoping to seize on strict scrutiny, GHAE asserts that LSIPA violates the Equal Protection Clause because it prevents "entities owned or controlled by Chinese persons such as GHAE" from connecting to the ERCOT grid, which GHAE contends constitutes unlawful discrimination on the basis of alienage, race, ethnicity, and national origin. Compl. ¶ 75.

GHAE is wrong. To begin, GHAE—a "domestic" Texas company, Compl. ¶ 1—fails to allege that it has any alienage, race, ethnicity, or national origin. For that reason alone, its claims should be reviewed solely for a rational basis. But even if a Texas LLC like GHAE could have those characteristics imputed to it,[25] and even if GHAE had adequately alleged them, GHAE's strict-scrutiny claims would fail.

---

[25] A questionable proposition at best. *See Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*, 591 U.S. 430, 435 (2020) ("*AID*") ("[S]eparately incorporated organizations are separate legal units with distinct legal rights and obligations."); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 263 (1977) ("As a corporation, MHDC has no racial identity . . . .").

LSIPA makes no classification based on race, ethnicity, or national origin. Race relates solely to ethnic or ancestry characteristics. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207–08 (2023). Ethnicity "refers to physical and cultural characteristics that make a social group distinctive." *Jumbo v. Goodwill Indus. Hous.*, No. 4:21-cv-03509, 2023 WL 5417149, at *3 (S.D. Tex. Aug. 7, 2023) (quoting Juan F. Perea, Ethnicity and the Constitution: Beyond the Black and White Binary Constitution, 36 Wm. & Mary L. Rev. 571, 575 (1995)), *report and recommendation adopted*, 2023 WL 5401874 (S.D. Tex. Aug. 22, 2023). And national origin means "the particular country in which one was born." *United States v. Osorto*, 995 F.3d 801, 822 (11th Cir. 2021); *see also Jumbo*, 2023 WL 5417149 at *3 (same). LSIPA is facially neutral as to each. For instance, an American citizen of Chinese ancestry and/or birth could control a company operating resources connected to the ERCOT grid without offending LSIPA or the ERCOT Planning Guide.

That leaves alienage, which refers only to one's status of "not being a citizen of the United States." *Osorto*, 995 F.3d at 822; *see also United States v. Nnanna*, 7 F.3d 420, 422 (5th Cir. 1993) (noting that "'alienage' and 'national origin' are not synonymous."). But the basis for LSIPA's classification is not whether the person is or is not "a citizen of the United States." *Osorto*, 995 F.3d at 822. Rather, LSIPA is facially neutral as to the person's American citizenship. LSIPA prohibits persons who are currently citizens of four adversary nations, including China, from controlling companies that have access to or control of critical infrastructure on the Texas grid. But that prohibition applies regardless of whether or not the person is *also* a United States citizen. LSIPA therefore does not discriminate on the basis of alienage.

Further, to the extent that GHAE's claim is based on the alienage of Mr. Guangxin (the owner of GHAE's parent company, Xinjiang), it would not be actionable. The precise corporate links between Mr. Guangxin and GHAE are unpleaded, but whatever the means of ownership, GHAE must be treated as legally distinct from Xinjiang and, thus, Mr. Guangxin. *AID*, 591 U.S. at 435

("[S]eparately incorporated organizations are separate legal units with distinct legal rights and obligations."); *see also Cibolo*, 718 F.3d at 474 (holding that litigants generally may not assert another person's legal rights). Moreover, both Mr. Guangxin and Xinjiang are located in China, Compl. ¶ 1, and Mr. Guangxin is not alleged to be a United States resident or immigrant. As "foreign citizens outside U.S. territory," Xinjiang and Mr. Guangxin "do not possess rights under the U.S. Constitution," *AID*, 591 U.S. at 434, including the Equal Protection Clause, *De Tenorio v. McGowan*, 510 F.2d 92, 101 (5th Cir. 1975). GHAE therefore cannot assert constitutional claims on behalf of legally distinct entities or persons located outside the United States. *AID*, 591 U.S. at 434–36.

Finally, even if LSIPA discriminated on the basis of alienage, rational-basis review would still apply here for several reasons. First, except for classifications affecting "resident aliens" or "permanent resident aliens," neither of which are implicated here, the U.S. Supreme "Court has never applied strict scrutiny review to a state law affecting any other alienage classifications." *LeClerc v. Webb*, 419 F.3d 405, 416 (5th Cir. 2005). Rational basis is thus "the appropriate standard for evaluating state law classifications affecting nonimmigrant aliens" that have been admitted into and are present in the United States. *LeClerc*, 419 F.3d at 420. Considering that Mr. Guangxin has not been "admitted to the United States," *id.* at 418, even on a temporary basis, any derivate equal-protection rights GHAE might assert would be even more attenuated than those at issue in *LeClerc*. It would make little sense to effectively grant Mr. Guangxin remote access to Texas's intrastate grid by applying a higher standard of review to a company he owns than would be applied to a lawfully admitted, nonimmigrant alien.

What's more, the Supreme Court has applied rational-basis review to, and upheld, state laws restricting non-citizens' access to certain privileges of unique importance to the State. *E.g.*, *Cabell v. Chavez-Salido*, 454 U.S. 432, 444–47 (1982) (upholding state law conditioning employment as a probation officer on citizenship); *Foley v. Connelie*, 435 U.S. 291, 299–399 (1978) (same, for state troopers). As in those cases, Texas may properly restrict aliens—especially non-present, nonresident

aliens who are citizens of a foreign adversary—from gaining access to or control of the State's critical, and uniquely intrastate, electric infrastructure. *See also Terrace v. Thompson*, 263 U.S. 197, 219–22 (1923) (upholding against equal-protection challenge state law restricting alien land ownership, and noting that "farm lands within its borders are matters of highest importance and affect the safety and power of the state itself").

### 2.    LSIPA easily passes rational-basis review.

Because rational-basis review applies, LSIPA's classifications must be treated "as valid if the Court is able to hypothesize a legitimate purpose to support the action." *Hines*, 982 F.3d at 273 (cleaned up). When "conceiving of hypothetical rationales for a law, the assumptions underlying those rationales may be erroneous so long as they are 'arguable.'" *Glaxx v. Paxton*, 900 F.3d 233, 246 (5th Cir. 2018) (affirming Rule 12(b)(6) dismissal of equal-protection claims). "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315.

It is easy to hypothesize a rational basis for limiting who can have direct or remote access or control of the ERCOT grid. As the Fifth Circuit has recognized, "ERCOT's independence makes the Texas electrical grid uniquely vulnerable to sudden power shortages" as—unlike the other Interconnections comprised of a vast network of power generators—ERCOT must almost wholly rely on its own self-contained system. *Texas*, 829 F.3d at 432. Ninety percent of Texans, or more than 27 million people, obtain their electricity from Texas's self-contained grid.[26] Were the ERCOT grid compromised, that ninety percent of Texans could be without power for weeks or even months. *See PUCT v. Luminant Energy Co.*, 691 S.W.3d 448, 455 (Tex. 2024) (recognizing that, during Winter Storm Uri, "Texas was fewer than five minutes away from a total grid collapse that would have plunged the

---

[26]    *See*   ERCOT   Fact   Sheet   (August   2024),   *available   at* https://www.ercot.com/files/docs/2022/02/08/ERCOT_Fact_Sheet.pdf.

state into darkness for weeks, maybe months"). Just three years ago, this State saw firsthand the impact a few-day loss of power had on millions of Texans' lives, when nearly half of ERCOT's generation fleet unexpectedly tripped offline due to Winter Storm Uri's historic freezing temperatures.

Given the millions of lives and livelihoods on the line, the Texas Legislature and ERCOT must be able to take action to ensure the reliability of the ERCOT grid. And, indeed, LSIPA was passed in furtherance of that very goal. LSIPA aims to ensure that companies owned or controlled by persons from certain countries that have demonstrated "human rights abuses, intellectual property theft, previous critical infrastructure attacks, and . . . other hostile actions performed against the State of Texas and the United States" cannot directly access Texas's critical infrastructure. *See* **Ex. A**.

Above all—and as GHAE acknowledges, Compl. ¶ 49—in enacting LSIPA, the Legislature was chiefly concerned about the integrity of the ERCOT grid; thus, it prohibited certain companies that it believed posed a security risk from gaining access to or control of the grid and Critical Energy Infrastructure Information. Whether this belief was right, fair, or wise is for neither GHAE nor this Court to second-guess. *Hines*, 982 F.3d at 273 ("Rational-basis review is guided by the principle that we do not have a license to judge the wisdom, fairness, or logic of legislative choices." (cleaned up)); *see also Texas*, 829 F.3d at 433 (acknowledging the "exceptional complexity of grid reliability concerns in Texas."). The only question is whether that rationale—or any other conceivable rationale—is "arguable," *Paxton*, 900 F.3d at 246, and not just a "matter of fiction." *Hines*, 982 F.3d at 273. Because LSIPA rationally restricts who may access the ERCOT grid, and GHAE has made no attempt to negate Texas's security risk concerns nor "every [other] conceivable basis which might support" LSIPA, *Beach Commc'ns*, 508 U.S. at 314–15, GHAE's equal protection claims must be dismissed.

## VI.    ERCOT has sovereign immunity from suit.[27]

ERCOT acknowledges the Fifth Circuit's recent determination that ERCOT is not an arm of the State for Eleventh Amendment purposes. *In re Entrust Energy, Inc.*, 101 F.4th at 387. Nevertheless, ERCOT contends that conclusion was erroneous. *Entrust* gave too much weight to the funding factor and insufficient weight to Texas's dignitary interests, which the Supreme Court has more recently called the "*preeminent* purpose of state sovereign immunity." *Fed. Mar. Comm'n v. State Ports Auth.*, 535 U.S. 743, 760 (2002) (emphasis added); *see Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1030 (9th Cir. 2023) (holding that "the Eleventh Amendment does not require a focus solely on the financial impact of the entity on the state because the Eleventh Amendment is equally concerned with the dignity interests of the state" (cleaned up)). Further, *Entrust*'s conclusions that the State does not fund ERCOT (*Clark* factor 2) and does not control ERCOT's property (*Clark* factor 6) were erroneous. 101 F.4th at 384–87 (citing *Clark v. Tarrant County*, 798 F.2d 736 (5th Cir. 1986)). The holdings misapprehended, and failed to duly defer to the Texas Supreme Court's binding construction of, ERCOT's statutory regime. *See, e.g.*, *CPS Energy*, 671 S.W.3d at 627 (holding that ERCOT's assets belong to the State and "the judgment [debtor]" for a money judgment against ERCOT "would be the state"); *id.* at 624, 627.

### PRAYER

For the reasons set forth above, ERCOT and the ERCOT Board Defendants respectfully request that the Court grant their Motion to Dismiss and dismiss all of GHAE's claims.

---

[27] The Eleventh Amendment's text protects a State from suit in federal court by non-citizens of that State, while the State is protected from other suits by a broader structural immunity. *See PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 509 (2021) (Gorsuch, J., dissenting); *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 495 n.2 (5th Cir. 2020) (en banc) (Oldham, J., concurring). Because GHAE's citizenship is unclear, *see* Compl. ¶ 1; *Settlement Funding, LLC v. Rapid Settlements, Ltd.*, 851 F.3d 530, 536 (5th Cir. 2017), it is uncertain which of these doctrines applies. ERCOT thus uses "Eleventh Amendment immunity" and "sovereign immunity" interchangeably. *See Meyers v. Texas*, 410 F.3d 236, 240–41 (5th Cir. 2005).

Respectfully submitted,

**WINSTEAD PC**

*/s/ Elliot Clark*
Elliot Clark
State Bar No. 24012428
eclark@winstead.com
D. Blake Wilson
State Bar No. 24090711
bwilson@winstead.com
Elin Isenhower
State Bar No. 24104206
eisenhower@winstead.com
600 W. 5th, Suite 900
Austin, Texas 78701
Telephone: (512) 370-2800
Facsimile: (512) 370-2850

**ATTORNEYS FOR ERCOT, PAUL FOSTER, BILL FLORES, CARLOS AGUILAR, LINDA CAPUANO, JULIE ENGLAND, ROBERT FLEXON, PEGGY HEEG, JOHN SWAINSON, AND PABLO VEGAS**

**AKERMAN LLP**

*/s/ Scott D. Marrs*
Scott D. Marrs
State Bar No. 13013400
scott.marrs@akerman.com
Wm. Bruce Stanfill
State Bar No. 19034350
bruce.stanfill@akerman.com
John K. Linker
Texas State Bar No. 00785313
john.linker@akerman.com
1300 Post Oak Boulevard, Suite 2300
Houston, Texas 77056
Tel: (713) 623-0887
Fax: 713-960-1527

Rola Daaboul
Texas Bar No. 24068473
rola.daaboul@akerman.com
500 West 5th Street, Suite 1210
Austin, Texas 78701
Tel: 737-999-7100
Fax: 512-623-6701

**ATTORNEYS FOR THOMAS GLEESON, LORI COBOS, AND COURTNEY HJALTMAN**

**ALEXANDER DUBOSE & JEFFERSON LLP**

*/s/ Wallace B. Jefferson*
Wallace B. Jefferson
State Bar No. 00000019
wjefferson@adjtlaw.com
Rachel A. Ekery
State Bar No. 00787424
rekery@adjtlaw.com
100 Congress Avenue, Suite 1450
Austin, Texas 78701-2709
Telephone: (512) 482-9300
Facsimile:  (512) 482-9303

**ATTORNEYS FOR ERCOT**

**COOPER & KIRK PLLC**

*/s/ David. H. Thompson*
David H. Thompson *(pro hac vice pending)*
D.C. Bar No. 450503
John D. Ramer *(pro hac vice pending)*
D. C. Bar No. 90002236
1523 New Hampshire Ave., N.W.
Washington D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
jramer@cooperkirk.com

**ATTORNEYS FOR ERCOT**

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2024, the foregoing document was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will send notification of such filing to all counsel of record..

*/s/ Elliot Clark*
Elliot Clark