UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2024 AUG 26  PM 4: 39

CLERK, US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____ CL _____

|  |  |  |
|---|---|---|
| GH AMERICA ENERGY LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:24-CV-00648 |
| | ) | |
| DOUGLAS FOHN, in his official capacity as | ) | |
| Assistant General Counsel of the Electric | ) | |
| Reliability Council of Texas, Inc. ("ERCOT"); | ) | |
| HOLLY HEINRICH, in her official capacity as | ) | |
| Legal/Regulatory Counsel of ERCOT; PABLO | ) | **AMENDED COMPLAINT** |
| VEGAS, in his official capacity as | ) | |
| Chief Executive Officer of ERCOT;  PAUL | ) | |
| FOSTER, in his official capacity as a member of | ) | |
| the Board of Directors of ERCOT; BILL FLORES, | ) | |
| in his official capacity as a member of the Board | ) | |
| of Directors of ERCOT; CARLOS AGUILAR, in | ) | |
| his official capacity as a member of the Board of | ) | |
| Directors of ERCOT; LINDA CAPUANO, in her | ) | |
| official capacity as a member of the Board of | ) | |
| Directors of ERCOT; JULIE ENGLAND, in her | ) | |
| official capacity as a member of the Board of | ) | |
| Directors of ERCOT; ROBERT FLEXON, in his | ) | |
| official capacity as a member of the Board of | ) | |
| Directors of ERCOT; PEGGY HEEG, in her | ) | |
| official capacity as a member of the Board of | ) | |
| Directors of ERCOT; and JOHN SWAINSON, | ) | |
| in his official capacity as a member of the Board | ) | |
| of Directors of ERCOT | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ATTORNEY GENERAL KEN PAXTON, | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |
| | ) | |

1

**AMENDED COMPLAINT**

GH America Energy, LLC ("GHAE") alleges as follows based upon its knowledge with respect to allegations involving it and upon information and reasonable belief with respect to allegations involving others:

**Parties**

1.      Plaintiff GHAE is a domestic limited liability company and renewable energy project developer registered and operating in the State of Texas and located at 2800 Post Oak Boulevard, Suite 5115, Houston, Texas 77056. GHAE is a U.S. subsidiary of Xinjiang Guanghui Industry Investment (Group) Company, Ltd. ("Xinjiang"), located in the People's Republic of China and majority owned by Sun Guangxin, a citizen of the People's Republic of China.

2.      Defendant Douglas Fohn is sued in his official capacity as Assistant General Counsel of the Electric Reliability Council of Texas, Inc. ("ERCOT"); defendant Holly Heinrich is sued in her official capacity as Legal/Regulatory Counsel at ERCOT; and Pablo Vegas is sued in his official capacity as the Chief Executive Officer of ERCOT.

3.      Defendants Paul Foster, Bill Flores, Carlos Aguilar, Linda Capuano, Julie England, Robert Flexon, Peggy Heeg, and John Swainson are sued in their official capacities as members of the Board of Directors of ERCOT, which selects ERCOT's chief executive officer, sets ERCOT's goals, and guides ERCOT's direction.

**Jurisdiction and Venue**

4.      This Court has subject matter jurisdiction because GHAE's claims arise under the U.S. Constitution and they are properly before this Court pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 1983.

5.      There are no administrative remedies for GHAE to exhaust because the Public Utilities Commission, which oversees ERCOT's activities, has no jurisdiction to review constitutional claims.

6.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1) because defendants perform their official duties in this District and all are residents of Texas. Venue in this district is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to GHAE's claims occurred here.

<u>**CFIUS**</u>

7.      The Committee on Foreign Investment in the United States ("CFIUS") was established by Executive Order 11858(b), issued by President Ford on May 7, 1975. 40 Fed. Reg. 20263 (1975). This Executive Order directed that CFIUS would have "the primary continuing responsibility within the executive branch for monitoring the impact of foreign investment in the United States, both direct and portfolio, and for coordinating the implementation of United States policy on such investment." *Id.*

8.      The Secretary of the Treasury chairs CFIUS, which also includes representatives from the Departments of Justice, Homeland Security, Commerce, Defense, State, and Energy, as well as the Office of the U.S. Trade Representative and the Office of Science and Technology Policy. The Director of National Intelligence and the Secretary of Labor serve as *ex officio* non-voting members of CFIUS.

9.      On August 23, 1988, Congress added section 721 to the Defense Production Act of 1950, commonly known as the Exon-Florio provision, as part of the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, Title V, section 5021, 102 Stat. 1107. The Exon-Florio provision granted the President authority to block proposed or pending foreign

mergers, acquisitions, or takeovers of persons engaged in interstate commerce in the United States that threatened to impair the national security.

10.     By Executive Order 12661, issued by President Reagan on December 27, 1988, President Reagan delegated to CFIUS his authority to administer the Exon-Florio provision.  54 Fed. Reg. 779.

11.     In 1990, President Bush, exercising his authority under the Exon-Florio provision, directed the China National Aero-Technology Import and Export Corporation ("CATIC") to divest its acquisition of MAMCO Manufacturing, a Seattle-based firm producing metal parts and assemblies for aircraft.  The reason for this direction was concern that CATIC might gain access to technology through MAMCO that it otherwise could obtain only under an export license.

12.     In 1991, the Treasury Department issued final regulations to implement the Exon-Florio provision.  31 C.F.R. Part 800.  Those regulations created an essentially voluntary system of notification by the parties to an acquisition.  However, firms largely complied, because the regulations stipulated that foreign acquisitions subject to the Exon-Florio review process that did not notify CFIUS would remain subject indefinitely to possible divestment or other appropriate actions by the President.

13.     Congress amended the Exon-Florio provision with the "Byrd Amendment" to the National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, section 837, 106 Stat. 2315, 2463-2485.  The Byrd Amendment expanded CFIUS' duties to investigate certain foreign investments, particularly those in which the acquirer was controlled or acting on behalf of a foreign government, and those in which the acquisition would result in the control of a person engaged in interstate commerce in the United States that could affect national security.

14.     Subsequently, Congress passed and President Bush signed the Foreign Investment

and National Security Act of 2007, Pub. L. No. 110-49, 121 Stat. 246, giving Congress further oversight over CFIUS. This statute also expanded the national security prerogatives subject to CFIUS review and required CFIUS to engage in even greater scrutiny of foreign direct investments. It also solidified CFIUS' position as a permanent federal agency by codifying it and granting it statutory authority, including the authority to certify to Congress that a transaction that had been reviewed had no unresolved national security issues and providing Congress with confidential briefings and annual reports.

15.     On November 8, 2017, Senator John Cornyn of Texas introduced a bipartisan bill that was eventually enacted by Congress as the Foreign Investment Risk Review Modernization Act of 2018 ("FIRMMA"). FIRMMA was signed by President Trump on August 13, 2018, as Title XVII, section 1701 *et seq.* of the John S. McCain Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, 132 Stat. 1636, codified at 50 U.S.C. § 4565 note.

16.     FIRMMA further broadened the scope of transactions subject to CFIUS review and modernized the review process. Section 1703 of FIRMMA defined a "covered transaction" to include, subject to regulation, *inter alia* "the purchase or lease by, or a concession to, a foreign person of private or public real estate that … is located in the United States … in close proximity to a United States military installation or another facility or property of the United States Government that is sensitive for reasons relating to national security;" an "investment … by a foreign person in any unaffiliated United States business that … owns, operates, manufactures, supplies, or services critical infrastructure;" and an investment that affords a foreign person access to information that "provides knowledge, know-how, or understanding, not available in the public domain, of the design, location, or operation of critical infrastructure."

17.     The term "critical infrastructure" is defined in the Critical Infrastructure Protection

Act, 42 U.S.C. § 5195c(e), to mean: "systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters." The Cybersecurity Infrastructure Security Agency ("CISA") of the Department of Homeland Security "assesses and analyze[s] threats to, vulnerabilities of, and consequences to critical infrastructure," which includes the "Energy Sector" and the "Electricity Subsector."

18.     In remarks at a White House roundtable discussion of FIRMMA on August 23, 2018, Senator Cornyn said: "Mr. President, under your administration, we're finally taking the big steps to address the national security threat posed by China, which has grown dramatically, as others have already said. And I believe that China represents the foremost national security and economic challenge to our country of any other county in the world in the long term."

19.     Congress legislated in section 1702(c)(1) of FIRMMA that it was "the sense of Congress" that, in reviewing covered transactions, CFIUS may consider "whether a covered transaction involves a country of special concern that has a demonstrated or declared strategic goal of acquiring a type of critical technology or critical infrastructure that would affect United States leadership in areas related to national security."

20.     Notwithstanding FIRMMA's expansion of CFIUS' role, Congress stipulated in section 1702(b)(1)-(3) of FIRMMA that it was "the sense of Congress" that "foreign investment provided substantial economic benefits to the United States, including the promotion of economic growth, productivity, competitiveness, and job creation, thereby enhancing national security;" that "maintaining the commitment of the United States to an open investment policy encourages other countries to reciprocate and helps open new foreign markets for United States businesses;" and

that "it should continue to be the policy of the United States to enthusiastically welcome and support foreign investment, consistent with the protection of national security."

21.     Congress also stipulated in section 1702(b)(6)-(7) of FIRMMA that "the President should conduct a more robust international outreach effort to urge and help allies and partners of the United States to establish processes that are similar to [CFIUS] in the United States to screen foreign investments for national security risks and to facilitate coordination."

22.     Under the revised CFIUS regulations issued by the Treasury Department after the enactment of FIRMMA, CFIUS uses a multi-step process for screening covered transactions. Parties to a proposed transaction typically consult CFIUS informally before making a formal filing. The formal process begins with the filing of either a short-form declaration or a formal written notice. The filing of a formal notice triggers a 45-day review period during which CFIUS conducts a risk assessment and determines whether a statutory-based concern is implicated. If risks are identified and need to be resolved, CFIUS initiates an investigation which must be completed within 45 days, with a possible 15-day extension.

23.     CFIUS may negotiate with the transaction parties and require agreements to mitigate identified risks. CFIUS can also require the establishment of a Corporate Security Committee and other mechanisms to ensure compliance with all required actions, including the appointment of a U.S. Government-approved security officer and requirements for security policies, annual reports, and independent audits. Transaction parties facing unpalatable mitigation measures or possible adverse presidential action often abandon their planned investments and withdraw notices filed with CFIUS to avoid such outcomes.

24.     On September 15, 2022, President Biden issued Executive Order 14083, 87 Fed. Reg. 57369, ensuring robust consideration of evolving national security risks by CFIUS. The

President reiterated that the "United States commitment to open investment is a cornerstone of our economic policy and provides the United States with substantial economic benefits." However, "[s]ome investments in the United States by foreign persons … present risks to the national security of the United States." The President specifically endorsed Congress' direction that CFIUS may consider "'the cumulative control of, or pattern of recent transactions involving, any one type of critical infrastructure, energy asset, critical material, or critical technology by a foreign government or foreign person.'"

25.     According to CFIUS' most recent annual report issued in July 2023, for the period 2018-2021 there were 1,205 formal notices filed, 655 investigations, and 281 (23%) notice withdrawals, as well as three presidential decisions.

26.     In addition to the CFIUS regime, the U.S. Department of the Treasury, through the Office of Foreign Assets Control ("OFAC"), administers and enforces economic and trade sanctions in support of U.S. national security and foreign policy objectives, including those authorized by Congress and the President under the International Emergency Economic Powers Act of 1977, Pub. L. No. 95-223, sections 201-208, 91 Stat. 1625, 1626-1629. One of OFAC's primary duties is to prevent designated "prohibited transactions." OFAC administers and enforces economic sanctions programs against countries, businesses, and groups of individuals, using the blocking of assets and trade restrictions to accomplish foreign policy and national security goals.

## The Facts

27.     On December 3, 2015, Xinjiang (on behalf of itself and U.S. affiliates) and GH America Investments Group, Inc., ("GH America"), an oil and gas business unit affiliated with Xinjiang (on behalf of itself and U.S. affiliates), gave notice to CFIUS regarding a proposed transaction by which the Xinjiang and GH America, through a subsidiary, would acquire assets of

several U.S. companies. The notice was designated CFIUS Case 15-138.

28.     CFIUS assigned Case 15-138 to the United States Department of Defense ("DoD") as the CFIUS Monitoring Agency.

29.     After reviewing the notice, CFIUS determined that the transaction contemplated by CFIUS Case 15-138 presented a national security risk.

30.     CFIUS informed Xinjiang and GH America that, pursuant to the Exion-Florio provision in the Defense Production Act of 1950, CFIUS would conclude action on the transaction only if they entered into an agreement with DoD to mitigate the national security risks.

31.     On February 29, 2016, Xinjiang and GH America submitted a "Letter of Assurance" ("LOA") to DoD to mitigate the national security risks presented by their proposed transaction. Under the LOA, Xinjiang and GH America agreed to provide DoD with at least 15 days' notice before acquiring any interest in, or executing an agreement with respect to the operation of, an oil or gas well located in the United States, or real property located within the United States for the purpose of oil or gas development. DoD was accorded 15 days after receiving notice of such an asset purchase to provide a written objection, non-objection, or conditional non-objection to the proposed asset purchase. In the event of an objection by DoD or the failure of Xinjiang and GH America to comply with the conditions in a conditional non-objection, Xinjiang and GH America were prohibited from consummating the asset purchase. If DoD provided a written non-objection or did not respond within 15 days, the proposed asset purchase would be deemed approved.

32.     The LOA also required Xinjiang and GH America to appoint a permanent Security Officer acceptable to DoD, who would at all times be responsible for overseeing and reporting on their implementation and compliance with the LOA, and would be authorized to communicate

directly and confidentially with DoD.

33.     From 2016 through 2018, the Xinjiang and GH America, through their land-owning subsidiaries Brazos Highland Properties, LLP ("BHP") and Harvest Texas, LLC ("HT"), acquired approximately 131,290 acres of land in Val Verde County, Texas.

34.     In December 2018, the Xinjiang and GH America formed GHAE as their renewable energy project development business, and GHAE was registered with the Office of the Texas Secretary of State.

35.     In 2019, GHAE began investing in wind and solar resource, geotechnical, electrical, and grid-connection consulting studies to determine the project development budgets for the construction of wind, solar, battery storage, and electrical transmission interconnection projects on BHP and HT lands.  These investments by GHAE were undertaken because of ERCOT's Grid Interconnection Approval for the Akuo Rocksprings Wind Farm on a parcel of HT's land referred to as "South Rodeo Ranch."

36.     The Xinjiang, GH America and GHAE informed the Military Aviation and Installation Assurance Siting Clearinghouse branch of DoD that it was entering the wind and solar renewable energy markets through GHAE, BHP and HT.  GHAE officially filed a project notification with the Military Aviation and Installation Assurance Siting Clearinghouse regarding the planned Blue Hills Wind Project on recently acquired 15,000 acres of the "Carma Ranch" in Val Verde County, Texas.

37.     The Military Aviation and Installation Assurance Siting Clearinghouse objected to the original planned proposal because the proposed developments were located approximately 70 miles from the Laughlin Air Force Base in Val Verde County.

38.     After GHAE and the Department of the Air Force, through Laughlin Air Force

Base, conducted an extensive mitigation review, and after multiple meetings and several project scope changes, the parties agreed that, to protect the U.S. national security, all GH America, GHAE, BHP, and HT business pursuits and lands would be included in an amendment to the 2016 LOA. Specifically, DoD, in its capacity as the CFIUS Monitoring Agency, and Xinjiang and GHA, agreed that the expansion into the wind, solar, and other renewable energy project markets by GHAE, BHP, and HT warranted an amendment to the scope of the 2016 LOA that would include wind energy and other renewable energy projects, as well as the relevant land holdings.

39. Accordingly, DoD, the Xinjiang, GH America, GHAE, and BHP executed a First Amendment to the LOA on December 22-23, 2020. The First Amendment reiterated the mitigation provisions in the LOA but made them applicable to the wind and other renewable energy projects in which the Xinjiang, GH America, GHAE, and BHP planned to engage and to their land holding transactions in Val Verde County, Texas. Specifically, the First Amendment reiterated the requirement in the LOA that Xinjiang, GH America, GHAE, and BHP give at least 15 days' advance notice to DoD before acquiring any interest in, or executing any agreement with respect to the operation of, any oil, gas, wind, or other renewable energy project, any real property for the purpose of oil, gas, wind, and other renewable energy development, or any rights to oil, gas, wind, and other renewable energy, except for the interests exempted in the LOA or listed in an exhibit to the First Amendment. The First Amendment also provided that, if DoD provided a written non-objection or did not respond within 15 days to Xinjiang's, GH America's, GHAE's, or BHP's notice, the proposed asset purchase would be deemed approved

40. The First Amendment added a new provision, by which Xinjiang, GH America, GHAE, and BHP acknowledged that the establishment and the operation of wind and other renewable energy sources near military installations might have a potential impact on U.S. national

security interests, and that DoD retained the right to deny any proposed construction by a developer under the control of Xinjiang, GH America or GHAE on any BHP or HT land they acquired if there was a confirmed national security concern with respect to such construction that could not be successfully mitigated.  The First Amendment did not preclude the separate and standalone requirement that any proposed project must be submitted for project approval or denial to DoD, acting through the Military Aviation and Installation Assurance Siting Clearinghouse and the Department of the Air Force, acting through the Deputy Assistant Secretary of the Air Force for Installations.

41.     With the approval of federal government stakeholders to the First Amendment, GHAE began capital investment in the development of the 276-Megawatt Blue Hills Wind Farm on BHP's parcel of land known as "Carma Ranch" in June 2021.  This investment included the hiring of two project developers for technical and business development.  GHAE also made an upfront payment for an ERCOT Screening Study Application, which produced a report used during land and project due diligence.  These efforts resulted in the award of a Power Purchasing Agreement for the anticipated Blue Hills Wind Project's wind power production in early 2022. The prospect of continuing to develop the Blue Hills Wind Project was highly lucrative and would have resulted in many millions of dollars of revenue over time.

42.     The next project development step was the final approval of the Carma Ranch Blue Hills Wind Turbine siting by DoD and the Department of the Air Force in 2022. In that final approval, every one of the project's 51 turbine sitings achieved its own approval for placement on BHP's Carma Ranch.  GHAE then applied and paid upfront for the next required step in the interconnection process, the ERCOT Full Interconnection Study for the Blue Hills Wind Project.

43.     To date, DoD and the Department of the Air Force have not objected to any

proposed asset purchase, transaction, or construction project by Xinjiang, GH America, GHAE, BHP, or HT.

## LSIPA

44.     On June 7, 2021, Governor Abbott of Texas signed the Lone Star Infrastructure Protection Act, codified at V.T.C.A. Bus. & Co. § 117.01 *et. seq.*, and V.T.C.A. Gov't Code § 2275.0101 *et. seq.* ("LSIPA").

45.     LSIPA prohibits any business or governmental entity from entering "into an agreement relating to critical infrastructure in this state with a company … if, under the agreement, the company would be granted direct or remote access to or control of critical infrastructure in this state, excluding access specifically allowed by the business [or governmental] entity for product warranty and support purposes, and … if the business [or governmental] entity knows that the company is … owned by or the majority of stock or other ownership interest of the company is held or controlled by …individuals who are citizens of China, Iran, North Korea, Russia, or a designated country, or … a company or other entity, including a governmental entity, that is owned or controlled by citizens of or is directly controlled by the government of China, Iran, North Korea, Russia, or a designated country, or … headquartered in China, Iran, North Korea, Russia, or a designated country."

46.     LSIPA defines "critical infrastructure" to mean "a communication infrastructure system, cybersecurity system, electric grid, hazardous waste treatment system, or water treatment facility."

47.     The sponsor of LSIPA in the Texas Senate was State Senator Donna Campbell, who introduced Texas Senate Bill 2116 that was eventually enacted as LSIPA.  At a closed hearing on this bill, Senator Campbell and a witness, former Congressman Will Hurd, testified that

enactment of LSIPA was necessary to deal with GHAE's proposed Blue Hills Wind Project in Val Verde County, Texas, which they noted was approximately 70 miles from Laughlin Air Force Base. Without the presence of representatives of GHAE, CFIUS, DoD, or the Department of the Air Force, Senator Campbell and former Congressman Hurd testified that the project would give GHAE access to the Texas electric grid, and that, because GHAE and BHP are owned by a prominent Chinese citizen, the GHAE wind-power generation project posed a national security risk.

48.     In response to an inquiry from Senator Campbell, Texas Attorney General Ken Paxton issued Opinion No. KP-0388 on September 23, 2021, concluding that an agreement by which a Chinese owned or controlled company that generates electric energy connects to the transmission system of the Texas electric grid would constitute an "agreement relating to critical infrastructure" and violate LSIPA.

### Defendants Apply LSIPA to GHAE's Projects

49.     Pursuant to ERCOT Planning Guide, section 5, an "Interconnecting Entity" that wants to interconnect with the Texas electric grid must submit a completed interconnection request to ERCOT. This request is designed to facilitate studies and provide relevant information to ERCOT.

50.     At the time LSIPA was signed into law in June 2021, GHAE had three separate interconnection requests pending with ERCOT: Generation Resource Project Blue Star Solar 24INR0146, Generation Resource Project Blue Star Wind 20INR0271 (which was the interconnection request for the Blue Hills Wind Project), and Generation Resource Project Blue Valley Solar 23INR0352.

51.     On December 6, 2021, defendant Douglas Fohn, in his official capacity as Assistant

General Counsel of ERCOT, sent on behalf of ERCOT a "request for information" ("RFI") to all "interconnecting entities" ("IEs") that had proposed generation resources projects for access to the Texas electric grid pending in ERCOT's interconnection process. One of the IEs that received this RFI from ERCOT was GHAE. The RFI asked GHAE to execute an attestation form regarding compliance with LSIPA as to its three interconnection requests. The RFI stated that if an IE does not come into compliance with LSIPA, "the IE's project will be cancelled."

52.     On January 12, 2022, GHAE responded to ERCOT's RFI, stating that Xinjiang had a majority ownership interest in GHAE and that, as Xinjiang, GH America and GHAE had informed CFIUS, DoD, and the Department of the Air Force, Xinjiang was located in China.

53.     GHAE's three interconnection requests satisfied all legal and regulatory criteria for the grant of those requests by ERCOT except for compliance with LSIPA.

54.     Defendant Douglas Fohn, in his official capacity as Assistant General Counsel of ERCOT, notified GHAE in February 24, 2022, of the "potential cancellation" by ERCOT of GHAE's interconnection requests because of GHAE's noncompliance with LSIPA.

55.     Due to ERCOT's threatened cancellation of the Blue Hills Wind Project (i.e., Generation Resource Project Blue Star Wind 20INR0271) and Blue Valley Solar Project (i.e., Generation Resource Project Blue Valley Solar 23INR0352), GHAE was compelled to sell those projects at a substantial loss.

56.     On October 3, 2022, defendant Douglas Fohn, in his official capacity as Assistant General Counsel of ERCOT, notified GHAE that "ERCOT is hereby providing notice of cancellation for the following proposed Generation Resource project: INR Number 24INR0146." The sole basis for the cancellation was that GHAE did not comply with LSIPA.

57.     ERCOT's cancellation of GHAE's Generation Resource Project Blue Star Solar

24NR0146 interconnection request was authorized and approved by defendant Pablo Vegas, in his official capacity as Chief Executive Officer of ERCOT, and by defendants Paul Foster, Bill Flores, Carlos Aguilar, Linda Capuano, Julie England, Robert Flexon, Peggy Heeg, and John Swainson in their official capacities as members of the Board of Directors of ERCOT.

58.     On April 26, 2024, GHAE asked ERCOT whether it could pursue a screening study for the Blue Star Solar project again.  ERCOT had been allowing interconnection requests made by a third party leasing BHP properties and had provided the third party with ERCOT screening study reports.  Because of this allowance, GHAE wanted to establish that the HT land for the Blue Star Solar project was interconnectable and saleable to potential customers who would be in compliance with the citizenship requirements of LSIPA.  GHAE expressly requested upfront confirmation from ERCOT as to whether ERCOT would approve such a screening study application for the HT property.

59.     GHAE's request that ERCOT approve its screening study application for the HT property satisfied all legal and regulatory criteria for the ministerial approval of that request by ERCOT except for compliance with LSIPA

60.     On May 2, 2024, defendant Holly Heinrich, in her official capacity as Legal/Regulatory Counsel of ERCOT, responded that ERCOT would not permit GHAE to pursue a screening study for the Blue Star Solar project solely because GHAE did not comply with LSIPA.

61.     In rejecting GHAE's request, ERCOT relied on the provisions of LSIPA incorporated in Sections 5.2.2(2)-(3) of ERCOT's Planning Guide.  Section 5.2.2(2) states:

> As Entity is not eligible to initiate or maintain a GIM (Generator Interconnection or Modification) if the Entity or any other owner of the project meets any of the company ownership (including affiliations) or headquarters criteria listed in Texas Business and Commerce Code, Sections 113.002(a)(2)(A)-(b)(2)(B) or 2274.0102(a)(2)(A)-(b)(2)(B), added by Act of June 18, 2021, 87th Leg., R.S., Ch. 975 (S.B. 2116).  Any

Entity that seeks to initiate a GIM shall submit an Attestation Section 8, Attachment D, Attestation Regarding Compliance with the Lone Star Infrastructure Protection Act, confirming that Entity does not meet any of the company ownership (including affiliations) or headquarters criteria listed in Texas Business and Commerce Code, Sections 113.002(a)(2)(A)(b)(2)(B) or 2274.0102(a)(2)(A)-(b)(2)(B).

Section 5.2.2(3) states:

An Entity is not eligible to initiate or maintain a GIM if the real property to be utilized by or for the project is owned or controlled, in whole or in part, by an Entity that meets any of the company ownership (including affiliations) or headquarters criteria listed in Texas Business and Commerce Code, Sections 113.002(a)(2)(A)-(b)(2)(B) or 2274.0102(a)(2)(A)-(b)(2)(B), added by Act of June 18, 2021, 87th Leg., R.S., Ch. 975 (S.B. 2116). The Interconnecting Entity (IE) must provide an attestation Section 8, Attachment D, confirming that such prohibited ownership or control does not apply to the real property.

62.     ERCOT's denial of GHAE's request for approval of its application to conduct a screening study for the HT property was authorized and approved by defendant Pablo Vegas, in his official capacity as Chief Executive Officer of ERCOT, and by defendants Paul Foster, Bill Flores, Carlos Aguilar, Linda Capuano, Julie England, Robert Flexon, Peggy Heeg, and John Swainson in their official capacities as members of the Board of Directors of ERCOT.

## FIRST CAUSE OF ACTION
### (*Ex Parte Young*, 209 U.S. 123 (1908))

64.     The allegations in paragraphs 1 through 62 are incorporated by this reference and realleged in this paragraph.

65.     The Supremacy Clause in Article VI, Paragraph 2 of the U.S. Constitution provides that "the Laws of the United States which shall be made in Pursuance thereof … shall be the Supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

66.     The Supremacy Clause establishes the doctrine of federal preemption, which

mandates that federal law preempts state law in any area or field over which Congress has expressly or impliedly reserved exclusive authority, or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with, or creates an obstacle to the achievement of, federal law or objectives.

67.     Under *Ex Parte Young*, 209 U.S. 123 (1908), GHAE has a right of action to obtain prospective equitable relief to enjoin defendants from enforcing a Texas statute that is preempted by federal law under the Supremacy Clause.

68.     Foreign relations, the power to deal with national security threats posed by foreign investments that affect critical infrastructure and military installations, and the power to regulate foreign commerce, are the domain of the federal government.   The federal government, through such instrumentalities as CFIUS and OFAC, has long occupied the fields of foreign affairs, foreign investment, and national security, as well as foreign relations with the People's Republic of China.

69.     CFIUS has a long history of reviewing and recommending the blocking of foreign investments and real estate transactions that raise national security concerns, including transactions related to critical infrastructure or in close proximity to military installations and other U.S. government facilities or properties of national security sensitivity.   OFAC is responsible for administering and enforcing economic regulations.

70.     CFIUS has carefully reviewed and not objected to asset purchases, land holdings transactions, and wind and renewable energy projects by GHAE and its affiliates, including transactions and projects in Val Verde County, Texas, in close proximity to a military installation, and CFIUS' Monitoring Agency, the U.S. Department of Defense, has entered into agreements with GHAE and its affiliates to mitigate national security risks presented by those transactions and projects.

71.     LSIPA is preempted under the Supremacy Clause by this federal regime because it purports to regulate foreign investments related to critical infrastructure that is an area comprehensively occupied by the President, CFIUS, and OFAC, and because it interferes with and creates an obstacle to the achievement of federal law or objectives in this area.

72.     GHAE is entitled to a preliminary and permanent injunction, enjoining defendants from applying and enforcing LSIPA to it, such as by denying GHAE's Generation Resource Project Blue Star Solar 24 NR0146 interconnection request, by denying GHAE's application to pursue a screening study for the HT property, or by denying any other interconnection request that GHAE would immediately submit to ERCOT were it not for LSIPA.

73.     GHAE is entitled to a judicial declaration under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), that LSIPA is preempted by federal law and that defendants may not authorize ERCOT to deny GHAE's Generation Project Blue Star Solar 24NR0146 interconnection request, deny GHAE's application to pursue a screening study for the HT property, or deny any other interconnection request that GHAE would immediately submit to ERCOT were it not for LSIPA.

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983)

74.     The allegations in paragraphs 1 through 62 are incorporated by this reference and realleged in this paragraph.

75.     Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subject, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

76.     The allegations in paragraphs 65-66 and 68-71 regarding the preemption of LSIPA under the Supremacy Clause are incorporated by this reference and realleged in this paragraph.

77.     The Equal Protection Clause of the 14th Amendment to the U.S. Constitution provides that "No State shall … deny to any person within its jurisdiction the equal protection of the laws."

78.     The Equal Protection Clause prohibits the states from denying any person equal protection of the laws based on the person's race, ethnicity, color, alienage, or national origin. This includes laws that are motivated by discriminatory intent and result in discriminatory practices or disparate treatment due to race, ethnicity, color, alienage, or national origin.

79.     LSIPA violates the Equal Protection Clause because it was enacted with the direct purpose and intent to discriminate against persons based on race, ethnicity, alienage, and national origin, and in particular entities owned or controlled by Chinese persons such as GHAE; because it makes impermissible classifications based on race, ethnicity, alienage, and national origin that are not justified by a compelling state interest; and because it is not narrowly tailored to meet a compelling state interest.

80.     Defendants' threatened and actual application and enforcement of LSIPA to and against GHAE deprived GHAE of rights, privileges, and immunities secured by the Supremacy Clause and the Equal Protection Clause and inflicted substantial monetary and non-monetary injuries on GHAE, rendering defendants liable to GHAE in damages at law and in equity for the injuries they caused.

## **PRAYER FOR RELIEF**

GHAE respectfully requests that the Court enter judgment in its favor and:

A.      Preliminarily and permanently enjoin defendants from implementing and enforcing

LSIPA against GHAE and its affiliates, including by denying GHAE's Generation Resource Project Blue Star Solar 24NR0146 interconnection request or deny GHAE's application to pursue a screening study for the HT property;

     B.    Declare that LSIPA is preempted under the Supremacy Clause by federal law and that defendants may not authorize ERCOT to deny GHAE's Generation Project Blue Star Solar 24NR0146 interconnection request or deny GHAE's application to pursue a screening study for the HT property;

     C.    Declare that LSIPA violates the Equal Protection Clause because it was enacted with the direct purpose and intent to discriminate against persons based on race, ethnicity, alienage, and national origin, and in particular entities owned or controlled by Chinese persons such as GHAE; because it makes impermissible classifications based on race, ethnicity, alienage, and national origin that are not justified by a compelling state interest; and because it is not narrowly tailored to meet a compelling state interest;

     D.    Award GHAE damages in an amount to be determined at trial for the losses it sustained in being compelled by ERCOT's prospective cancellation under LSIPA of two of GHAE's projects to sell those projects at a substantial loss;

     E.    Award GHAE its reasonable attorneys' fees; and

     F.    Grant GHAE such other and further relief as the Court deems just and proper.


Respectfully submitted,

NESS PLLC

Eliyahu Ness
eness@nesslegal.com
State Bar No. 24119651

21

3232 McKinney Ave., Suite 500
Dallas, TX 75204
Telephone: (469) 319-1355

Neil H. Koslowe
*Pro Hac Vice*
nkoslowe@nesslegal.com
445 Park Ave., 9th Floor
New York, NY 10022

**Attorneys for Plaintiff GH America Energy LLC**

**PROOF OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served on

Plaintiff's counsel of record by filing a copy of the foregoing document electronically with the

Clerk of Court using the CM/ECF system on August 22, 2024.

By: */s/ Eliyahu Ness*
Eliyahu Ness