IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**FILED**

October 03, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ pg
DEPUTY

| | | |
|---|---|---|
| GH AMERICA ENERGY LLC<br>*Plaintiff*, | § § § | |
| v. | § § | |
| DOUGLAS FOHN, in his official capacity<br>as Assistant General Counsel of Electric Reliability<br>Council of Texas, Inc. ("ERCOT"); HOLLY<br>HEINRICH, in her official capacity as Legal/<br>Regulatory Counsel of ERCOT; PABLO VEGAS,<br>in his official capacity as Chief Executive Officer<br>of ERCOT; and PAUL FOSTER, BILL FLORES,<br>CARLOS AGUILAR, LINDA CAPUANO,<br>JULIE ENGLAND, ROBERT FLEXON,<br>PEGGY HEEG, and JOHN SWAINSON, in their<br>official capacities as members of the Board of<br>Directors of ERCOT.<br>*Defendants*, | § § § § § § § § § § § § § § § § | Case No. 1:24-CV-00648 |
| ATTORNEY GENERAL KEN PAXTON,<br>*Intervenor-Defendant*. | § § § | |

## DEFENDANTS' MOTION TO DISMISS
## PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendants Douglas Fohn, Holly Heinrich, Pablo Vegas, Paul Foster, Bill Flores, Carlos Aguilar, Linda Capuano, Julie England, Robert Flexon, Peggy Heeg, and John Swainson (together, "Defendants"), move to dismiss Plaintiff GH America Energy LLC's ("GHAE") First Amended Complaint ("FAC") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[1]

Subject to the Court's availability, Defendants request oral argument on this Motion.

---

[1] The FAC's Proof of Service mistakenly states that GHAE's FAC "was served on Plaintiff's counsel . . . on August 22, 2024." Undersigned counsel has conferred with GHAE's counsel regarding this error, and it is undisputed that GHAE served its FAC on Defendants on August 30, 2024. Thus, this Motion is timely filed. *See* Fed. R. Civ. P. 15(a)(3).

# TABLE OF CONTENTS

**Page**

SUMMARY ................................................................................................................1

BACKGROUND .......................................................................................................2

    I.    The ERCOT intrastate grid. ...........................................................................2

    II.   ERCOT performs essential government services using delegated State rulemaking power.....3

    III.  The Lone Star Infrastructure Protection Act.................................................4

    IV.  GHAE's Lawsuit. ............................................................................................5

ARGUMENT...............................................................................................................7

    I.    GHAE's claims against Holly Heinrich must be dismissed............................7

    II.   GHAE's Supremacy Clause claims should be dismissed. ..............................8

        A.    GHAE has no federal rights enforceable under the Supremacy Clause............8

        B.    GHAE fails to plead a valid *Ex Parte Young* claim. .................................10

            1.    Defendants are not properly sued under *Ex Parte Young*.........................11

            2.    GHAE seeks retrospective relief beyond what *Ex Parte Young* permits................12

        C.    GHAE's preemption claim fails on its merits. .........................................13

            1.    There is no conflict preemption. ............................................................14

            2.    There is no field preemption.................................................................17

    III.  GHAE's equal protection claim should be dismissed. ...................................19

        A.    GHAE's equal protection claims should be dismissed because GHAE fails to plead a valid *Monell* claim.................................................................19

            1.    GHAE's § 1983 claims should be dismissed because no Defendant was a policymaker with respect to LSIPA. ..................................................21

            2.    Even if Defendants were policymakers, they cannot be liable because they were enforcing mandatory state law. ................................................22

            3.    GHAE's damages claim fail because, even if Defendants were policymakers, they made policy *for the State*................................................23

        B.    GHAE's equal protection claim fails on its merits. ..................................24

            1.    GHAE is not a member of a protected class. ..........................................25

            2.    LSIPA easily passes rational-basis review. ...........................................28

    IV.  Defendants are entitled to sovereign immunity...........................................30

PRAYER ..................................................................................................................31

CERTIFICATE OF SERVICE ..............................................................................33

**SUMMARY**

Plaintiff GHAE is a domestic, Texas-organized limited liability company that is controlled by a non-resident, non-citizen Chinese billionaire. Defendants, all of whom are sued solely in their official capacities, are officers and employees of ERCOT—an instrumentality of the State of Texas that regulates the State's intrastate power grid using State-delegated rulemaking authority. GHAE wishes to develop a solar power facility that would be interconnected to the ERCOT grid. GHAE alleges that ERCOT denied its interconnection request because a Texas law, the Lone Star Infrastructure Protection Act ("LSIPA"),[2] prohibits entities controlled by citizens of certain foreign countries, including China, from accessing or controlling Texas's critical infrastructure, including the ERCOT grid. GHAE's lawsuit seeks to invalidate that law.

GHAE's claims are procedurally and substantively defective. Asserting both an *Ex Parte Young* and § 1983 claim, GHAE argues that LSIPA is preempted by federal law. But GHAE has no federal rights to vindicate under the Supremacy Clause, and Defendants are not proper parties to a *Young* claim. On the merits, GHAE's Supremacy Clause claim fails because the federal regime on which that claim is based—the Committee of Foreign Investment in the United States ("CFIUS")—has no jurisdiction over the intrastate transaction at issue here, and no pervasive regulatory scheme occupies the field.

GHAE also brings a § 1983 equal protection claim. But GHAE fails to plead a valid *Monell* claim against Defendants because the only policy it identifies—LSIPA, a state law—was enacted by the State—not Defendants, who cannot be responsible for implementing mandatory state law. On the merits, GHAE's equal protection claim fails because the law is facially neutral as to race, ethnicity, national origin, and alienage. Moreover, as a Texas LLC, GHAE belongs to no protected class. And

---

[2] Tex. Bus. & Comm. Code §§ 117.001–.003; Tex. Gov't Code §§ 2275.0101–.0103; Tex. Util. Code § 39.360.

it cannot share the identity of its foreign parent's nonresident owner—who, in any event, has no rights under the United States Constitution that could be imputed to GHAE. Finally, the law easily survives rational basis review.

This Court should dismiss all of GHAE's claims.

**BACKGROUND**[3]

## I.    The ERCOT intrastate grid.

"In its electrical grid, as in so many things, Texas stands alone." *CPS Energy v. ERCOT*, 671 S.W.3d 605, 611 (Tex. 2023) (quoting *Texas v. Env't Prot. Agency*, 829 F.3d 405, 431 (5th Cir. 2016)). "While all the other states in the Union have extensive interconnections with neighboring states, nearly 90% of Texas is covered by a single isolated grid with limited connections to external power supplies," *Texas*, 829 F.3d at 431, making it "the U.S. mainland's only *intra*state electrical grid," *CPS Energy*, 671 S.W.3d at 611. Unlike in the U.S. mainland's two other grids, "electricity is distributed entirely within a single State" in the Texas Interconnection. *New York v. F.E.R.C.*, 535 U.S. 1, 6 (2002).

The "isolat[ion]" of Texas's grid "from the nation's electricity system" reflects a "conscious decision" by generations of Texas policymakers to ensure "independence from federal regulation," thus maintaining Texas's sovereignty in an area of traditional state control. *Phillips v. ERCOT (In re Entrust Energy, Inc.)*, 101 F.4th 369, 391 (5th Cir. 2024); *ERCOT v. Just Energy Tex., L.P. (In re Just Energy, Inc.)*, 57 F.4th 241, 251 (5th Cir. 2023) ("Utility regulation is one of the most important functions traditionally associated with the police power of the States." (cleaned up)). Texas's grid is thus generally exempt from federal regulation and the jurisdiction of the Federal Electric Regulatory Commission

---

[3] In ruling on a Rule 12(b)(1) motion to dismiss, the Court may find that subject-matter jurisdiction is lacking based on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001). In ruling on a Rule 12(b)(6) motion to dismiss, the Court may, in addition to the pleadings, consider matters of which it may take judicial notice, including matters of public record. *Hall v. Hodgkins*, 305 Fed. Appx. 224, 227–28 (5th Cir. 2008).

("FERC"). *PUCT v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 312 (Tex. 2001); *see also* Federal Power Act ("FPA"),[4] 16 U.S.C. § 824(a) (providing that FERC "shall not have jurisdiction . . . over facilities used for the generation of electric energy or over facilities used . . . only for the transmission of electric energy in intrastate commerce").

## II.    ERCOT performs essential government services using delegated State rulemaking power.

In Texas, the generation, transmission, and retail distribution of energy have been "unbundled," and (with a few exceptions not relevant here) energy is generated, transmitted and/or distributed, and sold for retail use by distinct entities. *Texas*, 829 F.3d at 432. ERCOT does not generate, transmit, distribute, or sell electricity. Instead, ERCOT is the entity that Texas—in the absence of federal regulatory control—selected to regulate Texas's intrastate grid and wholesale electricity market, subject to plenary control by the Public Utility Commission of Texas ("PUCT"). Texas Public Utility Regulatory Act ("PURA"), Tex. Util Code §§ 39.151(a), (g); 16 Tex. Admin. Code ("TAC") § 25.361(b); *see CPS Energy*, 671 S.W.3d at 611–12 (discussing ERCOT's history).

Today, ERCOT manages the intrastate grid and wholesale electricity market using statutory authority delegated to it by the PUCT to "establish, adopt, and enforce a variety of policies, rules, guidelines, standards, procedures, protocols, and other requirements to govern the operations of market participants." *CPS Energy*, 671 S.W.3d at 626 (citing PURA §§ 39.151(d), (i), (j), (*l*)). All aspects of ERCOT's finances and operations are subject to the PUCT's control, and the State of Texas selects ERCOT's governing board. *Id.* at 623–26. As the Texas Supreme Court recently put it, "ERCOT and the PUC[T] are uniquely situated as legislatively endorsed joint participants in a complex regulatory scheme—each serving its own distinct and essential purposes." *PUCT v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 490 (Tex. 2024).

---

[4] The FPA is codified at 16 U.S.C. §§ 824–824w.

### III.    The Lone Star Infrastructure Protection Act.

In June 2021, the Texas Legislature enacted LSIPA (or the "Act") to defend Texas's critical infrastructure—especially the ERCOT grid—from control or attack by hostile nations. *See* **Ex. A** (SB 2116 Bill Analysis). Relevant here, LSIPA prohibits entities from (1) entering into an agreement that would grant "direct or remote access to or control of critical infrastructure in this state"; with (2) any company that is (a) majority owned by individuals who are citizens of China, Iran, North Korea, Russia, or a designated country; (b) majority owned by a company that is owned or controlled by citizens of, or the government of, China, Iran, North Korea, Russia, or a designated country; or (c) headquartered in China, Iran, North Korea, Russia, or a designated country. Tex. Bus. & Com. Code § 117.002; *see also* Tex. Gov't Code § 2275.0102.[5] "Critical infrastructure" includes the "electric grid." Tex. Bus. & Com. Code § 117.001. Using its delegated rulemaking authority, *see* PURA § 39.151(d), ERCOT revised its Planning Guide in April 2022 to comply with LSIPA, FAC ¶ 61; *see* ERCOT Planning Guide § 5.2.2(c)–(d).[6]

In 2023, the Legislature—recognizing the need "to protect our grid from hostile foreign powers" and "harden[] the security of the Texas power grid . . . to prevent exposure from attacks on the electric grid," **Ex. A** (SB 2013 Bill Analysis)—specifically commanded ERCOT to ensure that Market Participants and would-be Market Participants meeting any of LSIPA's criteria are not granted access to the ERCOT grid. PURA § 39.360.

---

[5] LSIPA was originally enacted as Chapter 113 of the Business and Commerce Code and Chapter 2274 of the Government Code, but it was renumbered in 2023 as Chapters 117 and 2275 of those Codes. Act of May 17, 2023 (H.B. 4595), 88th Leg., R.S., ch. 768, § 24.001(2).

[6] ERCOT's      Planning      Guide      is      available      [here](#) (https://www.ercot.com/mktrules/guides/planning/current). *See KVUE, Inc. v. Austin Broad. Corp.*, 709 F.2d 922, 929 (5th Cir. 1983) (taking judicial notice of state administrative materials).

IV.    **GHAE's Lawsuit.**

Plaintiff GHAE is a Texas LLC operating in Texas. FAC ¶ 1. GHAE is a subsidiary of Xinjiang Guanghui Industry Investment (Group) Company, Ltd. ("Xinjiang"), which in turn is majority owned by Sun Guangxin, a nonresident Chinese citizen. *Id.* This case concerns ERCOT's compliance with LSIPA with respect to GHAE's applications to interconnect proposed wind and solar generation resources to the Texas grid. *See* ERCOT Protocols § 3.11.6.

Before a proposed generation resource may connect to the ERCOT Transmission Grid,[7] it must comply with the Generator Interconnection or Modification ("GIM") process established in Section 5 of the ERCOT Planning Guide. The GIM process requires that, among other things, the Interconnecting Entity submit certain information and documentation, undergo studies of how the proposed project will affect the ERCOT Transmission Grid, and successfully complete performance testing before the project may commence commercial operations. *See* ERCOT Planning Guide § 5; *see also* ERCOT Protocols § 3.11.6. Some of the required documentation includes an Interconnection Agreement with the interconnecting Transmission and Distribution Service Providers that will serve the project, a Standard Form Market Participant Agreement (SFA) with ERCOT, and an attestation that the project complies with LSIPA. *See* ERCOT Planning Guide §§ 5.2.2(2)–(3), 5.3.2.5(7), 6.8(1)*; see also id.* § 5.2.2 (describing other information that must be submitted to initiate a GIM); *id.* § 5.2.8 (Interconnection Agreement); ERCOT Protocols § 22 (SFA).

When LSIPA took effect, GHAE had pending interconnection requests for: (1) the Blue Hills Wind Project, (2) the Blue Valley Solar Project, and (3) the Blue Star Solar Project. FAC ¶ 50. In response to an ERCOT Request for Information regarding compliance with LSIPA, GHAE informed ERCOT that it was majority owned by Xinjiang, a Chinese company. *Id.* ¶ 52. GHAE's response also

---

[7] Any capitalized terms not defined herein have the meaning ascribed to them under ERCOT Protocols § 2.1. ERCOT's Protocols can be found here. (https://www.ercot.com/mktrules/nprotocols/current).

stated that GHAE was "in the process of divesting," i.e., selling, its three projects. *See* **Ex. B** (RFI Response).[8] Following a notice of "potential cancellation" sent to GHAE by Defendant Fohn, GHAE sold the Blue Valley and Blue Hills Projects, allegedly "at a substantial loss." FAC ¶¶ 54–55; *see also* **Ex. C** (Deeds).[9]

GHAE alleges that in October 2022, Defendant Fohn "notified GHAE" that ERCOT had cancelled the Blue Star Solar Project. *Id.* ¶ 56. Almost two years later, in April 2024, GHAE asked ERCOT whether it could pursue a screening study for the Blue Star Project in order to make the underlying property more marketable. *Id.* ¶ 58. Defendant Holly Heinrich, a now-former employee of the ERCOT legal department, "responded that ERCOT would not permit GHAE to pursue" that study. *Id.* ¶ 60; *see also* **Ex. D** (Heinrich Declaration). GHAE alleges that LSIPA was the "sole" reason ERCOT denied these requests, and it alleges that the decisions were "authorized and approved by" Defendant Pablo Vegas, who is ERCOT's CEO; and Defendants Paul Foster, Bill Flores, Carlos Aguilar, Linda Capuano, Julie England, Robert Flexon, Peggy Heeg, and John Swainson, all of whom serve on ERCOT's Board of Directors (the "ERCOT Board Defendants"). *Id.* ¶¶ 56–58, 60, 62.

Initially, GHAE sued ERCOT itself, Mr. Vegas, the ERCOT Board Defendants, and three other members of ERCOT's Board who serve *ex officio* by virtue of their roles at other Texas agencies. *See* Dkt. 1. GHAE alleged that ERCOT's actions violated the Supremacy Clause, the Commerce Clause, and the Equal Protection Clause. *Id.* The original defendants moved to dismiss GHAE's claims. Dkt. 13. Rather than respond, GHAE filed its First Amended Complaint, which dismissed ERCOT, the *ex officio* board members, and GHAE's Commerce Clause claims. However, GHAE

---

[8] GHAE incorporated its RFI Response into its complaint by reference, *see* FAC ¶ 52, and this Court may therefore consider them as part of Defendants' Rule 12(b)(6) motion. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[9] *See infra* note 11.

added claims against Mr. Fohn and Ms. Heinrich, and it clarified the causes of action underlying its remaining constitutional claims.

GHAE's live pleading asserts two causes of action against all remaining Defendants. First, under *Ex Parte Young*, GHAE seeks a declaration that LSIPA is preempted by federal law, and it seeks an injunction against LSIPA's prospective enforcement with respect to the Blue Star Solar Project. FAC ¶¶ 64–73. And second, GHAE brings a § 1983 claim asserting that LSIPA is unconstitutional on both preemption and equal-protection grounds, seeking the same declaratory and injunctive relief, as well as damages allegedly resulting from the sale of the Blue Valley Solar and Blue Hills Wind Projects. *Id.* ¶¶ 74–80 & Prayer for Relief.

## ARGUMENT

### I.    GHAE's claims against Holly Heinrich must be dismissed.

GHAE's Amended Complaint names, for the first time, Holly Heinrich, a former employee of ERCOT's legal department. FAC ¶ 2. Ms. Heinrich is sued exclusively in her purported official capacity as "Legal/Regulatory Counsel of ERCOT." *Id.* However, at the time GHAE filed its Amended Complaint on August 30, 2024, Ms. Heinrich was no longer an ERCOT employee. She had resigned more than two months earlier, on June 21, 2024, and is now an associate at a law firm. **Ex. D**. As a *former* employee at the time she was sued, Ms. Heinrich had no official capacity in which she could be sued. The purported official-capacity claims against her must, therefore, be dismissed. *Enders v. Boone*, 658 F. Supp.3d 70, 93 (N.D.N.Y. 2023) (dismissing purported official-capacity defendants who were sued *after* they left office); *Michalik v. Hermann*, No. Civ.A. 99-3496, 2001 WL 434489, at *2 (E.D. La. Apr. 26, 2001) ("Case law provides that a person cannot be sued in his capacity as an official if he does not hold the office in question when suit is filed."). For the same reason, GHAE lacks standing to seek prospective relief against Ms. Heinrich: as a former employee at the time she was

sued, Ms. Heinrich "no longer held the authority" necessary to redress GHAE's alleged injuries. *Enders*, 658 F. Supp.3d at 93.

When Defendants' counsel informally reached out to GHAE's counsel to seek Ms. Heinrich's voluntary dismissal, GHAE's counsel asserted that the claims against her were proper under Rule 25, which provides for automatic substitution of an official-capacity defendant "*who is a party*" if she "resigns, or otherwise ceases to hold office *while the action is pending*." Fed. R. Civ. P. 25(d) (emphasis added). By its plain language, Rule 25(d) is inapplicable: Ms. Heinrich was not "a party" when she ceased to hold office. *Cf. Washington v. Baltimore Police Dep't*, 457 F. Supp.3d 520, 544 (D. Md. 2020) (holding that similar language in Rule 25(a)(1) restricts the Rule's application to a person who had *already* been made a party to the action *before* the event purportedly requiring substitution). Instead, she was sued and became a party *after* she resigned. Consequently, no automatic substitution would be appropriate, and the claims against Ms. Heinrich should be dismissed. *See Massachusetts Hosp. Ass'n v. Harris*, 500 F. Supp. 1270, 1283 (D. Mass. 1980) (dismissing official-capacity defendants, and rejecting applicability of Rule 25(d), where the defendants were first named in amended complaint filed *after* the defendants left office); *see also Michalik*, 2001 WL 434489, at *3 (rejecting substitution where purported officials "did not retire during the pendency of this action but rather before the action was filed").

## II.    GHAE's Supremacy Clause claims should be dismissed.

GHAE asserts two distinct claims under the Supremacy Clause. First, it asserts an *Ex Parte Young* action for prospective relief, FAC ¶¶ 64–73, and second it asserts a § 1983 claim for damages, *id.* ¶¶ 76, 80. Both claims should be dismissed against all Defendants.

### A.    GHAE has no federal rights enforceable under the Supremacy Clause.

For independent but related reasons, both GHAE's § 1983 and *Ex Parte Young* claims under the Supremacy Clause must be dismissed for lack of an enforceable federal right.

First, GHAE's § 1983 preemption claim must be dismissed. GHAE seeks relief under § 1983 for the alleged deprivation of its "rights, privileges, and immunities secured by the Supremacy Clause." FAC ¶ 80. But "the Supremacy Clause, of its own force, does not create rights enforceable under § 1983." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989); *id.* at 108 ("[I]t would obviously be incorrect to assume that a federal right of action pursuant to § 1983 exists every time a federal rule of law pre-empts state regulatory authority."); *accord Armstrong v. Exceptional Child Care Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) ("[T]he Supremacy Clause is not the 'source of any federal rights' . . . and certainly does not create a cause of action."); *United States v. Texas*, 97 F.4th 268, 275 (5th Cir. 2024) ("[T]he Supremacy Clause does not create a cause of action."). Accordingly, GHAE's § 1983 preemption claim should be dismissed.[10]

Second, while *Ex Parte Young* often provides a cause of action to enforce the Supremacy Clause, such a claim is unavailable if the statute allegedly having the preemptive effect "implicitly precludes private enforcement." *Armstrong*, 575 U.S. at 328. In *Armstrong*, the Supreme Court held that a *Young* claim was unavailable to enforce the Medicaid Act because the relevant statute: (1) provided the "sole remedy . . . for a State's failure to comply with Medicaid's requirements"; and (2) was "judicially unadministrable" because it conferred "judgment-laden" authority on the Secretary of Health and Humans Services. *Id.* at 328–29; *accord Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73–74 (1996) (holding that *Young* claim was rendered unavailable by the relevant statute's "carefully crafted and intricate remedial scheme").

---

[10] *Golden State Transit* recognized that while the Supremacy Clause itself creates no rights enforceable under § 1983, the underlying preemptive federal statute might "create a federal right for which § 1983 provides a remedy." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 108 (1989). But GHAE specifically pleads that its rights derive from the Supremacy Clause itself, FAC ¶ 80, and it fails to identify any personal federal statutory rights on which its § 1983 claim might be premised. In any event, GHAE's § 1983 preemption claim would also fail for the reasons stated *infra* Argument § III.A.

GHAE's preemption claim is premised on the CFIUS regime, enforcement of which is invested in the President, 50 U.S.C. §§ 4565(d)(1), (4), whose actions are not subject to judicial review, *id.* § 4565(e)(1). Instead, only the Attorney General, at the President's direction, may sue to enforce the regime. *Id.* § 4565(d)(3). To that end, the President may sue even a State that violates the statutory framework. *Id.* §§ 4556(a), 4552(15). Congress's grant of exclusive enforcement authority to the President and Attorney General precludes private enforcement of CFIUS's alleged preemptive effects. *Armstrong*, 575 U.S. at 328; *see also Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons."). And the statute's standard for assessing the effects of a covered transaction on U.S. national security, *see infra* Argument § II.C, is not judicially administrable because it is obviously a "judgment-laden" standard, *Armstrong*, 575 U.S. at 328. GHAE's *Young* claim should therefore be dismissed as well.

**B.    GHAE fails to plead a valid *Ex Parte Young* claim.**

Under *Ex Parte Young*, a plaintiff may "sue a state officer in his official capacity for an injunction to stop ongoing violations of federal law." *Tex. All. For Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022) (citing 209 U.S. 123 (1908)). Because "*Ex Parte Young* only affords prospective relief to stop future harms," *United States v. Abbott*, 85 F.4th 328, 336 (5th Cir. 2023), GHAE's *Young* claim is limited to the Blue Star Solar Project, FAC ¶ 72–73.[11]

---

[11] GHAE alleges that it sold the Blue Valley and Blue Hills Projects before they were canceled by ERCOT. FAC ¶ 55. As Defendants showed in their original motion to dismiss, GHAE would not have standing to sue for, and could not state a claim regarding, prospective relief for projects it no longer owns. Dkt. 13 at 11–12; *see also* **Ex. B** (Deeds).

### 1.    Defendants are not properly sued under *Ex Parte Young*.

Defendants can be grouped into three sets: the ERCOT Board Members;[12] ERCOT's CEO, Pablo Vegas (who is also a nonvoting member of the Board, PURA § 39.151(g-1)(3)); and the ERCOT Employees, Mr. Fohn and Ms. Heinrich. To show that these individuals are "proper defendant[s] under *Ex Parte Young*," GHAE must plead that each is a "state official" with "some connection with the enforcement of the law being challenged." *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024) (cleaned up). This requires showing that each defendant: (1) has "a particular duty to enforce the statute in question"; (2) "has a demonstrated willingness to exercise that duty"; and (3) "compels or constrains persons to obey the challenged law." *Id.* (cleaned up). This enforcement connection must be to "the particular statutory provision that is the subject of the litigation," and it cannot be satisfied by pointing to general or "[d]iscretionary authority to act." *Id.* at 327 (cleaned up).

In the first place, given the Fifth Circuit's holding that ERCOT is not an arm of the State for Eleventh Amendment purposes, *Entrust*, 101 F.4th at 387, it is doubtful that *any* Defendant could qualify as a state officer subject to a *Young* claim. *See Freedom from Religion Found., Inc. v. Mack*, 4 F.4th 306, 312 (5th Cir. 2021) (holding that *Young* claim could not be asserted against a county official because he was not employed by an arm of the State), *vacated in part*, 49 F.4th 941, 948 n.4 (5th Cir. 2022).[13]

Further, the ERCOT Board Members have no enforcement connection to LSIPA. The ERCOT Board has delegated to ERCOT's CEO "all general powers and duties necessary to accomplish ERCOT's purpose, goals, and objectives," save for powers "specifically reserved to the

---

[12] Defendants Foster, Flores, Aguilar, Capuano, England, Flexon, Heeg, and Swainson. FAC ¶ 3. GHAE does not sue *all* of ERCOT's Board Members, as it dropped its claims against the Texas agency officials who serve *ex officio* on ERCOT's Board. *See* Dkt. 13 at 8–9; *see* PURA §§ 39.151(g-1)(1)–(2).

[13] The merits panel in *Mack* vacated the motions panel's discussion of the plaintiff's official-capacity claim because the district court's order on that claim had not been appealed. Nevertheless, the Fifth Circuit's reasoning remains persuasive.

Board." ERCOT Board Policies & Procedures § 2.3.[14] The power to enforce LSIPA has not been reserved to the Board, and it therefore resides with ERCOT's CEO. The *Young* claims against the Board Members should therefore be dismissed. *See W. Va. Oil & Nat. Gas Ass'n v. Wooten*, 631 F. Supp.2d 788, 794–95 (S.D.W. Va. 2008) (dismissing *Young* claims against board members when the board had no enforcement power over the relevant rule). For the same reason, GHAE's alleged injuries are not redressable via relief against the ERCOT Board Members, and GHAE's claims against them fail for lack of standing. *See City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (noting that the standing and *Ex Parte Young* analyses "significantly overlap" (cleaned up)).

The ERCOT Employee Defendants, Mr. Fohn and Ms. Heinrich, are likewise not proper defendants under *Young*. GHAE pleads that while these Defendants *notified* GHAE of ERCOT's decision under LSIPA, GHAE specifically pleads that they *were not* responsible for ERCOT's underlying decisions. FAC ¶¶ 56–57, 60–62. GHAE thus fails to plead that these Defendants have a duty to enforce LSIPA, and it fails to plead any facts suggesting that an injunction against these Defendants could redress its alleged harm.[15]

### 2.    GHAE seeks retrospective relief beyond what *Ex Parte Young* permits.

The only relief that may be awarded under *Young* is prospective. However, GHAE asks for an injunction prohibiting Defendants from "denying GHAE's Generation Resource Project Blue Star Solar 24NR0146 interconnection request." FAC ¶¶ 72–73. But that request has already been finally denied. *Id.* ¶ 56; ERCOT Planning Guide § 5.2.6(6) ("Once a project is canceled, it is permanently removed from the GIM process and must be resubmitted to be reconsidered for interconnection."). *Young* does not permit relief from that final action. *Green Valley Special Util. Dist. v. City of Schertz*, 969

---

[14]    https://www.ercot.com/files/docs/2019/04/16/Board-Policies-and-Procedures-eff-6-18-2024.pdf.

[15] GHAE also lacks standing to pursue a *Young* claim against Ms. Heinrich because, as a non-employee of ERCOT, she has no conceivable duty or authority to enforce LSIPA. *Supra* Argument § I.

F.3d 460, 473 (5th Cir. 2020) (en banc). Similarly, GHAE appears to complain about the past denial of its request for a screening study. FAC ¶¶ 72–73. That prior decision is likewise not subject to challenge. *Green Valley*, 969 F.3d at 473.

GHAE also seeks equitable relief on behalf of unidentified "affiliates." FAC, Prayer for Relief ¶ A. Those affiliates are distinct entities not before this Court, and GHAE lacks standing to sue over their alleged injuries. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 435 (2020) ("*AID*") ("[S]eparately incorporated organizations are separate legal units with distinct legal rights and obligations."); *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 474 (5th Cir. 2013) (noting that a litigant may not raise another person's legal rights).

### C.    GHAE's preemption claim fails on its merits.

GHAE asserts that LSIPA is preempted by federal law. There are three types of preemption: (1) express preemption; (2) conflict preemption; and (3) field preemption. *See Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 311 (5th Cir. 2023). Absent express preemption, which is not alleged here, a federal law may impliedly preempt a state law by either "directly conflicting with it or by occupying a field so pervasively as to naturally exclude it." *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 333 (5th Cir. 2007). In all instances, "[p]re-emption is not to be lightly presumed." *Cal. Fed. Sav. & Loan v. Guerra*, 479 U.S. 272, 281 (1987); *English v General Elec. Co.*, 496 U.S. 72, 90 (1990) ("The teaching of this Court's decisions enjoins seeking out conflicts between state and federal regulation where none clearly exists." (cleaned up)).

In determining whether a state law is preempted, a court's "sole task is to ascertain the intent of Congress." *Empacadora*, 476 F.3d at 333. This requires an "examin[ation] of the explicit statutory language and the structure and purpose of the statute." *Smatresk*, 73 F.4th at 311 (cleaned up). Because the preemption analysis turns on the language of the allegedly preempting federal law, preemption

claims may be resolved under Rule 12(b)(6). *See, e.g.*, *Nat'l Press Photographers Assoc. v. McCraw*, 90 F.4th 770, 796 (5th Cir. 2024).

GHAE alleges that LSIPA is impliedly preempted because it (1) "purports to regulate foreign investments related to critical infrastructure that is an area comprehensively occupied by the President, CFIUS, and OFAC"; and (2) " interferes with and creates an obstacle to the achievement of federal law or objectives in this area." FAC ¶ 71. Neither of these claims has merit.

### 1.    There is no conflict preemption.

Conflict preemption exists where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English*, 496 U.S. at 79.[16] But while GHAE invokes this principle, FAC ¶ 71, it never identifies the federal objectives with which LSIPA purportedly interferes. The reason is simple: the CFIUS regime on which GHAE's arguments are premised does not govern the interconnection agreement at issue in this case. Because the laws are complementary, there can be no conflict or obstacle preemption.

CFIUS is an "interagency committee . . . that is authorized to review **certain transactions** involving foreign investments in the United Stated to determine [their] effect . . . on the national security of the United States."[17] Congress established CFIUS in a 1988 amendment to the Defense Production Act of 1950 ("DPA"). *See* 50 U.S.C. § 4565. The DPA vests the President with general authority to "provide for the national security" by "ensur[ing] the vitality of the domestic industrial base." 50 U.S.C. §§ 4502(a)(1), (2). Via CFIUS, the President is directed "to review a 'covered

---

[16] Conflict preemption may also exist where "it is impossible for a private party to comply with both state and federal requirements." *English*, 496 U.S. at 79. GHAE does not allege this form of conflict preemption here.

[17] Fact Sheet: Final CFIUS Regulations Implementing FIRRMA, U.S. Dept. of the Treasury (Jan. 13, 2020), *available at* https://home.treasury.gov/system/files/206/Final-FIRRMA-Regulations-FACT-SHEET.pdf (emphasis added).

transaction to determine the effect of the transaction on the national security of the [U.S]." *Ralls Corp. v. CFIUS*, 758 F.3d 296, 302 (D.C. Cir. 2014) (quoting 50 U.S.C. § 4565(b)(1)(A)).

CFIUS may review *only* "covered transactions." 50 U.S.C. § 4565(a)(4). For most of its existence, CFIUS's jurisdiction was limited to "covered control transactions," or transactions resulting in foreign control of an *existing* U.S. business. 31 C.F.R. § 800.210. Beginning in 2020, CFIUS's jurisdiction was expanded to also include (as relevant here): (1) foreign acquisition of real estate located in close proximity to U.S. military installations ("covered real estate transactions"); and (2) certain *non*-controlling investments that afford foreign persons either (a) access to material nonpublic information concerning critical infrastructure; or (b) "involvement, other than through voting of shares, in substantive decision making" regarding the "management, operation, manufacture, or supply of covered investment critical infrastructure," ("covered investments"). *See* 50 U.S.C. §§ 4565(a)(4)(B)(ii)–(iii)(I), (a)(4)(i)(I), (a)(4)(D)(ii)(I)(aa); 31 C.F.R. §§ 802.203, .211–.212, .217.

Critically, however, CFIUS *may not* review "greenfield" investments, in which a foreign person builds a new U.S. business from the ground up. Thus, if a foreign corporation "incorporat[es] a newly formed subsidiary" and "construct[s] . . . a plant to make a new product," it "will not have acquired a U.S. business, and its greenfield investment *is not* a covered control transaction" or covered investment. 31 C.F.R. § 800.301(e)(7) (emphasis added).[18]

While GHAE alleges many facts about supposed CFIUS review of *other* projects,[19] GHAE carefully avoids alleging that CFIUS has jurisdiction over, let alone actually reviewed, the Blue Star Solar Project. The reason is simple: the Blue Star Project is exactly the sort of greenfield investment

---

[18] While CFIUS may still review certain real estate transactions related to greenfield investments, *see* 31 C.F.R. § 800.301(e)(7), GHAE does not allege that ERCOT applied LSIPA with respect to any (let alone a covered) real estate transaction.

[19] GHAE spends substantial time recounting the federal government's national-security review (under both CFIUS and a non-CFIUS statute) of *different* projects that ERCOT did not cancel and GHAE sold. FAC ¶¶ 27–30, 34–43. These include GHAE's allegations regarding a Department of Defense mitigation agreement executed under 10 U.S.C. § 183a—*not* CFIUS. *See* **Ex. E** (mitigation agreement).

over which CFIUS expressly lacks jurisdiction. Xinjiang, a foreign corporation, caused GHAE to be created as a Texas LLC to develop a new solar energy project. FAC ¶ 34. Because CFIUS does not apply to GHAE's Blue Star Solar Project, there can be no conflict between CFIUS and LSIPA.[20] *English*, 496 U.S. at 90 ("The Court has observed repeatedly that pre-emption is ordinarily not to be implied absent an actual conflict.").

LSIPA, moreover, does not impede CFIUS's goals. In the first place, CFIUS is not concerned with greenfield investments or intrastate businesses like GHAE's. As important, LSIPA, as applicable here, is narrowly concerned with protecting Texas's intrastate electric grid, the isolation of which make it "uniquely vulnerable to sudden power shortages." *Texas*, 829 F.3d at 432. Texas's regulation of its grid is an exercise of its "historic police powers," which are "not to be curtailed by federal law unless Congress indicates a clear and manifest purpose to do so." *Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 210 (5th Cir. 2010) (cleaned up); *see Just Energy*, 57 F.4th at 251–52 (holding that utility regulation through ERCOT is an exercise of such a traditional state power). Because LSIPA, as applied here, merely controls who may access or control Texas's grid—a wholly intrastate activity, in an area of traditional state power—there is no obstacle preemption.

Because of LSIPA's focus on control of intrastate economic activity, as well its application here to a transaction outside of CFIUS's jurisdiction, *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), is readily distinguishable. The law struck down in *Crosby* imposed economic sanctions on Burma by barring "state entities from buying goods or services from any person . . . doing business with Burma." *Id.* at 367. In other words, the law was designed to penalize foreign commerce with Burma in order to influence Burma's government. The Court held that the law was an obstacle to, and

---

[20] CFIUS would also not apply because it only covers investments in a "US Business," which is defined as a business "engaged in *inter*state commerce." 50 U.S.C. §§ 4565(a)(13) (emphasis added); 31 C.F.R. § 802.241. GHAE alleges only that it engages in *intra*state commerce, i.e., a proposed generation resource on Texas's wholly intrastate grid, so it would not be a "US business" in any event. FAC ¶¶ 1, 33–35; *see* Dkt. 13 at 20–23.

"undermine[d] the intended purpose and 'natural effect' of," Congress's own sanctions regime targeting Burma. *Id.* at 373–74. Here, by contrast, LSIPA's goal is to protect the stability of Texas's critical infrastructure, including the ERCOT grid. And unlike in *Crosby*, Texas's regulation of these intrastate matters, in an area of traditional state authority, *see Entrust*, 101 F.4th at 391; *Just Energy*, 57 F.4th at 251, in no way impedes CFIUS's jurisdiction.

Finally, GHAE's complaint includes several stray references to the Office of Foreign Asset Control as an alleged source of preemption. FAC ¶¶ 26, 69, 71. But GHAE fails to identify any OFAC-enforced *law* that might preempt LSIPA. *See Tex. Midstream*, 608 F.3d at 210. The one it does mention—the International Emergency Economic Powers Act—gets GHAE nowhere because (1) it concerns the President's authority after declaring a national emergency,[21] which is not implicated on these facts; (2) like CFIUS, the Act does not grant GHAE any substantive federal rights; and (3) in any event, GHAE fails to point to any part of that Act that evidences "clear and manifest congressional intent" to preempt state law. The Court should dismiss GHAE's conflict-preemption claims.

### 2.    There is no field preemption.

Field preemption exists only where a federal statutory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or that it "touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *McCraw*, 90 F.4th at 796. "Field preemption of state law is disfavored," and "courts should hesitate to infer field preemption unless plaintiffs show that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress." *Id.* at 795–96 (quoting *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018)); *accord Empacadora*, 476 F.3d at 334 ("Field

---

[21] *See* 50 U.S.C. § 1701 ("The authorities granted to the President by . . . this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose.").

preemption requires a clear congressional intent."). Even where it applies, the "field" must be narrowly construed, and the States' power to regulate in fields of traditional authority respected.

Nothing in the statutes authorizing CFIUS suggests an intent to create a pervasive regulatory scheme. CFIUS is merely authorized to conduct a national-security review of a narrow class of transactions, during a short time frame, after which the case is either closed or, if there exists an unmitigated national-security risk, the case is transferred to the President for final action. 50 U.S.C. §§ 4565(b)(1)(A), (b)(2)(A)–(B), (f); *Ralls*, 758 F.3d at 303.

The CFIUS regime certainly expresses no intent to preempt a State's regulation of intrastate economic activity to secure its critical intrastate infrastructure. *Cf. Chamber of Commerce v. Whiting*, 563 U.S. 582, 604 (2011) (refusing to find preemption over state law "[r]egulating in-state businesses through licensing"); *DeCanas v. Bica*, 424 U.S. 351, 355 (1976). To the contrary, Congress has expressly conceded that the CFIUS regime is *not* comprehensive: it neither alters nor affects "any other authority, process, [or] regulation . . . provided by or established under any other provision of Federal law." 50 U.S.C. § 4565(i); 31 C.F.R. §§ 800.103, 802.103. Among the laws CFIUS does not alter is the FPA, which both recognizes the uniquely intrastate nature of the Texas grid and disclaims any intent to preempt state grid regulations. FPA §§ 824(a), 824o(i)(3) ("Nothing in this section shall be construed to preempt any authority of any State to take action to ensure the safety, adequacy, and reliability of electric service within that State . . . ."); *see McCraw*, 90 F.4th at 796 ("[I]mportantly, field preemption is not to be found where federal regulations . . . appear to contemplate some concurrent state regulation." (cleaned up)).

Where, as here, "the field which Congress is said to have preempted includes areas that have been traditionally occupied by the states," courts generally "should not infer field preemption." *English*, 496 U.S. at 79; *McCraw*, 90 F.4th at 796 (further explaining that "States' police powers, including those necessary to safeguard the protection of citizens, fall into this category."). And "utility regulation is

one of the most important of the functions traditionally associated with the police power of the States." *Just Energy*, 57 F.4th at 252 (cleaned up). Nothing in CFIUS overcomes this presumption, and GHAE's field-preemption claim should therefore be rejected.[22]

## III. GHAE's equal protection claim should be dismissed.

GHAE asserts a § 1983 equal protection claim against each Defendant in his or her official capacity, and it seeks damages and equitable relief. FAC ¶ 80. Such claims "represent only another way of pleading an action against an entity of which an officer is an agent"; the suit is, therefore, "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165–67 (1985). Thus, ERCOT itself is the real party in interest for GHAE's equal protection claims.

### A. GHAE's equal protection claims should be dismissed because GHAE fails to plead a valid *Monell* claim.[23]

Defendants are sued *exclusively* in their official capacities, and GHAE's claims therefore amount to claims against ERCOT itself. *Hafer v. Melo*, 502 U.S. 21, 26–27 (1991). Consequently, GHAE was required to allege liability under *Monell. Kentucky* , 473 U.S. at 166 (1985) (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)); *accord Los Angeles County v. Humphries*, 562 U.S. 29, 37 (2010). To state a *Monell* claim, GHAE had to "identify: (1) an official policy (or custom),

---

[22] If GHAE intended to allege preemption under the moribund foreign affairs field preemption doctrine, *see* FAC ¶ 68, that claim fails for the same reason. After first recognizing this doctrine almost 60 years ago in *Zschernig v. Miller*, 389 U.S. 429 (1968), the Supreme Court "has never again applied" it. Jack Goldsmith, *Statutory Foreign Affairs Preemption*, 2000 Sup. Ct. Rev. 175, 210 n.131. And the doctrine's focus on a law's court-predicted effects on foreign affairs, *see id.* at 203, is out of step with more recent, text-first preemption cases, which disclaim "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Whiting*, 563 U.S. at 607. In any event, this doctrine applies only to a state law that "has no serious claim to be addressing a traditional state responsibility." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1071, 1075 (9th Cir. 2012). LSIPA, as applied to regulation of the ERCOT grid, is exactly the opposite. *See Just Energy*, 57 F.4th at 252.

[23] As Defendants note supra note 10, the arguments in this section would apply equally to GHAE's § 1983 claim under the Supremacy Clause. But that claim is independently barred by the lack of any asserted right enforceable under § 1983. *See supra* Argument § II.A.

of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom." *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (cleaned up).

The identity of the policymaker responsible for a particular policy is a legal question. *Groden v. City of Dallas*, 826 F.3d 280, 284 (5th Cir. 2016). A plaintiff suing *an entity* therefore need not plead the identity of the policymaker, but need only plead facts that "establish that the challenged policy was promulgated or ratified by the [the entity's] policymaker." *Id.* at 284 & n.4. GHAE, however, dismissed its claims against ERCOT the entity, and it now exclusively asserts official-capacity claims against ERCOT's officers and employees. This choice imposes an additional burden on GHAE. Because an official-capacity claim "may be brought *only* against an official acting as a policymaker," the pleadings and law must establish that each Defendant was a policymaker with respect to the policy responsible for GHAE's alleged injuries. *Guillot v. Russell*, 59 F.4th 743, 750–51 (5th Cir. 2023) (emphasis added); *Arnone v. Dallas County*, 29 F.4th 262, 265–66 (5th Cir. 2022).

Finally, an official-capacity damages claim may not be asserted against a defendant who was acting as a policymaker for the State in "establishing the policy that is relevant to the claims." *Daves v. Dallas County*, 22 F.4th 522, 533 (5th Cir. 2022) (en banc). This is because if the policymaker was acting on the State's behalf, he—like the State itself—is not a "person" against whom a § 1983 damages claim may be brought. *Hafer*, 502 U.S. at 22, 26–27 ("[S]tate officials 'acting in their official capacities' are outside the class of 'persons' subject to liability under [§ 1983].'"); *Daves*, 22 F.4th at 532 (holding that if the defendant was acting for the State, "there is no case or controversy . . . , and no Article III jurisdiction."). Thus, even if a Defendant is shown to have been a policymaker, he cannot be liable for damages if he made the policy on *the State's* behalf.

Here, GHAE's § 1983 claims fail because no Defendant was a policymaker with respect to the policy at issue here—namely LSIPA, a state law. Indeed, GHAE's allegations that Defendants

complied with mandatory state law would defeat their claims even if Defendants were otherwise local policymakers. And, in any event, GHAE could not sue Defendants for damages because ERCOT and its officers and employees act exclusively for the State of Texas, and they therefore cannot qualify as "persons" under § 1983.

### 1. GHAE's § 1983 claims should be dismissed because no Defendant was a policymaker with respect to LSIPA.

GHAE does not specifically identify the policy underlying its *Monell* claim, but its pleadings leave only one possibility: LSIPA itself. GHAE alleges that the "sole basis" for ERCOT's cancellation of GHAE's Blue Star Solar interconnection request "was that GHAE did not comply with LSIPA." FAC ¶ 56. Likewise, GHAE's request for a screening study was allegedly denied "solely because GHAE did not comply with LSIPA." *Id.* ¶ 60; *accord id.* ¶¶ 48, 53–54, 59, 61–62, 80. Thus, LSIPA was the "moving force" behind the alleged constitutional violations. *Valle*, 613 F.3d at 541–42.

No Defendant was a policymaker with respect to LSIPA. LSIPA is a state law, enacted by the Legislature and signed by the Governor. FAC ¶¶ 44, 47. No Defendant is alleged to have enacted, approved, or ratified LSIPA. Indeed, no Defendant is even alleged to have the authority to decide whether ERCOT complies with LSIPA, *see* PURA § 39.360 (mandating ERCOT's compliance with LSIPA); they are only alleged to have "appl[ied] LSIPA to GHAE's Projects," FAC at 14 (heading). For this simple reason, GHAE's § 1983 claims fail against every Defendant. *Guillot*, 59 F.4th 750–51; *Arnone*, 29 F.4th at 265–66.

GHAE's pleading establishes that Mr. Fohn and Ms. Heinrich are not policymakers for an additional reason. GHAE alleges that Mr. Fohn and Ms. Heinrich were employees in ERCOT's legal department and that they *notified* GHAE of certain ERCOT decisions regarding LSIPA's application to GHAE's projects. FAC ¶¶ 56, 60. But GHAE does not allege that Mr. Fohn or Ms. Heinrich even made the relevant decisions to cancel GHAE's projects or refuse a screening study, let alone that they did so as final policymakers. Instead, GHAE alleges that the decisions were made by ERCOT's CEO

and Board. *Id.* ¶¶ 57, 61–62; *see also Longoria v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 271 (5th Cir. 2019) (distinguishing between *decisionmaking* authority and *policymaking* authority, and holding that only the latter can support a *Monell* claim). Because Mr. Fohn and Ms. Heinrich were mere employees giving notice of decisions based on State-law policies they did not make, the § 1983 claims against Mr. Fohn and Ms. Heinrich must be dismissed.

> ## 2.    Even if Defendants were policymakers, they cannot be liable because they were enforcing mandatory state law.

Here, GHAE specifically pleads that its injuries were caused by a *state* policy, for which Defendants cannot be responsible. But even if GHAE had pleaded that it was harmed by a non-State policy implemented by Defendants, its claims would fail because Defendants were nevertheless complying with mandatory state law.

GHAE alleges that it was harmed by LSIPA, and it alleges that ERCOT's application of LSIPA was consistent with a formal interpretation of that law by Texas's Attorney General. FAC ¶ 48 (alleging that Texas's Attorney General concluded that a Chinese-owned or -controlled company entering into an interconnection agreement would "violate LSIPA" (citing Tex. Att'y Gen. Op. KP-0388, 2021 WL 4447075 (2021)). Thus, GHAE alleges that Defendants complied with mandatory state law, as construed by the Attorney General.

Such an allegation cannot be the basis for § 1983 liability under *Monell*. In *Society of Separationists, Inc. v. Herman*, for instance, the Fifth Circuit held that a county was not "susceptible to liability under § 1983" where the relevant policymaker had only "effectuated a policy of the State of Texas." 939 F.2d 1207, 1215 n.31 (5th Cir. 1991); *see also Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) (holding that county official's enforcement of a state law "may more fairly be characterized as the effectuation of the policy of the State of Texas," for which reason the county was "not susceptible to liability under section 1983"). District courts in this Circuit have thus held that imposing *Monell* liability based on the enforcement of state law would be "inconsistent with *Monell*'s requirement that a *municipal*

*policy* be the 'moving force' behind the constitutional violation." *Cain v. City of New Orleans*, No. 15-4479, 2016 WL 2849498, at *8 (E.D. La. May 13, 2016).

Because GHAE pleads that Defendants complied with LSIPA, a mandatory Texas statute, Defendants are "not susceptible to liability under section 1983." *Familias Unidas*, 619 F.2d at 404. GHAE's § 1983 claims should therefore be dismissed.

### 3.    GHAE's damages claim fail because, even if Defendants were policymakers, they made policy *for the State*.

Even if GHAE had pleaded that an ERCOT policy implemented by Defendants was responsible for its injuries, its damages claims would have to be dismissed because ERCOT, and all its officers and employees, act exclusively on behalf of the State of Texas. "For purposes of Section 1983 personhood, it is *state law* that determines whether an official with final policymaking authority as to the specific function involved in the litigation is acting for a local government unit or the state." *Daves*, 22 F.4th at 532–33 (emphasis added); *id.* at 533 ("[W]e examine function, not funding, when deciding whether an official is acting for the state or local government in a case brought pursuant to Section 1983.").[24] And Texas law is clear that ERCOT acts as "an arm of the State government" that Texas "utilize[s] . . . to achieve its objectives for the Texas power region." *CPS Energy*, 671 S.W.3d at 623, 626 (cleaned up).

"Texas caselaw says unequivocally that ERCOT is an organ of government that performs a uniquely governmental function." *Entrust*, 101 F.4th at 383 (cleaned up). "ERCOT operates as part of [Texas's] broader electric-regulation system under PURA and performs the uniquely governmental function of utilities regulation." *CPS Energy*, 671 S.W.3d at 616. "ERCOT and the PUC[T] are uniquely situated as legislatively endorsed joint participants in a complex regulatory scheme—each serving its

---

[24] As *Daves* explains, the § 1983 personhood inquiry is distinct from the "arm of the State" inquiry under the Eleventh Amendment. 22 F.4th at 532–33.

own distinct and essential purpose." *RWE*, 691 S.W.3d at 490. "There is no evidence that ERCOT performs any functions outside its role" as an arm of the State. *CPS Energy*, 671 S.W.3d at 628.[25]

Moreover, ERCOT's Planning Guide—which GHAE alleges mirrors LSIPA—is a binding document promulgated using rulemaking authority delegated to ERCOT from the PUCT. *See CPS Energy*, 671 S.W.3d at 626 (holding that ERCOT is "statutorily authorized to establish, adopt, and enforce a variety of policies, rules, guidelines, standards, procedures, protocols, and other requirements" (citing PURA §§ 39.151(d), (i), (j), (*l*))). ERCOT's rules, including the Planning Guide provisions at issue, cannot take effect without the PUCT's approval. PURA § 39.151(g-6). Likewise, when ERCOT enforces its rules—as occurred here—it utilizes *state* power delegated to it from the PUCT. PURA §§ 39.151(d), (g-6); *CPS Energy*, 671 S.W.3d at 616. And PURA requires ERCOT to enforce LSIPA with respect to participants and would-be participants in the ERCOT grid and market. PURA § 39.360(b).

Because ERCOT solely acts on behalf of the State of Texas, and was doing so here by allegedly applying LSIPA to GHAE, Defendants are not "persons" for § 1983 purposes, and this Court lacks jurisdiction over GHAE's § 1983 damages claim against them. *Daves*, 24 F.4th at 533; *Green Valley*, 969 F.3d at 475.[26]

**B.    GHAE's equal protection claim fails on its merits.**

"In areas of social . . . policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). This highly deferential standard

---

[25] In its Original Complaint, GHAE alleged that "ERCOT is a governmental entity that performs governmental functions." Dkt. 1 ¶ 2.

[26] Defendants acknowledge that they may be "persons" with respect to § 1983 claims for injunctive relief. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989). But GHAE's injunction claims fail for the other reasons stated in this section.

is "a paradigm of judicial restraint," as "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313–14. Accordingly, a non-suspect classification, like LSIPA's, "bear[s] a strong presumption of validity," which GHAE can defeat only by "negat[ing] every conceivable basis which might support" it. *Id.*

Even at the pleading stage, this bar is high. When courts "**apply rational basis at the failure-to-state-a-claim stage, [they] must treat a legislative classification as valid if a court is able to hypothesize a legitimate purpose to support the action.**" *Hines v. Quillivan*, 982 F.3d 266, 273 (5th Cir. 2020) (emphasis added). That hypothetical legitimate purpose may be determined post-hoc, *id.* at 274, as it is "entirely irrelevant for constitutional purposes whether the conceived reasons for the challenged distinction actually motivated the [L]egislature," *Beach Commc'ns*, 508 U.S. at 315. A legitimate purpose is simply one that is not pure fantasy or fiction. *Hines*, 982 F.3d at 273.

Because (1) GHAE is not part of a suspect class; and (2) LSIPA's grid access limitations serve a legitimate purpose, GHAE fails to state a claim under the Equal Protection Clause.

### 1.    GHAE is not a member of a protected class.

Hoping to seize on strict scrutiny, GHAE asserts that LSIPA violates the Equal Protection Clause because it prevents "entities owned or controlled by Chinese persons[27] such as GHAE" from connecting to the ERCOT grid, which GHAE contends constitutes unlawful discrimination on the basis of alienage, race, ethnicity, and national origin. FAC ¶ 79.

GHAE is wrong. To begin, GHAE—a "domestic" Texas company, FAC ¶ 1—fails to allege that it has any alienage, race, ethnicity, or national origin. For that reason alone, its claims should be reviewed solely for a rational basis. But even if a Texas LLC like GHAE could have those

---

[27] Contrary to GHAE's claim that LSIPA applies broadly to "Chinese *persons*," FAC ¶ 79, LSIPA contains no such language.

characteristics imputed to it,[28] and even if GHAE had adequately alleged them, GHAE's strict-scrutiny claims would still fail.

Race relates solely to ethnic or ancestral characteristics. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207–08 (2023). Ethnicity "refers to physical and cultural characteristics that make a social group distinctive." *Jumbo v. Goodwill Indus. Hous.*, No. 4:21-cv-03509, 2023 WL 5417149, at *3 (S.D. Tex. Aug. 7, 2023) (quoting Juan F. Perea, Ethnicity and the Constitution: Beyond the Black and White Binary Constitution, 36 Wm. & Mary L. Rev. 571, 575 (1995)), *report and recommendation adopted*, 2023 WL 5401874 (S.D. Tex. Aug. 22, 2023). And national origin means "the particular country in which one was born." *United States v. Osorto*, 995 F.3d 801, 822 (11th Cir. 2021); *see also Jumbo*, 2023 WL 5417149 at *3 (same). LSIPA is facially neutral as to each. For instance, a person of Chinese ancestry and/or birth who is an American (but not Chinese) citizen could control a company operating resources connected to the ERCOT grid without offending LSIPA.

That leaves alienage. Alienage does not refer to having a foreign citizenship. It refers, instead, to the status of "*not* being a citizen of the United States." *Osorto*, 995 F.3d at 822 (emphasis added); *see also United States v. Nnanna*, 7 F.3d 420, 422 (5th Cir. 1993) (noting that "'alienage' and 'national origin' are not synonymous."); 8 U.S.C. § 1101(a)(3) (defining "alien" as "any person not a citizen or national of the United States"). LSIPA is neutral regarding alienage; it applies regardless of whether the person is or is not "a citizen of the United States." *Osorto*, 995 F.3d at 822. LSIPA instead prohibits companies controlled by persons who are currently citizens of four adversary nations, including China, from being given access to or control of critical infrastructure on the Texas grid. That prohibition applies

---

[28] A questionable proposition at best. *See AID*, 591 U.S. at 435 ("[S]eparately incorporated organizations are separate legal units with distinct legal rights and obligations."); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 263 (1977) ("As a corporation, MHDC has no racial identity . . . .").

regardless of whether or not the person is *also* a United States citizen. LSIPA therefore does not discriminate on the basis of alienage.

Further, to the extent that GHAE's claim is based on the alienage of Mr. Guangxin (the owner of GHAE's ultimate parent company, Xinjiang), it would not be actionable. The precise corporate links between Mr. Guangxin and GHAE remain obscure, but whatever the means of ownership, GHAE must be treated as legally distinct from Xinjiang and, thus, Mr. Guangxin. *AID*, 591 U.S. at 435 ("[S]eparately incorporated organizations are separate legal units with distinct legal rights and obligations."); *see also Cibolo*, 718 F.3d at 474 (holding that litigants generally may not assert another person's legal rights). Moreover, both Mr. Guangxin and Xinjiang are located in China, FAC ¶ 1, and Mr. Guangxin is not alleged to be a United States resident or immigrant. As "foreign citizens outside U.S. territory," Xinjiang and Mr. Guangxin "do not possess rights under the U.S. Constitution," *AID*, 591 U.S. at 434, including the Equal Protection Clause, *De Tenorio v. McGowan*, 510 F.2d 92, 101 (5th Cir. 1975). GHAE therefore cannot assert constitutional claims on behalf of legally distinct entities or persons located outside the United States. *AID*, 591 U.S. at 434–36.

Finally, even if LSIPA discriminated on the basis of alienage, rational-basis review would still apply here for several reasons. First, except for classifications affecting "resident aliens" or "permanent resident aliens," neither of which are implicated here, the U.S. Supreme "Court has never applied strict scrutiny review to a state law affecting any other alienage classifications." *LeClerc v. Webb*, 419 F.3d 405, 416 (5th Cir. 2005). Rational basis is thus "the appropriate standard for evaluating state law classifications affecting nonimmigrant aliens" that have been admitted into and are present in the United States. *LeClerc*, 419 F.3d at 420. Considering that Mr. Guangxin has not been "admitted to the United States," *id.* at 418, even on a temporary basis, any derivate equal-protection rights GHAE might assert would be even more attenuated than those at issue in *LeClerc*. It would make little sense to

effectively grant Mr. Guangxin remote access to Texas's intrastate grid by applying a higher standard of review to a company he owns than would be applied to a lawfully admitted, nonimmigrant alien.

What's more, the Supreme Court has applied rational-basis review to, and upheld, state laws restricting non-citizens' access to certain privileges of unique importance to the State. *E.g.*, *Cabell v. Chavez-Salido*, 454 U.S. 432, 444–47 (1982) (upholding state law conditioning employment as a probation officer on citizenship); *Foley v. Connelie*, 435 U.S. 291, 299–399 (1978) (same, for state troopers). As in those cases, Texas may properly restrict aliens—especially non-present, nonresident aliens who are citizens of a foreign adversary—from gaining access to or control of the State's critical, and uniquely intrastate, electric infrastructure. *See also Terrace v. Thompson*, 263 U.S. 197, 219–22 (1923) (upholding against equal-protection challenge state law restricting alien land ownership, and noting that "farm lands within its borders are matters of highest importance and affect the safety and power of the state itself").

### 2.    LSIPA easily passes rational-basis review.

Because rational-basis review applies, LSIPA's classifications must be treated "as valid if the Court is able to hypothesize a legitimate purpose to support the action." *Hines*, 982 F.3d at 273 (cleaned up). When "conceiving of hypothetical rationales for a law, the assumptions underlying those rationales may be erroneous so long as they are 'arguable.'" *Glaxx v. Paxton*, 900 F.3d 233, 246 (5th Cir. 2018) (affirming Rule 12(b)(6) dismissal of equal-protection claims). "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315.

It is easy to hypothesize a rational basis for limiting who can have direct or remote access or control of the ERCOT grid. As the Fifth Circuit has recognized, "ERCOT's independence makes the Texas electrical grid uniquely vulnerable to sudden power shortages" as—unlike the other Interconnections comprised of a vast network of power generators—ERCOT must almost wholly

rely on its own self-contained system. *Texas*, 829 F.3d at 432. Ninety percent of Texans, or more than 27 million people, obtain their electricity from Texas's self-contained grid.[29] Were the ERCOT grid compromised, that ninety percent of Texans could be without power for weeks or even months. *See PUCT v. Luminant Energy Co.*, 691 S.W.3d 448, 455 (Tex. 2024) (recognizing that, during Winter Storm Uri, "Texas was fewer than five minutes away from a total grid collapse that would have plunged the state into darkness for weeks, maybe months"). Just three years ago, this State saw firsthand the impact a few-day loss of power had on millions of Texans' lives, when nearly half of ERCOT's generation fleet unexpectedly tripped offline due to Winter Storm Uri's historic freezing temperatures.

Given the millions of lives and livelihoods on the line, the Texas Legislature and ERCOT must be able to take action to ensure the reliability of the ERCOT grid. And, indeed, LSIPA was passed in furtherance of that very goal. LSIPA aims to ensure that companies owned or controlled by citizens of certain countries that have demonstrated "human rights abuses, intellectual property theft, previous critical infrastructure attacks, and . . . other hostile actions performed against the State of Texas and the United States" cannot directly access Texas's critical infrastructure. *See* **Ex. A**.

Above all—and as GHAE acknowledges, FAC ¶ 47—in enacting LSIPA, the Legislature was chiefly concerned about the integrity of the ERCOT grid; thus, it prohibited certain companies that it believed posed a security risk from gaining access to or control of the grid and Critical Energy Infrastructure Information. *See* PURA § 39.360. Whether this belief was right, fair, or wise is for neither GHAE nor this Court to second-guess. *Hines*, 982 F.3d at 273 ("Rational-basis review is guided by the principle that we do not have a license to judge the wisdom, fairness, or logic of legislative choices." (cleaned up)); *see also Texas*, 829 F.3d at 433 (acknowledging the "exceptional complexity of grid reliability concerns in Texas."). The only question is whether that rationale—or any other

---

[29] *See* ERCOT Fact Sheet (September 2024), *available at* https://www.ercot.com/files/docs/2022/02/08/ERCOT_Fact_Sheet.pdf.

conceivable rationale—is "arguable," *Paxton*, 900 F.3d at 246, and not just a "matter of fiction." *Hines*, 982 F.3d at 273. Because LSIPA rationally restricts who may access the ERCOT grid, and GHAE has made no attempt to negate Texas's security risk concerns nor "every [other] conceivable basis which might support" LSIPA, *Beach Commc'ns*, 508 U.S. at 314–15, GHAE's equal protection claims must be dismissed.

## IV.    Defendants are entitled to sovereign immunity.

If ERCOT is an arm of the State of Texas, GHAE's official-capacity damages claims under § 1983 are barred by sovereign immunity.[30] *Kentucky*, 473 U.S. at 167. Likewise, GHAE's claims for injunctive relief would be barred by immunity to the extent GHAE has failed to plead a valid official-capacity claim for prospective injunctive relief. *Green Valley*, 969 F.3d at 471.

Defendants acknowledge the Fifth Circuit's recent determination that ERCOT is not an arm of the State for Eleventh Amendment purposes. *In re Entrust Energy, Inc.*, 101 F.4th at 387. Nevertheless, Defendants contend that conclusion was erroneous. *Entrust* gave too much weight to the funding factor and insufficient weight to Texas's dignitary interests, which the Supreme Court has more recently called the "*preeminent* purpose of state sovereign immunity." *Fed. Mar. Comm'n v. State Ports Auth.*, 535 U.S. 743, 760 (2002) (emphasis added); *see Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1030 (9th Cir. 2023) (holding that "the Eleventh Amendment does not require a focus solely on the financial impact of the entity on the state because the Eleventh Amendment is equally concerned with the dignity interests of the state" (cleaned up)). Further, *Entrust*'s conclusions that the State does not fund ERCOT (*Clark* factor 2) and does not control ERCOT's property (*Clark* factor 6) were erroneous.

---

[30] The Eleventh Amendment's text protects a State from suit in federal court by non-citizens of that State, while the State is protected from other suits by a broader structural immunity. *See PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 509 (2021) (Gorsuch, J., dissenting); *Green Valley*, 969 F.3d at 495 n.2 (Oldham, J., concurring). Because GHAE's citizenship is unclear, *see* FAC ¶ 1; *Settlement Funding, LLC v. Rapid Settlements, Ltd.*, 851 F.3d 530, 536 (5th Cir. 2017), it is uncertain which of these doctrines applies. Defendants thus use "Eleventh Amendment immunity" and "sovereign immunity" interchangeably. *See Meyers v. Texas*, 410 F.3d 236, 240–41 (5th Cir. 2005).

101 F.4th at 384–87 (citing *Clark v. Tarrant County*, 798 F.2d 736 (5th Cir. 1986)). The holdings misapprehended, and failed to duly defer to the Texas Supreme Court's binding construction of, ERCOT's statutory regime. *See, e.g.*, *CPS Energy*, 671 S.W.3d at 627 (holding that ERCOT's assets belong to the State and "the judgment [debtor]" for a money judgment against ERCOT "would be the state"); *id.* at 624, 627.

## PRAYER

For the reasons set forth above, Defendants respectfully request that the Court grant their Motion to Dismiss and dismiss all of the claims asserted in GHAE's First Amended Complaint.

Respectfully submitted,

**WINSTEAD PC**

*/s/ Elliot Clark*
Elliot Clark
State Bar No. 24012428
eclark@winstead.com
D. Blake Wilson
State Bar No. 24090711
bwilson@winstead.com
Elin Isenhower
State Bar No. 24104206
eisenhower@winstead.com
600 W. 5th, Suite 900
Austin, Texas 78701
Telephone: (512) 370-2800
Facsimile: (512) 370-2850

**ATTORNEYS FOR DEFENDANTS IN THEIR OFFICAL CAPACITIES**

**ALEXANDER DUBOSE & JEFFERSON LLP**

*/s/ Wallace B. Jefferson*
Wallace B. Jefferson
State Bar No. 00000019
wjefferson@adjtlaw.com
Rachel A. Ekery
State Bar No. 00787424
rekery@adjtlaw.com
100 Congress Avenue, Suite 1450
Austin, Texas 78701-2709
Telephone: (512) 482-9300
Facsimile:  (512) 482-9303

**ATTORNEYS  FOR  DEFENDANTS  IN THEIR OFFICIAL CAPACITIES**

**COOPER & KIRK PLLC**

/s/ *David. H. Thompson*
David H. Thompson *(pro hac vice)*
D.C. Bar No. 450503
John D. Ramer *(pro hac vice)*
D. C. Bar No. 90002236
1523 New Hampshire Ave., N.W.
Washington D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
jramer@cooperkirk.com

**ATTORNEYS  FOR  DEFENDANTS  IN THEIR OFFICAL CAPACITIES**

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2024, the foregoing document was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Elliot Clark*
Elliot Clark

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| GH AMERICA ENERGY LLC | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| DOUGLAS FOHN, in his official capacity as | § | |
| Assistant General Counsel of the Electric | § | |
| Reliability Council of Texas, Inc. ("ERCOT"); | § | |
| HOLLY HEINRICH, in her official capacity | § | |
| as Legal/Regulatory Counsel of ERCOT; | § | |
| PABLO VEGAS, in his official capacity as | § | |
| Chief Executive Officer of ERCOT; PAUL | § | |
| FOSTER, in his official capacity as a member | § | |
| of the Board of Directors of ERCOT; BILL | § | |
| FLORES, in his official capacity as a member | § | CASE NO.1:24-CV-00648 |
| of the Board of Directors of ERCOT; | § | |
| CARLOS AGUILAR, in his official capacity | § | |
| as a member of the Board of Directors of | § | |
| ERCOT; LINDA CAPUANO, in her official | § | |
| capacity as a member of the Board of | § | |
| Directors of ERCOT; JULIE ENGLAND, in | § | |
| her official capacity as a member of the Board | § | |
| of Directors of ERCOT; ROBERT | § | |
| FLEXON, in his official capacity as a member | § | |
| of the Board of Directors of ERCOT; | § | |
| PEGGY HEEG, in her official capacity as a | § | |
| member of the Board of Directors of | § | |
| ERCOT; and JOHN SWAINSON, in his | § | |
| official capacity as a member of the Board of | § | |
| Directors of ERCOT, | § | |
| | § | |
| *Defendants,* | § | |
| | § | |
| ATTORNEY GENERAL KEN PAXTON, | § | |
| | § | |
| *Intervenor-Defendant.* | § | |

**APPENDIX TO**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

| Exhibit A | SB 2116 and SB 2013 Enrolled Versions & Bill Analyses |
|---|---|
| Exhibit B | Deeds Re: Sale of Blue Hills Wind and Blue Valley Solar Projects |
| Exhibit C | GHAE's LSIPA Attestations for Blue Hills Wind, Blue Valley Solar, and Blue Star Solar Projects |
| Exhibit D | Declaration of Holly Heinrich |
| Exhibit E | GHAE/Department of Defense Mitigation Agreement Re: Blue Hills Wind Project |

# EXHIBIT A-1

S.B. No. 2116

1                              AN ACT

2   relating to prohibiting contracts or other agreements with certain

3   foreign-owned companies in connection with critical infrastructure

4   in this state.

5          BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

6          SECTION 1.  This Act may be cited as the Lone Star

7   Infrastructure Protection Act.

8          SECTION 2.  Subtitle C, Title 5, Business & Commerce Code, is

9   amended by adding Chapter 113 to read as follows:

10   CHAPTER 113.  PROHIBITION ON AGREEMENTS WITH CERTAIN FOREIGN-OWNED

11          COMPANIES IN CONNECTION WITH CRITICAL INFRASTRUCTURE

12          Sec. 113.001.  DEFINITIONS.  In this chapter:

13          (1) "Company" means a sole proprietorship,

14   organization, association, corporation, partnership, joint

15   venture, limited partnership, limited liability partnership, or

16   limited liability company, including a wholly owned subsidiary,

17   majority-owned subsidiary, parent company, or affiliate of those

18   entities or business associations, that exists to make a profit.

19          (2) "Critical infrastructure" means a communication

20   infrastructure system, cybersecurity system, electric grid,

21   hazardous waste treatment system, or water treatment facility.

22          (3) "Cybersecurity" means the measures taken to

23   protect a computer, computer network, computer system, or other

24   technology infrastructure against unauthorized use or access.

1

S.B. No. 2116

1      (4)  "Designated country" means a country designated by
2  the governor as a threat to critical infrastructure under Section
3  113.003.
4      Sec. 113.002.  PROHIBITED     ACCESS       TO      CRITICAL
5  INFRASTRUCTURE.  (a)  A business entity may not enter into an
6  agreement relating to critical infrastructure in this state with a
7  company:
8          (1)  if, under the agreement, the company would be
9  granted  direct  or  remote  access  to  or  control  of  critical
10 infrastructure  in  this  state,  excluding  access  specifically
11 allowed  by  the  business  entity  for  product  warranty  and  support
12 purposes; and
13         (2)  if the business entity knows that the company is:
14             (A)  owned by or the majority of stock or other
15 ownership interest of the company is held or controlled by:
16                 (i)  individuals who are citizens of China,
17 Iran, North Korea, Russia, or a designated country; or
18                 (ii)  a company or other entity, including a
19 governmental entity, that is owned or controlled by citizens of or
20 is directly controlled by the government of China, Iran, North
21 Korea, Russia, or a designated country; or
22             (B)  headquartered in China, Iran, North Korea,
23 Russia, or a designated country.
24     (b)  The prohibition described by Subsection (a) applies
25 regardless of whether:
26         (1)  the company's or its parent company's securities
27 are publicly traded; or

2

S.B. No. 2116

1          (2)  the company or its parent company is listed on a

2   public stock exchange as:

3               (A)  a Chinese, Iranian, North Korean, or Russian

4   company; or

5               (B)  a company of a designated country.

6      Sec. 113.003.  DESIGNATION OF COUNTRY AS THREAT TO CRITICAL

7   INFRASTRUCTURE.  (a)  The governor, after consultation with the

8   public safety director of the Department of Public Safety, may

9   designate a country as a threat to critical infrastructure for

10  purposes of this chapter.

11     (b)  The governor shall consult the Homeland Security

12  Council, established under Subchapter B, Chapter 421, Government

13  Code, to assess a threat to critical infrastructure for purposes of

14  making a designation under this section.

15     SECTION 3.  Subtitle F, Title 10, Government Code, is

16  amended by adding Chapter 2274 to read as follows:

17  CHAPTER 2274.  PROHIBITION ON CONTRACTS WITH CERTAIN FOREIGN-OWNED

18          COMPANIES IN CONNECTION WITH CRITICAL INFRASTRUCTURE

19     Sec. 2274.0101.  DEFINITIONS.  In this chapter:

20          (1)  "Company" means a sole proprietorship,

21  organization, association, corporation, partnership, joint

22  venture, limited partnership, limited liability partnership, or

23  limited liability company, including a wholly owned subsidiary,

24  majority-owned subsidiary, parent company, or affiliate of those

25  entities or business associations, that exists to make a profit.

26          (2)  "Critical infrastructure" means a communication

27  infrastructure system, cybersecurity system, electric grid,

3

S.B. No. 2116

1    hazardous waste treatment system, or water treatment facility.

2              (3)  "Cybersecurity"  means  the  measures  taken  to

3    protect a computer, computer network, computer system, or other

4    technology infrastructure against unauthorized use or access.

5              (4)  "Designated country" means a country designated by

6    the governor as a threat to critical infrastructure under Section

7    2274.0103.

8              (5)  "Governmental  entity"  means  a  state  agency  or

9    political subdivision of this state.

10   Sec. 2274.0102.  PROHIBITED CONTRACTS.  (a)  A governmental

11   entity may not enter into a contract or other agreement relating to

12   critical infrastructure in this state with a company:

13             (1)  if,  under  the  contract  or  other  agreement,  the

14   company would be granted direct or remote access to or control of

15   critical  infrastructure  in  this  state,  excluding  access

16   specifically  allowed  by  the  governmental  entity  for  product

17   warranty and support purposes; and

18             (2)  if the governmental entity knows that the company

19   is:

20             (A)  owned by or the majority of stock or other

21   ownership interest of the company is held or controlled by:

22                       (i)  individuals who are citizens of China,

23   Iran, North Korea, Russia, or a designated country; or

24                       (ii)  a company or other entity, including a

25   governmental entity, that is owned or controlled by citizens of or

26   is directly controlled by the government of China, Iran, North

27   Korea, Russia, or a designated country; or

S.B. No. 2116

1        (B)  headquartered in China, Iran, North Korea,
2  Russia, or a designated country.

3        (b)  The prohibition described by Subsection (a) applies
4  regardless of whether:

5            (1)  the company's or its parent company's securities
6  are publicly traded; or

7            (2)  the company or its parent company is listed on a
8  public stock exchange as:

9                (A)  a Chinese, Iranian, North Korean, or Russian
10  company; or

11                (B)  a company of a designated country.

12      Sec. 2274.0103.  DESIGNATION  OF  COUNTRY  AS  THREAT  TO
13  CRITICAL INFRASTRUCTURE.  (a)  The governor, after consultation
14  with the public safety director of the Department of Public Safety,
15  may designate a country as a threat to critical infrastructure for
16  purposes of this chapter.

17      (b)  The  governor  shall  consult  the  Homeland  Security
18  Council, established under Subchapter B, Chapter 421, to assess a
19  threat  to  critical  infrastructure  for  purposes  of  making  a
20  designation under this section.

21      SECTION 4.  Chapter 113, Business & Commerce Code, as added
22  by this Act, and Chapter 2274, Government Code, as added by this
23  Act, apply to a contract or agreement entered into on or after the
24  effective date of this Act.

25      SECTION 5.  This Act takes effect immediately if it receives
26  a vote of two-thirds of all the members elected to each house, as
27  provided by Section 39, Article III, Texas Constitution. If this

5

S.B. No. 2116

1  Act does not receive the vote necessary for immediate effect, this
2  Act takes effect September 1, 2021.


_____        _____
    President of the Senate              Speaker of the House

     I hereby certify that S.B. No. 2116 passed the Senate on
April 26, 2021, by the following vote:  Yeas 31, Nays 0; and that
the Senate concurred in House amendments on May 29, 2021, by the
following vote: Yeas 31, Nays 0.


                                _____
                                    Secretary of the Senate

     I hereby certify that S.B. No. 2116 passed the House, with
amendments, on May 24, 2021, by the following vote:  Yeas 141,
Nays 0, one present not voting.


                                _____
                                    Chief Clerk of the House


Approved:


_____
          Date


_____
          Governor

# EXHIBIT A-2

<u>BILL ANALYSIS</u>

Senate Research Center                                                                              S.B. 2116
                                                                                            By: Campbell; Hall
                                                                                          Business & Commerce
                                                                                                    6/7/2021
                                                                                                    Enrolled

**AUTHOR'S / SPONSOR'S STATEMENT OF INTENT**

S.B. 2116 would ban the following governments from connecting physically/remotely into Texas critical infrastructure due to acts of aggression towards the United States, human rights abuses, intellectual property theft, previous critical infrastructure attacks, and ties to other hostile actions performed against the State of Texas and the United States: companies owned (controlling interests) or connected to individuals holding citizenship with the governments of China, Iran, North Korea, and/or Russia.

Critical infrastructure is defined as an electrical grid system, water treatment facility, communications system, critical cyber infrastructure, or chemical facility.

(Original Author's / Sponsor's Statement of Intent)

S.B. 2116 amends current law relating to prohibiting contracts or other agreements with certain foreign-owned companies in connection with critical infrastructure in this state.

**RULEMAKING AUTHORITY**

This bill does not expressly grant any additional rulemaking authority to a state officer, institution, or agency.

**SECTION BY SECTION ANALYSIS**

SECTION 1. Authorizes this Act to be cited as the Lone Star Infrastructure Protection Act.

SECTION 2. Amends Subtitle C, Title 5, Business & Commerce Code, by adding Chapter 113, as follows:

CHAPTER 113. PROHIBITION ON AGREEMENTS WITH CERTAIN FOREIGN-OWNED COMPANIES IN CONNECTION WITH CRITICAL INFRASTRUCTURE

Sec. 113.001. DEFINITIONS. Defines "company," "critical infrastructure," "cybersecurity," and "designated country."

Sec. 113.002. PROHIBITED ACCESS TO CRITICAL INFRASTRUCTURE. (a) Prohibits a business entity from entering into an agreement relating to critical infrastructure in this state with a company:

(1) if, under the agreement, the company would be granted direct or remote access to or control of critical infrastructure in this state, excluding access specifically allowed by the business entity for product warranty and support purposes; and

(2) if the business entity knows that the company is:

(A) owned by or the majority of stock or other ownership interest of the company is held or controlled by:

(i) individuals who are citizens of China, Iran, North Korea, Russia, or a designated country; or

(ii) a company or other entity, including a governmental entity, that is owned or controlled by citizens of or is directly controlled by the government of China, Iran, North Korea, Russia, or a designated country; or

(B) headquartered in China, Iran, North Korea, Russia, or a designated country.

(b) Provides that the prohibition described by Subsection (a) applies regardless of whether the company's or its parent company's securities are publicly traded, or whether the company or its parent company is listed on a public stock exchange as a Chinese, Iranian, North Korean, or Russian company or as a company of a designated country.

Sec. 113.003. DESIGNATION OF COUNTRY AS THREAT TO CRITICAL INFRASTRUCTURE. (a) Authorizes the governor, after consultation with the public safety director of the Department of Public Safety of the State of Texas (public safety director), to designate a country as a threat to critical infrastructure for purposes of this chapter.

(b) Requires the governor to consult the Homeland Security Council, established under Subchapter B (Homeland Security Council), Chapter 421 (Homeland Security), Government Code, to assess a threat to critical infrastructure for purposes of making a designation under this section.

SECTION 3. Amends Subtitle F, Title 10, Government Code, by adding Chapter 2274, as follows:

CHAPTER 2274. PROHIBITION ON CONTRACTS WITH CERTAIN FOREIGN-OWNED COMPANIES IN CONNECTION WITH CRITICAL INFRASTRUCTURE

Sec. 2274.0101. DEFINITIONS. Defines "company," "critical infrastructure," "cybersecurity," "designated country," and "governmental entity."

Sec. 2274.0102. PROHIBITED CONTRACTS. (a) Prohibits a governmental entity from entering into a contract or other agreement relating to critical infrastructure in this state with a company:

(1) if, under the contract or other agreement, the company would be granted direct or remote access to or control of critical infrastructure in this state, excluding access specifically allowed by the governmental entity for product warranty and support purposes; and

(2) if the governmental entity knows that the company is:

(A) owned by or the majority of stock or other ownership interest of the company is held or controlled by:

(i) individuals who are citizens of China, Iran, North Korea, Russia, or a designated country; or

(ii) a company or other entity, including a governmental entity, that is owned or controlled by citizens of or is directly controlled by the government of China, Iran, North Korea, Russia, or a designated country; or

(B) headquartered in China, Iran, North Korea, Russia, or a designated country.

(b) Provides that the prohibition described by Subsection (a) applies regardless of whether the company's or its parent company's securities are publicly traded, or whether the company or its parent company is listed on a public stock exchange as a Chinese, Iranian, North Korean, or Russian company or as a company of a designated country.

Sec. 2274.0103. DESIGNATION OF COUNTRY AS THREAT TO CRITICAL INFRASTRUCTURE. (a) Authorizes the governor, after consultation with the public safety director, to designate a country as a threat to critical infrastructure for purposes of this chapter.

(b) Requires the governor to consult the Homeland Security Council, established under Subchapter B, Chapter 421, to assess a threat to critical infrastructure for purposes of making a designation under this section.

SECTION 4. Makes application of this Act prospective.

SECTION 5. Effective date: upon passage or September 1, 2021.

# EXHIBIT A-3

S.B. No. 2013

1                          AN ACT

2  relating to access to and the security of certain critical

3  infrastructure.

4        BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

5        SECTION 1.  Section 113.001, Business & Commerce Code, as

6  added by Chapter 975 (S.B. 2116), Acts of the 87th Legislature,

7  Regular Session, 2021, is amended by adding Subdivision (5) to read

8  as follows:

9            (5) "Affiliate," with respect to a company entering

10  into an agreement in which the critical infrastructure is electric

11  grid equipment, has the meaning assigned by the protocols of the

12  independent organization certified under Section 39.151, Utilities

13  Code, for the ERCOT power region.

14        SECTION 2.  Subchapter F, Chapter 411, Government Code, is

15  amended by adding Section 411.1183 to read as follows:

16        Sec. 411.1183.  ACCESS   TO   CRIMINAL   HISTORY   RECORD

17  INFORMATION:  INDEPENDENT ORGANIZATION CERTIFIED UNDER UTILITIES

18  CODE.  (a)  An independent organization certified under Section

19  39.151, Utilities Code, for security reasons is entitled to obtain

20  from the department criminal history record information maintained

21  by the department that relates to a person who has or is seeking

22  employment at or access to the independent organization's systems

23  that affect the security of the electric grid or any other

24  background information maintained by the department that relates to

1

S.B. No. 2013

1  the person that is considered necessary by the independent

2  organization or required by the Public Utility Commission.

3         (b)  Information obtained from the department under this

4  section may not be released or disclosed except:

5              (1)  as needed in protecting the security of the

6  electric grid;

7              (2)  as authorized by a court order or a federal or

8  state law or order; or

9              (3)  with the consent of the person who is the subject

10  of the criminal history record information.

11        SECTION 3.  Section 2274.0101, Government Code, as added by

12  Chapter 975 (S.B. 2116), Acts of the 87th Legislature, Regular

13  Session, 2021, is amended by amending Subdivision (5) and adding

14  Subdivision (6) to read as follows:

15             (5)  "Governmental entity" means a state agency, a [or]

16  political subdivision, or an independent organization certified

17  under Section 39.151, Utilities Code, to perform a function

18  described by Section 39.151(a), Utilities Code [of this state].

19             (6)  "Affiliate," with respect to a company entering

20  into an agreement in which the critical infrastructure is electric

21  grid equipment, has the meaning assigned by the protocols of the

22  independent organization certified under Section 39.151, Utilities

23  Code, for the ERCOT power region.

24        SECTION 4.  Section 39.151, Utilities Code, is amended by

25  adding Subsection (g-7) to read as follows:

26        (g-7)  To maintain certification as an independent

27  organization under this section, the organization must:

S.B. No. 2013

1       (1) identify all employee positions in the
2  organization that are critical to the security of the electric
3  grid; and

4       (2) before hiring a person for a position described by
5  Subdivision (1), obtain from the Department of Public Safety or a
6  private vendor criminal history record information relating to the
7  prospective employee and any other background information
8  considered necessary by the independent organization or required by
9  the commission.

10      SECTION 5.  Subchapter H, Chapter 39, Utilities Code, is
11  amended by adding Section 39.360 to read as follows:

12      Sec. 39.360.  TRANSACTIONS WITH CERTAIN FOREIGN-OWNED
13  COMPANIES IN CONNECTION WITH CRITICAL INFRASTRUCTURE.  (a)  In this
14  section, "company" and "critical infrastructure" have the meanings
15  assigned by Section 113.001, Business & Commerce Code, as added by
16  Chapter 975 (S.B. 2116), Acts of the 87th Legislature, Regular
17  Session, 2021.

18      (b)  An independent organization certified under Section
19  39.151 may not register a business entity or maintain the
20  registration of a business entity to operate in the power region for
21  which the independent organization is certified unless the business
22  entity attests that the entity complies with Chapter 113, Business
23  & Commerce Code, as added by Chapter 975 (S.B. 2116), Acts of the
24  87th Legislature, Regular Session, 2021.

25      (c)  An independent organization certified under Section
26  39.151 shall require as a condition of operating in the power region
27  for which the independent organization is certified that a business

3

S.B. No. 2013

1  entity report to the independent organization the purchase of any

2  critical electric grid equipment or service from a company

3  described by Section 113.002(a)(2), Business & Commerce Code, as

4  added by Chapter 975 (S.B. 2116), Acts of the 87th Legislature,

5  Regular Session, 2021.

6      (d)  For each purchase reported by a business entity under

7  Subsection (c), the business entity shall submit an attestation to

8  the independent organization that the purchase will not result in

9  access to or control of its critical electric grid equipment by a

10  company described by Section 113.002(a)(2), Business & Commerce

11  Code, as added by Chapter 975 (S.B. 2116), Acts of the 87th

12  Legislature, Regular Session, 2021, excluding access specifically

13  allowed by the business entity for product warranty and support

14  purposes.

15      (e)  Notwithstanding any other law, an independent

16  organization certified under Section 39.151 may immediately

17  suspend or terminate a company's registration or access to any of

18  the independent organization's systems if the independent

19  organization has a reasonable suspicion that the company meets any

20  of the criteria described by Section 2274.0102(a)(2), Government

21  Code, as added by Chapter 975 (S.B. 2116), Acts of the 87th

22  Legislature, Regular Session, 2021.

23      (f)  A contractual provision that limits or contradicts

24  Subsection (e) is contrary to public policy and is unenforceable

25  and void.

26      (g)  An independent organization certified under Section

27  39.151 may adopt guidelines or procedures relating to the

S.B. No. 2013

1   requirements in this section, including the qualification of
2   electric grid equipment or services as critical.

3       (h)  The commission shall adopt any rules necessary to
4   administer this section or authorize an independent organization to
5   carry out a duty imposed by this section.

6       (i)  The attorney general may conduct periodic audits of the
7   attestations required by Subsection (d) and may prioritize the
8   audits as necessary to protect critical infrastructure.

9       SECTION 6.  The changes made by this Act to Chapter 113,
10  Business & Commerce Code, and Chapter 2274, Government Code, apply
11  only to a contract or agreement entered into on or after the
12  effective date of this Act.

13      SECTION 7.  (a)  For the purposes of Section 39.360(c),
14  Utilities Code, as added by this Act, a business entity operating in
15  a power region on the effective date of this Act shall report to the
16  independent organization certified for that power region under
17  Section 39.151, Utilities Code, any purchase made within the five
18  years preceding the effective date of this Act.

19      (b)  For any past purchase reported by a business entity as
20  described by Subsection (a) of this section, the business entity
21  shall take reasonable and necessary actions to mitigate access to
22  or control of its critical electric grid equipment by a company
23  described by Section 113.002(a)(2), Business & Commerce Code, as
24  added by Chapter 975 (S.B. 2116), Acts of the 87th Legislature,
25  Regular Session, 2021, excluding access specifically allowed by the
26  business entity for product warranty and support purposes, and
27  report those actions to the independent organization.

5

S.B. No. 2013

1          SECTION 8.  It is the intent of the 88th Legislature, Regular
2     Session, 2023, that the amendments made by this Act be harmonized
3     with another Act of the 88th Legislature, Regular Session, 2023,
4     relating to nonsubstantive additions to and corrections in enacted
5     codes.
6          SECTION 9.  This Act takes effect immediately if it receives
7     a vote of two-thirds of all the members elected to each house, as
8     provided by Section 39, Article III, Texas Constitution.  If this
9     Act does not receive the vote necessary for immediate effect, this
10    Act takes effect September 1, 2023.

S.B. No. 2013

_____          _____
       President of the Senate                  Speaker of the House

    I hereby certify that S.B. No. 2013 passed the Senate on April 4, 2023, by the following vote: Yeas 31, Nays 0; and that the Senate concurred in House amendment on May 25, 2023, by the following vote: Yeas 31, Nays 0.

 

                                    _____
                                     Secretary of the Senate

    I hereby certify that S.B. No. 2013 passed the House, with amendment, on May 23, 2023, by the following vote:  Yeas 142, Nays 1, one present not voting.

 

                                     _____
                                     Chief Clerk of the House

Approved:

_____
               Date

_____
            Governor

# EXHIBIT A-4

BILL ANALYSIS

Senate Research Center                                                    S.B. 2013
                                                                   By: Schwertner; King
                                                                    Business & Commerce
                                                                         6/14/2023
                                                                          Enrolled


**AUTHOR'S / SPONSOR'S STATEMENT OF INTENT**

In today's climate of cyber and physical attacks on electric grids, it is now more important than ever to ensure we are taking the necessary steps to protect our grid from hostile foreign powers. Currently, all critical grid equipment is not prohibited from having an external connection. This creates an environment in which there could be connections to hostile country-controlled businesses and unsecured communications. Inverters, converters, and similar sensitive equipment are often manufactured in hostile countries by companies with known connections to hostile intelligence services and are maintained remotely by hostile nation companies or their subsidiaries. Protective relays at substations are also vulnerable to remote manipulation which could cause a cascading grid failure. Additionally, there is no requirement for background checks for sensitive positions at ERCOT. S.B. 2013 hardens the security of the Texas power grid and puts in place necessary protections to prevent exposure from attacks on the electric grid.

(Original Author's/Sponsor's Statement of Intent)

S.B. 2013 amends current law relating to access to and the security of certain critical infrastructure.

**RULEMAKING AUTHORITY**

Rulemaking authority is expressly granted to the Public Utility Commission of Texas in SECTION 5 (Section 39.360, Utilities Code) of this bill.

**SECTION BY SECTION ANALYSIS**

SECTION 1. Amends Section 113.001, Business and Commerce Code, as added by Chapter 975 (S.B. 2116), Acts of the 87th Legislature, Regular Session, 2021, by adding Subdivision (5) to define "affiliate."

SECTION 2. Amends Subchapter F, Chapter 411, Government Code, by adding Section 411.1183, as follows:

> Sec. 411.1183. ACCESS TO CRIMINAL HISTORY RECORD INFORMATION: INDEPENDENT ORGANIZATION CERTIFIED UNDER UTILITIES CODE. (a) Entitles an independent organization certified under Section 39.151 (Essential Organizations), Utilities Code, for security reasons to obtain from the Department of Public Safety of the State of Texas (DPS) criminal history record information maintained by DPS that relates to a person who has or is seeking employment at or access to the independent organization's systems that affect the security of the electric grid or any other background information maintained by DPS that relates to the person that is considered necessary by the independent organization or required by the Public Utility Commission (PUC).

> (b) Prohibits information obtained from DPS under this section from being released or disclosed except:

> (1) as needed in protecting the security of the electric grid;

(2) as authorized by a court order or a federal or state law or order; or

(3) with the consent of the person who is the subject of the criminal history record information.

SECTION 3. Amends Section 2274.0101, Government Code, as added by Chapter 975 (S.B. 2116), Acts of the 87th Legislature, Regular Session, 2021, by amending Subdivision (5) and adding Subdivision (6) to redefine "governmental entity" and define "affiliate."

SECTION 4. Amends Section 39.151, Utilities Code, by adding Subsection (g-7), as follows:

(g-7) Requires an organization, to maintain certification as an independent organization under this section, to:

(1) identify all employee positions in the organization that are critical to the security of the electric grid; and

(2) before hiring a person for a position described by Subdivision (1), obtain from DPS or a private vendor criminal history record information relating to the prospective employee and any other background information considered necessary by the independent organization or required by the PUC.

SECTION 5. Amends Subchapter H, Chapter 39, Utilities Code, by adding Section 39.360, as follows:

Sec. 39.360. TRANSACTIONS WITH CERTAIN FOREIGN-OWNED COMPANIES IN CONNECTION WITH CRITICAL INFRASTRUCTURE. (a) Defines "company" and "critical infrastructure."

(b) Prohibits an independent organization certified under Section 39.151 from registering a business entity or maintaining the registration of a business entity to operate in the power region for which the independent organization is certified unless the business entity attests that the entity complies with Chapter 113 (Prohibition on Agreements With Certain Foreign-Owned Companies in Connection With Critical Infrastructure), Business and Commerce Code, as added by Chapter 975 (S.B. 2116), Acts of the 87th Legislature, Regular Session, 2021.

(c) Requires an independent organization certified under Section 39.151 to require as a condition of operating in the power region for which the independent organization is certified that a business entity report to the independent organization the purchase of any critical electric grid equipment or service from a company described by Section 113.002(a)(2) (relating to prohibiting a business entity from entering into an agreement relating to critical infrastructure in this state with a company if the business entity knows that the company is owned or controlled by citizens of or is directly controlled by the government of China, Iran, North Korea, Russia, or a designated country), Business and Commerce Code, as added by Chapter 975 (S.B. 2116), Acts of the 87th Legislature, Regular Session, 2021.

(d) Requires the business entity, for each purchase reported by a business entity under Subsection (c), to submit an attestation to the independent organization that the purchase will not result in access to or control of its critical electric grid equipment by a company described by Section 113.002(a)(2), Business and Commerce Code, as added by Chapter 975 (S.B. 2116), Acts of the 87th Legislature, Regular Session, 2021, excluding access specifically allowed by the business entity for product warranty and support purposes.

(e) Authorizes an independent organization certified under Section 39.151, notwithstanding any other law, to immediately suspend or terminate a company's registration or access to any of the independent organization's systems if the

independent organization has a reasonable suspicion that the company meets any of the criteria described by Section 2274.0102(a)(2) (relating to prohibiting a governmental entity from entering into certain contracts including if the governmental entity knows that the company is owned by or the majority of stock or other ownership interest of the company is held or controlled by certain individuals), Government Code, as added by Chapter 975 (S.B. 2116), Acts of the 87th Legislature, Regular Session, 2021.

(f) Provides that a contractual provision that limits or contradicts Subsection (e) is contrary to public policy and is unenforceable and void.

(g) Authorizes an independent organization certified under Section 39.151 to adopt guidelines or procedures relating to the requirements in this section, including the qualification of electric grid equipment or services as critical.

(h) Requires the PUC to adopt any rules necessary to administer this section or authorize an independent organization to carry out a duty imposed by this section.

(i) Authorizes the attorney general to conduct periodic audits of the attestations required by Subsection (d) and to prioritize the audits as necessary to protect critical infrastructure.

SECTION 6. Makes application of changes made by this Act to Chapter 113, Business and Commerce Code, and Chapter 2274, Government Code, prospective.

SECTION 7. (a) Requires a business entity operating in a power region on the effective date of this Act, for the purposes of Section 39.360(c), Utilities Code, as added by this Act, to report to the independent organization certified for that power region under Section 39.151, Utilities Code, any purchase made within the five years preceding the effective date of this Act.

(b) Requires the business entity, for any past purchase reported by a business entity as described by Subsection (a) of this section, to take reasonable and necessary actions to mitigate access to or control of its critical electric grid equipment by a company described by Section 113.002(a)(2), Business and Commerce Code, as added by Chapter 975 (S.B. 2116), Acts of the 87th Legislature, Regular Session, 2021, excluding access specifically allowed by the business entity for product warranty and support purposes, and to report those actions to the independent organization.

SECTION 8. Provides that it is intent of the 88th Legislature, Regular Session, 2023, that the amendments made by this Act be harmonized with another Act of the 88th Legislature, Regular Session, 2023, relating to nonsubstantive additions to and corrections in enacted codes.

SECTION 9. Effective date: upon passage or September 1, 2023.

# EXHIBIT B-1

## REQUEST FOR INFORMATION (RFI) TO INTERCONNECTING ENTITIES (IEs) REGARDING COMPLIANCE WITH THE LONE STAR INFRASTRUCTURE PROTECTION ACT

### I.    Background Information

The Texas Legislature recently passed the Lone Star Infrastructure Protection Act,[1] Senate Bill 2116, 87th Regular Session (the "Act"), which was signed by Governor Abbott on June 18, 2021, with immediate effect.[2]  The Act prohibits business and governmental entities from entering into an agreement that would grant direct or remote access to critical infrastructure with foreign companies from certain countries.[3]  The electric grid is included in the definition of "critical infrastructure."  Permitting an entity to interconnect a Generation Resource to the ERCOT System would constitute granting access to the "electric grid."[4]  To ensure compliance with the Act, ERCOT is reviewing the ownership of all Interconnecting Entities (IEs) that have proposed Generation Resource projects pending in ERCOT's interconnection process.

The Act prohibits ERCOT from entering into an agreement that would grant access to the ERCOT System with companies[5] that are:

- **owned by or the majority of stock or other ownership interest of the company is held or controlled by:**
  - **individuals who are citizens of China, Iran, North Korea, Russia, or a designated country;[6] or**
  - **a company or other entity, including a governmental entity, that is owned or controlled by citizens of or is directly controlled by the government of China, Iran, North Korea, Russia, or a designated country; or**
- **headquartered in China, Iran, North Korea, Russia, or a designated country.**

The prohibition described above applies regardless of whether:

- **the company's or its parent company's securities are publicly traded; or**
- **the company or its parent company is listed on a public stock exchange as:**
  - **a Chinese, Iranian, North Korean, or Russian company; or**
  - **a company of a designated country.**

The Act further prohibits ERCOT from entering into an agreement that would grant access to the ERCOT System if the project would be located on real property that is owned or controlled by a company that meets the above criteria. This RFI requests that each IE execute an attestation form regarding compliance with the Act.[7]  If an attestation reflects that any of the statutory criteria apply to IE, ERCOT may provide notice of potential cancellation

---

[1] Tex. Bus. & Com. Code, Sections 113.001-003.

[2] The full text of the Act (S.B. 2116) is available here: https://capitol.texas.gov/tlodocs/87R/billtext/html/SB02116F.htm

[3] On September 23, 2021, the Office of the Attorney General of Texas issued an opinion letter analyzing the scope of the Act in response to a request submitted by Senator Donna Campbell. See Tex. Att'y Gen. Op. No. KP-0388 (2021).

[4] See Tex. Att'y Gen. Op. No. KP-0388 (2021).

[5] The Act also prohibits such an agreement with a company if any wholly owned subsidiary, majority-owned subsidiary, parent company, or affiliate of the company meets any of the above referenced ownership or headquarters criteria.

[6] ERCOT is not aware of any additional country, beyond those listed, that has been designated at this time under the Act.

[7] In addition to this RFI, ERCOT will update existing rules and processes to ensure that Market Participants comply with the Act.

in accordance with the process established in the ERCOT Planning Guide, Section 5.7.7, Cancellation of a Project Due to Failure to Comply with Requirements.  If an IE does not timely submit the attestation and achieve compliance with the Act, the IE's project will be canceled.

**II.    RFI Instructions and Attestation Form**

Please complete the attestation form on the following page and return the executed attestation to ERCOT via email to: LSIPA@ercot.com.  **Executed attestations must be received by ERCOT no later than January 14, 2022.**

## ATTESTATION REGARDING COMPLIANCE WITH
## THE LONE STAR INFRASTRUCTURE PROTECTION ACT

**Interconnecting Entity (IE):** GH America Energy LLC

**IE's Interconnection Request (INR) number:** 24INR0146

Check the one box that applies [do not check both boxes]:

1. With respect to the above referenced IE and INR number and with respect to each Entity with an ownership interest in the real property to be utilized by the above referenced IE's project ("Property Owner"), I hereby attest that:

   ☐ NONE of the following statements in paragraphs (A)-(C) are TRUE.

   ☒ ONE OR MORE of the following statements in paragraphs (A)-(C) are TRUE.

   A) the IE or Property Owner, or a wholly owned subsidiary, majority-owned subsidiary, parent company, or affiliate of the IE or Property Owner, is owned by:
   (i) individuals who are citizens of China, Iran, North Korea, Russia, or a designated country;[8] or
   (ii) a company or other entity, including a governmental entity, that is owned or controlled by citizens of or is directly controlled by the government of China, Iran, North Korea, Russia, or a designated country; or

   B) the majority of stock or other ownership interest of the IE or Property Owner, or a wholly owned subsidiary, majority-owned subsidiary, parent company, or affiliate of the above referenced IE or Property Owner is held or controlled by:
   (i) individuals who are citizens of China, Iran, North Korea, Russia, or a designated country; or
   (ii) a company or other entity, including a governmental entity, that is owned or controlled by citizens of or is directly controlled by the government of China, Iran, North Korea, Russia, or a designated country; or

   C) the IE or Property Owner, or a wholly owned subsidiary, majority-owned subsidiary, parent company, or affiliate of the IE or Property Owner is headquartered in China, Iran, North Korea, Russia, or a designated country.

---

[8] The term "designated country" as used in this attestation shall have the same meaning as the definition of that term in Texas Business and Commerce Code, Section 113.001(4).

If you checked the second box above (i.e., ONE OR MORE statements are TRUE), then please provide the following additional information:

Name(s) of the entities or individuals that have a majority ownership interest in the IE: Xinjiang Guanghui Industry Investment Group Company

Country of citizenship and/or headquarters location for each entity or individual listed: China

Other information:   Per the Lone Star Infrastructure Protection Act RFI sent on December 6, 2021, please find GH America Energy's response.  In addition, GH America Energy is in the process of divesting its queued interconnection project (24INR0146 - "Blue Star Solar"), including the real property.  As part of the planned divestitures, GH America Energy will be transferring the project queue positions to the new buyers at their request.  It is expected the divestitures will occur within the next 6-12 months.

If you have any further questions or need additional detail, please do not hesitate to contact John Skibinski at JSkibinski@gha-group.com.

If you have any documentation confirming the above information, please submit it along with the attestation.

By signing below, I certify that I am an officer, executive, or authorized employee with authority to bind the IE listed above, that I am authorized to execute and submit this attestation on behalf of each IE listed above, and that the statements contained herein are true and correct.

_____
Signature

Mingyu Tang
Name

Vice President
Title

1/12/2022
Date

# EXHIBIT B-2

## ATTESTATION REGARDING COMPLIANCE WITH
## THE LONE STAR INFRASTRUCTURE PROTECTION ACT

**Interconnecting Entity (IE):** GH America Energy LLC

**IE's Interconnection Request (INR) number:** 20INR0271

Check the one box that applies [do not check both boxes]:

1. With respect to the above referenced IE and INR number and with respect to each Entity with an ownership interest in the real property to be utilized by the above referenced IE's project ("Property Owner"), I hereby attest that:

   ☐ NONE of the following statements in paragraphs (A)-(C) are TRUE.

   ☒ ONE OR MORE of the following statements in paragraphs (A)-(C) are TRUE.

   A) the IE or Property Owner, or a wholly owned subsidiary, majority-owned subsidiary, parent company, or affiliate of the IE or Property Owner, is owned by:
   (i) individuals who are citizens of China, Iran, North Korea, Russia, or a designated country;[8] or
   (ii) a company or other entity, including a governmental entity, that is owned or controlled by citizens of or is directly controlled by the government of China, Iran, North Korea, Russia, or a designated country; or

   B) the majority of stock or other ownership interest of the IE or Property Owner, or a wholly owned subsidiary, majority-owned subsidiary, parent company, or affiliate of the above referenced IE or Property Owner is held or controlled by:
   (i) individuals who are citizens of China, Iran, North Korea, Russia, or a designated country; or
   (ii) a company or other entity, including a governmental entity, that is owned or controlled by citizens of or is directly controlled by the government of China, Iran, North Korea, Russia, or a designated country; or

   C) the IE or Property Owner, or a wholly owned subsidiary, majority-owned subsidiary, parent company, or affiliate of the IE or Property Owner is headquartered in China, Iran, North Korea, Russia, or a designated country.

---

[8]  The term "designated country" as used in this attestation shall have the same meaning as the definition of that term in Texas Business and Commerce Code, Section 113.001(4).

If you checked the second box above (i.e., ONE OR MORE statements are TRUE), then please provide the following additional information:

Name(s) of the entities or individuals that have a majority ownership interest in the IE: Xinjiang Guanghui Industry Investment Group Company

Country of citizenship and/or headquarters location for each entity or individual listed: China

Other information:   Per the Lone Star Infrastructure Protection Act RFI sent on December 6, 2021, please find GH America Energy's response.  In addition, GH America Energy is in the process of divesting its queued interconnection project (20INR0271 - "Blue Hills Wind"), including the real property.  As part of the planned divestitures, GH America Energy will be transferring the project queue positions to the new buyers at their request.  It is expected the divestitures will occur within the next 6-12 months.

If you have any further questions or need additional detail, please do not hesitate to contact John Skibinski at JSkibinski@gha-group.com.

If you have any documentation confirming the above information, please submit it along with the attestation.

By signing below, I certify that I am an officer, executive, or authorized employee with authority to bind the IE listed above, that I am authorized to execute and submit this attestation on behalf of each IE listed above, and that the statements contained herein are true and correct.

_____
Signature

Mingyu Tang
Name

Vice President
Title

1/12/2022
Date

# EXHIBIT B-3

**REQUEST FOR INFORMATION (RFI) TO INTERCONNECTING ENTITIES (IEs)**
**REGARDING COMPLIANCE WITH THE LONE STAR INFRASTRUCTURE PROTECTION ACT**

## I.    Background Information

The Texas Legislature recently passed the Lone Star Infrastructure Protection Act,[1] Senate Bill 2116, 87th Regular Session (the "Act"), which was signed by Governor Abbott on June 18, 2021, with immediate effect.[2]  The Act prohibits business and governmental entities from entering into an agreement that would grant direct or remote access to critical infrastructure with foreign companies from certain countries.[3]  The electric grid is included in the definition of "critical infrastructure."  Permitting an entity to interconnect a Generation Resource to the ERCOT System would constitute granting access to the "electric grid."[4]  To ensure compliance with the Act, ERCOT is reviewing the ownership of all Interconnecting Entities (IEs) that have proposed Generation Resource projects pending in ERCOT's interconnection process.

The Act prohibits ERCOT from entering into an agreement that would grant access to the ERCOT System with companies[5] that are:

- **owned by or the majority of stock or other ownership interest of the company is held or controlled by:**
  - **individuals who are citizens of China, Iran, North Korea, Russia, or a designated country;[6] or**
  - **a company or other entity, including a governmental entity, that is owned or controlled by citizens of or is directly controlled by the government of China, Iran, North Korea, Russia, or a designated country; or**
- **headquartered in China, Iran, North Korea, Russia, or a designated country.**

The prohibition described above applies regardless of whether:

- **the company's or its parent company's securities are publicly traded; or**
- **the company or its parent company is listed on a public stock exchange as:**
  - **a Chinese, Iranian, North Korean, or Russian company; or**
  - **a company of a designated country.**

The Act further prohibits ERCOT from entering into an agreement that would grant access to the ERCOT System if the project would be located on real property that is owned or controlled by a company that meets the above criteria. This RFI requests that each IE execute an attestation form regarding compliance with the Act.[7]  If an attestation reflects that any of the statutory criteria apply to IE, ERCOT may provide notice of potential cancellation

---

[1] Tex. Bus. & Com. Code, Sections 113.001-003.

[2] The full text of the Act (S.B. 2116) is available here: https://capitol.texas.gov/tlodocs/87R/billtext/html/SB02116F.htm

[3] On September 23, 2021, the Office of the Attorney General of Texas issued an opinion letter analyzing the scope of the Act in response to a request submitted by Senator Donna Campbell. See Tex. Att'y Gen. Op. No. KP-0388 (2021).

[4] See Tex. Att'y Gen. Op. No. KP-0388 (2021).

[5] The Act also prohibits such an agreement with a company if any wholly owned subsidiary, majority-owned subsidiary, parent company, or affiliate of the company meets any of the above referenced ownership or headquarters criteria.

[6] ERCOT is not aware of any additional country, beyond those listed, that has been designated at this time under the Act.

[7] In addition to this RFI, ERCOT will update existing rules and processes to ensure that Market Participants comply with the Act.

in accordance with the process established in the ERCOT Planning Guide, Section 5.7.7, Cancellation of a Project Due to Failure to Comply with Requirements.  If an IE does not timely submit the attestation and achieve compliance with the Act, the IE's project will be canceled.

**II.**    **RFI Instructions and Attestation Form**

Please complete the attestation form on the following page and return the executed attestation to ERCOT via email to: LSIPA@ercot.com.  **Executed attestations must be received by ERCOT no later than January 14, 2022.**

## ATTESTATION REGARDING COMPLIANCE WITH
## THE LONE STAR INFRASTRUCTURE PROTECTION ACT

**Interconnecting Entity (IE):** GH America Energy LLC

**IE's Interconnection Request (INR) number:** 23INR0352

Check the one box that applies [do not check both boxes]:

1. With respect to the above referenced IE and INR number and with respect to each Entity with an ownership interest in the real property to be utilized by the above referenced IE's project ("Property Owner"), I hereby attest that:

    ☐ NONE of the following statements in paragraphs (A)-(C) are TRUE.

    ☒ ONE OR MORE of the following statements in paragraphs (A)-(C) are TRUE.

    A)  the IE or Property Owner, or a wholly owned subsidiary, majority-owned subsidiary, parent company, or affiliate of the IE or Property Owner, is owned by:
    (i) individuals who are citizens of China, Iran, North Korea, Russia, or a designated country;[8] or
    (ii) a company or other entity, including a governmental entity, that is owned or controlled by citizens of or is directly controlled by the government of China, Iran, North Korea, Russia, or a designated country; or

    B) the majority of stock or other ownership interest of the IE or Property Owner, or a wholly owned subsidiary, majority-owned subsidiary, parent company, or affiliate of the above referenced IE or Property Owner is held or controlled by:
    (i) individuals who are citizens of China, Iran, North Korea, Russia, or a designated country; or
    (ii) a company or other entity, including a governmental entity, that is owned or controlled by citizens of or is directly controlled by the government of China, Iran, North Korea, Russia, or a designated country; or

    C) the IE or Property Owner, or a wholly owned subsidiary, majority-owned subsidiary, parent company, or affiliate of the IE or Property Owner is headquartered in China, Iran, North Korea, Russia, or a designated country.

---

[8]  The term "designated country" as used in this attestation shall have the same meaning as the definition of that term in Texas Business and Commerce Code, Section 113.001(4).

If you checked the second box above (i.e., ONE OR MORE statements are TRUE), then please provide the following additional information:

Name(s) of the entities or individuals that have a majority ownership interest in the IE: Xinjiang Guanghui Industry Investment Group Company

Country of citizenship and/or headquarters location for each entity or individual listed: China

Other information:  Per the Lone Star Infrastructure Protection Act RFI sent on December 6, 2021, please find GH America Energy's response.  In addition, GH America Energy is in the process of divesting its queued interconnection project (23INR0352 - "Blue Valley Solar"), including the real property.  As part of the planned divestitures, GH America Energy will be transferring the project queue positions to the new buyers at their request.  It is expected the divestitures will occur within the next 6-12 months.

If you have any further questions or need additional detail, please do not hesitate to contact John Skibinski at JSkibinski@gha-group.com.

If you have any documentation confirming the above information, please submit it along with the attestation.

By signing below, I certify that I am an officer, executive, or authorized employee with authority to bind the IE listed above, that I am authorized to execute and submit this attestation on behalf of each IE listed above, and that the statements contained herein are true and correct.

_____
Signature

Mingyu Tang
Name

Vice President
Title

1/12/2022
Date

# EXHIBIT C-1

**\*\*\*\***    **Electronically Filed Document**    **\*\*\*\***

Val Verde County

**County Clerk**

---

Document Number: 2023-342701
Recorded As    : EREC - RECORDINGS

Recorded On:        July 20, 2023
Recorded At:        01:54:18 pm
Number of Pages:    16

Recording Fee:    $82.00

Parties:

Direct- BRAZOS HIGHLAND PROPERTIES LP
Indirect- GREENALIA WIND POWER BLUE HILLS LLC

Receipt Number:    178313
Processed By:      Norma Rangel

---

\*\*\*\*\*\*\*\*\*\*\* **THIS PAGE IS PART OF THE INSTRUMENT** \*\*\*\*\*\*\*\*\*\*\*\*

Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.

---



State of Texas, County of Val Verde

I hereby certify that this instrument was filled on the date and time stamped
hereon by me and was duly recorded in the OFFICIAL PUBLIC RECORDS of
Val Verde County.

Teresa Esther Chapoy
County Clerk, Val Verde County

**CERTIFIED COPY CERTIFICATE**
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING __1__ OF _11_ PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST _7/12_, 20_24_
TERESA ESTHER CHAPOY, COUNTY CLERK
BY: _____ DEPUTY

SPECIAL WARRANTY DEED

THE STATE OF TEXAS      §
                            §           KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF VAL VERDE    §

        BRAZOS HIGHLAND PROPERTIES, LP, a Delaware limited partnership, with an address of 2800 Post Oak Blvd., Suite 5115, Houston, Texas 77056 ("Grantor"), for and in consideration of the sum of $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, has GRANTED, BARGAINED, SOLD, and CONVEYED and by these presents does GRANT, BARGAIN, SELL, and CONVEY unto GREENALIA WIND POWER BLUE HILLS, LLC (formerly known as Babcock & Wilcox Blue Hills, LLC), a Delaware limited liability company, with an address of c/o Greenalia S.A., Plaza de Maria Pita 10, 1°, 15001 A Coruña, Spain ("Grantee"), the tracts or parcels of land in Val Verde County, Texas, described in Exhibits A, together with all rights, titles, and interests appurtenant thereto including, without limitation, Grantor's interest, if any, in any and all adjacent streets, alleys, rights of way and any adjacent strips and gores (such land and interests are hereinafter collectively referred to as the "Property").

        This Special Warranty Deed and the conveyance hereinabove set forth is executed by Grantor and accepted by Grantee subject to the matters described in Exhibit B hereto, to the extent the same are validly existing and applicable to the Property (hereinafter referred to collectively as the "Permitted Exceptions").

        This Special Warranty Deed is being executed and delivered pursuant to that certain Option to Purchase and Right of First Refusal Agreement dated as of February 14, 2022, as amended by that certain First Amendment to Option to Purchase and Right of First Refusal Agreement dated May 9, 2022, and as further amended by that certain Second Amendment to Option to Purchase and Right of First Refusal Agreement dated on or about the date hereof, by and between Grantor and Grantee (as so amended, the "Purchase Agreement"). Grantee acknowledges that Grantee has independently and personally inspected the Property. Except as otherwise expressly set forth in the Purchase Agreement, the Property is hereby conveyed to and accepted by Grantee in its present condition, "AS-IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED." This Deed is not intended to, and does not in any manner, enlarge, diminish, or modify the rights, obligations, representations, warranties, or covenants of Grantor or Grantee under the Purchase Agreement.

        Prior to satisfaction of all obligations of Grantee under the Purchase Agreement, Grantee shall not sell or convey all or any portion of the Property, without the prior written consent of Grantor, except to an affiliate entity that assumes all obligations of Grantee under the Purchase Agreement. This restriction shall terminate upon satisfaction of all obligations of Grantee under the Purchase Agreement, which may occur contemporaneous with a sale or conveyance, and Grantor shall provide a release of this restriction in recordable form to Grantee contemporaneous with such satisfaction if notice and request for such release is made by Grantee at least five (5) days prior to such date.

        TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereunto in anywise belonging, unto Grantee, its successors and assigns forever, and Grantor does hereby bind itself, its successors and assigns, to WARRANT AND FOREVER DEFEND all and singular the title to the Property unto the said Grantee, its successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through, or under Grantor but not otherwise, subject to the Permitted Exceptions.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

4136-4113-3896.4

CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING 2 OF 116 PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST 7/12 20 24
TERESA ESTHER CHABOYA, COUNTY CLERK
BY: _____ DEPUTY

EXECUTED as of the date set forth in the acknowledgement below, but to be effective as of July 19, 2023.

Brazos Highland Properties, LP,
a Delaware limited partnership

By: _____
Name: _____
Title: _____
CAO

STATE OF ___TEXAS___ §
                      §
COUNTY OF __HARRIS__ §

This instrument was acknowledged before me on July __18__, 2023, by __LINGYUN SUN__, as ____CAO____ of Brazos Highland Properties, LP, a Delaware limited partnership, on behalf of said limited partnership.

Notary Public, State of ___TEXAS___

My Commission Expires: __7-31-2027__

__MELISSA CAO__
Printed Name of Notary

MELISSA CAO
Notary Public, State of Texas
Comm. Expires 07-31-2027
Notary ID 130316308

4136-4113-3896.4

CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING _3_ OF _16_ PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST __7/12__, 20_24_
TERESA ESTHER CHAPOY, COUNTY CLERK
BY: _____ DEPUTY

EXHIBIT A

Legal Description

[Attached Following This Page]

4136-4113-3896.4

CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING __7__ OF __16__ PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.

ATTEST __7/12__ 20__24__
TERESA ESTHER CHACON, COUNTY CLERK
BY: _____ DEPUTY

**EXHIBIT A**
**LEGAL DESCRIPTION OF LAND**

**Carma Ranch Property Description**

Tract 1:

All that certain tract or parcel of land containing 15,350.08 acres in Val Verde County, Texas, situated Northwest of Comstock on and both side of Ranch Road No. 1024, about 65 miles, N 24°41' W, of the City of Del Rio, Texas, the County Seat, and containing acreages in the various original Surveys as follows:

| Survey No. | Original Grantee | Abstract | Certificate | Block | Acreage |
|---|---|---|---|---|---|
| 74 | T.C. RR Co. (H. Mills) | 2238 | 224 | A | 634.76 |
| 75 | T.C. RR Co. | 1371 | 225 | A | 636.80 |
| 76 | T.C. RR Co. (H. Mills) | 3373 | 225 | A | 637.26 |
| 21 | G.C. & S.F. RR Co. | 1514 | 2010 | G | 630.55 |
| 20 | G.C. & S.F. RR Co. (R. Fiero) | 2567 | 2009 | G | 632.30 |
| 17 | G.C. & S.F. RR Co. | 1512 | 2008 | G | 634.22 |
| 16 | G.C. & S.F. RR Co. (S. Basquez) | 2052 | 2007 | G | 632.37 |
| 23 | G.C. & S.F. RR Co. | 1515 | 2011 | G | 640.42 |
| 22 | G.C. & S.F. RR Co. (R. Fiero) | 2563 | 2010 | G | 635.09 |
| 19 | G.C. & S.F. RR Co. | 1513 | 2009 | G | 635.58 |
| 18 | G.C. & S.F. RR Co. (R. Fiero) | 2566 | 2008 | G | 637.65 |
| 15 | G.C. & S.F. RR Co. | 1511 | 2007 | G | 634.66 |
| 24 | G.C. & S.F. RR Co. (R. Fiero) | 2568 | 2011 | G | 636.89 |
| 25 | G.C. & S.F. RR Co. | 1516 | 2012 | G | 634.98 |

Exhibit A – Page 1

31668327v.5

CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING  5 OF 6 PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST  7/12  20 24
TERESA ESTHER CHAPOY, COUNTY CLERK
BY:  DEPUTY

| Survey No. | Original Grantee | Abstract | Certificate | Block | Acreage |
|---|---|---|---|---|---|
| 26 | G.C. & S.F. RR Co. (R. Fiero) | 2564 | 2012 | G | 635.38 |
| 27 | G.C. & S.F. RR Co. | 1517 | 2013 | G | 637.32 |
| 28 | G.C. & S.F. RR Co. (R. Fiero Survey) | 2050 | 2013 | G | 632.94 |
| 2 | O. De Blanc Survey (Y. B. Montemayor) | 3375 | 1690 | C-15 | 1166.51 |
| N 1/8 of 4 | R.O. Bennet (F. Earwood) | 3609 | 1585 | C-15 | 160.00 |
| S 7/8 of 4 | R.O. Bennet (E. Cerda) | 2865 | 1585 | C-15 | 952.65 |
| N 1/8 of N ½ of 6 | S. H. Laramore (F. Earwood) | 3610 | 844 | C-15 | 80.00 |
| S 7/8 of N ½ of 6 | S.H. Laramore (E. Cerda) | 2868 | 844 | C-15 | 477.50 |
| S part of 6 | S.H. Laramore (E. Cerda) | 2864 | 844 | C-15 | 578.68 |
| N part of 8 | J.C. Smith (F. Earwood) | 3611 | 716 | C-15 | 480.00 |
| S part of 8 | J.C. Smith (E. Cerda) | 2866 | 716 | C-15 | 655.57 |

Total Acres: 15,350.08

Said 15,350.08 acres of land being known as the "Brewer Ranch" and being the same tract conveyed to Jack Brewer Jr., in Volume 877, Page 885 and in Volume 653, Page 105, both of the Official Public Records of Val Verde County, Texas. Said 15,350.08 acres being bounded on the West by Jack Brewer Jr., 85.61 acre tract, as recorded in Volume 605, Page 681, Official Public Records of Val Verde County, Texas, and Dennis E. Rowland Property, recorded in Volume 107, Page 612, Deed Records of Val Verde County, Texas, on the North by Susan P. Mills, et al, Property, as recorded in Document 6254, Probate Records of Val Verde County, Texas, and in Clerk's Document # 00299953, Official Public Records of Val Verde, County, Texas, and Barton Riley Freeman, 5576.435 acre tract, recorded in Clerk's Document # 00300195, Official Public Records of Val Verde County, Texas, and also by Kelly W. Walter Family Trust, et al, Property recorded in Volume 618, Page 128, Official Public Records of Val Verde County, Texas, bounded on the East by Bill Cole Ranches Ltd., Property, recorded in Volume 617, Page 869, Official Public records of Val Verde County, Texas, and the Balderidge Family Land Ltd., 6653.8 acre tract, recorded in Volume 1128, Page 709, Official Public Records of Val Verde County, Texas, and on the South by said Balderidge

Exhibit A – Page 2

31668327v.5

CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING _6_ OF _16_ PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST _7/12_, 20 _24_
TERESA ESTHER CHAPOY, COUNTY CLERK
BY: _____ DEPUTY

Family Land Ltd., 6653.8 acre tract , and Donald I. & Jo Anne M. McClurg, 495.365 acre tract, of record in Volume 849, Page 677, Official Public Records of Val Verde, Texas, and Candy Lee Bynum, 1563.336 acre tract, of record in Volume 921, Page 631, Official Public Records of Val Verde County, Texas, and Ray R. Robinson, 2209.92 acre tract, of record in Volume 813, Page 709, Official Public Records of Val Verde County, Texas, and also by said Jack Brewer Jr., 85.61 acre tract. Said 15,350.08 acre tract being more fully described by metes and bounds as follows:

BEGINNING:     at a 1" galvanized iron pipe found in rock mound marked "SW 9" & "SE 8" & N LINE 16" located on the North line of North line of Survey 16, Block S-10, at the Southeast corner of the South part of Survey 8, Block C-15, and also being the Southwest corner of Survey 9, Block C-15, from which a ½" iron pin found at fence post being the Northeast corner of said McClurg, 495.365 acre tract and a reentrant corner of said Balderidge Family Land Ltd., 6653.8 acre tract bears: North 89 deg. 48 min. 34 sec. West, 165.11 feet;

THENCE:     South 89 deg. 43 min. 46 sec. West, at 2289.92 feet passing a 2-7/8" metal post found on the Northeast line of Ranch Road No. 1024, at 2408.52 feet passing a reference ½" iron pin set with cap on the Southwest line of Ranch road No. 1024, from which iron pin a fence 2-7/8" metal post found bears: South 25 deg. 32 min. 33 sec. East, 3.76 feet, and continuing in all a total distance of 26554.00 feet to a 5/8" iron pin found with aluminum cap in rock mound marked "NW 22 S-10" on the South line of said Survey 2, Block C-15, at the Northwest corner of Survey 22, Block S-10, and also being a reentrant corner of said Brewer, 85.61 acre tract, (Survey 20, Abstract 4099, Block Q-7), for a corner of this herein described tract;

THENCE:     South 89 deg. 40 min. 45 sec. West, 178.95 feet to a 5/8" iron pin found with aluminum cap in rock mound marked "SW 2 S-10" at the Southwest corner of said Survey 2, Block C-15 at another reentrant corner of said Brewer, 85.61 acre tract, (Survey 20, Abstract 4099, Block Q-7), for the Southwest corner of this herein described tract;

THENCE:     North 00 deg. 10 min. 59 sec. West, at 6435.11 feet passing 5/8" iron pin found with aluminum cap on the South line of Ranch Road No. 1024, at 6537.05 feet passing a 5/8" iron pin found with aluminum cap on the North line of Ranch Road No. 1024, and continuing in all a total distance of 7459.78 feet to a 5/8" iron pin with aluminum cap in rock mound marked "NW 2 S-10" on the South line of Survey 24, Block G, at the Northwest corner of Survey 2, C-15, at the Northeast corner of said Brewer, 85.61 acre tract, (Survey 20, Abstract 4099, Block Q-7), for a corner of this herein described tract;

THENCE:     North 89 deg. 33 min. 57 sec. West, 247.73 feet to a ½" iron pin set with cap on the Southeast corner of said Rowland tract and same being the Northeast corner of George Gries, et al, Property, of record in Volume 850, Page 47, Official Public Records of Val Verde County, Texas, at the common corner of Survey 1, Block Q-7, Survey 6, Block Q-7, said Survey 24, Block G, and

Exhibit A – Page 3

31668327v.5


CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING _1_ OF _16_ PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST _7/12_ 20_24_
TERESA ESTHER CHAPOY, COUNTY CLERK
BY: _____ DEPUTY

said Brewer, 85.61 acre tract *(Survey 20, Abstract 4099, Block Q-7), for a corner of this herein described tract;

THENCE:    North 00 deg. 28 min. 56 sec. West, at 10376.84 feet passing a wood fence post found and continuing in all a total distance of 10524.76 feet to a point on the South line of said Susan P. Mills, et al, Property, at the common corner of Survey 1, Block Q-7, Survey 19, Block Q-4, Survey 20, Block Q-4, and said Survey 23, Block G, for the lower Northwest corner of this herein described tract;

THENCE:    North 89 deg. 54 min. 57 sec. East, 5316.28 feet to a ½" iron pin set with cap with rock mound at the common corners of Survey No. 20, Block Q-4, Survey 21, Block G, Survey 22, Block G, and Survey 23, Block G, for a corner of this herein described tract;

THENCE:    North 00 deg. 09 min. 09 sec. West, 5212.98 feet to a ½" iron pin found with cap "K H ROSS" in rock mound at the lower Southwest corner of said Barton Riley Freeman, 5576.435 acre tract, on the East line of said Mills, et al, Property also being the common corner of Survey 13, Block Q-4, Survey 73, Block A, Survey 21, Block G, and Survey 20, Block Q-4, for a corner of this herein described tract;

THENCE:    North 89 deg. 38 min. 26 sec. East, 5256.94 feet to a 2-7/8" metal fence post found at the Southeast corner of said Freeman, 5576.435 acre tract, at the common corner of Survey 73, Block A, Survey 74, Block A, Survey 20, Block G, and Survey 21, Block G, for a corner of this herein described tract;

THENCE:    North 00 deg. 19 min. 15 sec. West, 5245.25 feet to a 2-7/8" metal fence post found at the Southwest corner of said Kelly W. Walter Family Trust, et al, Property, at the common corner of Survey 64, Block A, Survey 65, Block A, Survey 74, Block A and Survey 73, Block A, for the upper Northwest corner of this herein described tract;

THENCE:    North 89 deg. 48 min. 16 sec. East, at 15746.14 feet passing a 2-7/8" metal fence post and continuing in all a total distance of 15824.59 feet to a point, on the West line of Survey 20, Block O, at the Southeast corner of Survey 71, Block A, and same being the Northeast 76, Block A, for the Northeast corner of this herein described tract;

THENCE:    South 00 deg. 02 min. 05 sec. East, at 5273.10 feet passing a rock mound called the Northwest corner of Survey 13, Block G, at 10514.15 feet passing a 5/8" iron pin found & rock mound called the Northwest corner of Survey 14, Block G, and continuing in all a total distance of 21041.00 feet to a 5/8" iron pin found in rock mound at a reentrant corner of said Balderidge Family Land Ltd., 6653.8 acre tract, on the North line of Survey 8, Block C-15, at the Southeast corner of Survey 28, Block G, and

31668327v.5


CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING __8__ OF __6__ PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST __7/12__ 20 __24__
TERESA ESTHER CHAPOY, COUNTY CLERK
BY: _____ DEPUTY

same being the Southwest of Survey 29, Block G, for a corner of this herein described tract;

THENCE:    North 89 deg. 54 min. 14 sec. East, 690.94 feet to a 5/8" iron pin found with cap in rock mound at a reentrant corner of said Balderidge Family Land Ltd., 6653.8 acre tract, on the South line of Survey 29, Block G, at the Northeast corner of Survey 8, Block C-15 and same being the Northwest corner of Survey 9, Block C-15, for a corner of this herein described tract;

THENCE:    South 00 deg. 16 min. 12 sec. East, 7372.84 feet to the Point of Beginning.

Bearing Basis – South 00 deg. 16 min. 12 sec. East- for the East line of this herein described Tract obtained from GPS Observation (WGS84 NAVD 88).

**Tract 2:**

All that certain tract or parcel of land containing 85.61 acres in Val Verde County, Texas, situated Northwest of Comstock on and both side of Ranch Road No. 1024, about 65 miles, N 27°15' W, of the City of Del Rio, Texas, the County Seat, being the R. J. Burges Survey No. 20, Abstract 4099, Certificate 97, Block Q-7, and being the same tract patented to Jack Brewer Jr., in Volume 605, Page 681, Official Public Records of Val Verde County, Texas. Said 85.61 acres being bounded on the West by George Gries, et al, Property, as recorded in Volume 850, Page 47, Official Public Records of Val Verde County, Texas, on the North and East by Jack Brewer Jr., Property, as recorded in Volume 877, Page 885 and Volume 653, Page 105, both of the Official Public Records of Val Verde, County, Texas, and on the East and South by Ray R. Robinson, 2209.92 acre tract, of record in Volume 813, Page 709, Official Public Records of Val Verde County, Texas. Said 85.61 acre tract being more fully described by metes and bounds as follows:

BEGINNING:    at a 5/8" iron pin found with aluminum cap in rock mound marked "NW 2 S-10" at a reentrant corner of said Jack Brewer Jr. Property (surveyed this same day and found to contain 15,350.08 acres), on the South line of Survey 24, Block G at the Northwest corner of Survey No. 2, Block C-15, for the Northeast corner of this herein described tract,

THENCE:    North 89 deg. 33 min. 57 sec. West, 247.73 feet to a ½" iron pin set with cap on the Southeast corner of Dennis E. Rowland Property, of record in Volume 107, Page 612, Deed Records of Val Verde County, Texas and same being the Northeast corner of said George Gries, et al, Property, at the common corner of Survey 1, Block Q-7, Survey 6, Block Q-7, said Survey 24, Block G, for a corner of this herein described tract;

THENCE:    South 00 deg. 28 min. 58 sec. East, at 971.26 feet passing a 5/8" iron pin found with cap on the North line of Ranch Road No. 1024, at 1073.94 feet passing a 5/8" iron pin found with aluminum cap on the South line of Ranch Road No. 1024 and continuing in all a total distance of 12,826.33 feet to a 5/8" iron pin found with aluminum cap in rock mound marked "NW 7 S-10" on the East line of Survey No. 7, Block Q-7, at the Northwest corner of Survey No. 7, Block S-10, for the Southwest corner of this herein described tract;

Exhibit A – Page 5

31668327v.5

**CERTIFIED COPY CERTIFICATE**
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING _9_ OF _16_ PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST. _7/12_, 20_24_
TERESA ESTHER CHABOY, COUNTY CLERK
BY: _____ DEPUTY

THENCE:     North 89 deg. 43 min. 05 sec. East, 368.09 feet to a 5/8" iron pin found with aluminum cap in rock mound marked "SW 22 S-10" at the Southwest corner of said Survey 22, Block S-10, for the Southeast corner of this herein described tract;

THENCE:     North 00 deg. 16 min. 27 sec. West, 5363.50 feet to a 5/8" iron pin found with aluminum cap in rock mound marked "NW 22 S-10" on the South line of said Survey 2, Block C-15, at the Northwest corner of Survey 22, Block S-10, for a corner of this herein described tract;

THENCE:     South 89 deg. 40 min. 45 sec. West, 178.95 feet to a 5/8" iron pin found with aluminum cap in rock mound marked "SW 2 S-10" at the Southwest corner of said Survey 2, Block C-15, for a corner of this herein described tract;

THENCE:     North 00 deg. 10 min. 59 sec. West, at 6435.11 feet passing 5/8" iron pin found with aluminum cap on the South line of Ranch Road No. 1024, at 6537.05 feet passing a 5/8" iron pin found with aluminum cap on the North line of Ranch Road No. 1024, and continuing in all a total distance of 7459.78 feet to the Point of Beginning.

Bearing Basis — South 00 deg. 16 min. 12 sec. East - for the East line of this herein described Tract obtained from GPS Observation (WGS84 NAVD 88).

Mineral Estate Description

Surface ownership – 100% Brazos Highland PROPERTIES, L.P.

Ownership of the Mineral Estate

| Gross Acres* | Percentage | Owner |
| --- | --- | --- |
| 2,469.06 | 85% | Brazos Highland Properties, L.P. |
| 11,077.25 | 21.25% | Brazos Highland Properties, L.P. |
| 1,803.77 | 50% | Brazos Highland Properties, L.P. (Mineral classified designation) |
| 85.61 | 00% | Brazos Highland Properties, L.P. |

*As more particularly reflected on the map attached hereto as Exhibit A-1

Exhibit A – Page 6

31668327v.5



CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING 10 OF 16 PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST 7/12, 20 24
TERESA ESTHER CHAPOY, COUNTY CLERK
BY: _____ DEPUTY



Exhibit A-1

31668327v.5

CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING __11__ OF __11__ PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.

ATTEST ___7/12___ , 20_24_
TERESA ESTHER CHAPOY, COUNTY CLERK
BY: _____ DEPUTY

EXHIBIT B

Permitted Exceptions

1. All, leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges, and immunities relating thereto, appearing in the Public Records whether listed herein or not. There may be leases, grants, exceptions or reservations of mineral interest that are not listed.

2. Oil and Gas Lease executed by Cowan Oil & Gas, Ltd., a Texas limited Partnership of which Cowan Energy, Inc., a Texas Corporation, is the Sole General Partner, and Cynthia Cowan Guiles, Co-Trustee of the Robert J. Cowan Residuary Marital Trust, as Lessor and Wolfcamp Engery, LLC, as Lessee, dated May 18, 2018, recorded in Clerk's Document No. 00309525, Official Public Records, Val Verde County, Texas.

3. Oil and Gas Lease executed by McDonnold Family Partnership, LP, as Lessor and Wolfcamp Engery, LLC, as Lessee, dated June 19, 2018, recorded in Clerk's Document No. 00309526, Official Public Records, Val Verde County, Texas.

4. Oil and Gas Lease executed by Amy Abbey Robinson, as Lessor and Wolfcamp Engery, LLC, as Lessee, dated July 30, 2018, recorded in Clerk's Document No. 00309527, Official Public Records, Val Verde County, Texas.

5. Mineral/Royalty Deed, Assignment of Overiding Royalty executed by Paul R. Mayo, Jr. to Mayo Minerals, LLC, dated November 19, 2018, recorded in Clerk's Document No. 00310891, Official Public Records, Val Verde County, Texas.

6. Oil and Gas Lease executed by LAJ Corporation, as Lessor and Wolfcamp Engery, LLC, as Lessee, dated June 19, 2018, recorded in Clerk's Document No. 00310919, Official Public Records, Val Verde County, Texas.

7. Oil and Gas Lease executed by Petra Resources, LLC, as Lessor and Wolfcamp Engery, LLC, as Lessee, dated June 19, 2018, recorded in Clerk's Document No. 00310920, Official Public Records, Val Verde County, Texas.

8. Oil and Gas Lease executed by W. Taylor Mayne, as Lessor and Wolfcamp Engery, LLC, as Lessee, dated October 15, 2018, recorded in Clerk's Document No. 00315559, Official Public Records, Val Verde County, Texas.

9. Oil and Gas Lease executed by Smith Ray, as Lessor and Wolfcamp Engery, LLC, as Lessee, dated May 8, 2018, recorded in Clerk's Document No. 00315560, Official Public Records, Val Verde County, Texas.

10. Memorandum of Option for Renewable Energy Lease Agreement between Brazos Highland Properties, LP and Babcock & Wilcox Blue Hills, LLC, effective February 14, 2022, recorded in Clerk's Document No. 2022-332973, Official Public Records, Val Verde County, Texas.

11. Memorandum of Wind Energy Lease and Easement Agreement between Brazos Highland Properties, LP and Greenalia Wind Power Blue Hills, LLC, effective July 22, 2022, recorded in Clerk's Document No. 2022-336438, Official Public Records, Val Verde County, Texas.

4136-4113-3896.4

CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING _12_ OF _6_ PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST _7/12_, 20 _24_
TERESA ESTHER CHUPOY, COUNTY CLERK
BY: _____ DEPUTY

Tract I:

12. Land in Survey 2, Block C-15, Abstract 3375, Oscar de Blanc is Mineral Classified and Subject to the Relinquishment Act of the State of Texas, as shown in document recorded in Volume 56, Page 485, Deed Records, Val Verde County, Texas.

13. Minerals Retained in Warranty Deed dated September 26, 1927, recorded in Volume 66, Page 380, Deed Records, Val Verde County, Texas, executed by W.M. Abbey to Robert Cauthorn.

14. Volume 37, Page 317, Deed Records, Val Verde County, Texas, as to Survey 24, Block G, G.C. & S. F. Ry. Co.

15. Volume 37, Page 320, Deed Records, Val Verde County, Texas, as to Survey 23, Block G, G.C. & S.F. Ry. Co.

16. Volume 37, Page 329, Deed Records, Val Verde County, Texas, as to Survey 25, Block G, G.C. & S.F. Ry. Co.

17. Volume 37, Page 319, Deed Records, Val Verde County, Texas, as to Survey 26, Block G, G.C. & S.F. Ry. Co.

18. Volume 37, Page 330, Deed Records, Val Verde County, Texas, as to Survey 27, Block G, G.C. & S.F. Ry. Co.

19. Volume 37, Page 318, Deed Records, Val Verde County, Texas, as to Survey 28, Block G, G.C. & S.F. Ry. Co.

20. Volume 37, Page 326, Deed Records, Val Verde County, Texas, as to Survey 15, Block G, G.C. & S.F. Ry. Co.

21. Volume 37, Page 314, Deed Records, Val Verde County, Texas, as to Survey 16, Block G, G.C. & S.F. Ry. Co.

22. Volume 37, Page 325, Deed Records, Val Verde County, Texas, as to Survey 17, Block G, G.C. & S.F. Ry. Co.

23. Volume 37, Page 315, Deed Records, Val Verde County, Texas, as to Survey 18, Block G, G.C. & S.F. Ry. Co.

24. Volume 37, Page 327, Deed Records, Val Verde County, Texas, as to Survey 19, Block G, G.C. & S.F. Ry. Co.

25. Volume 37, Page 323, Deed Records, Val Verde County, Texas, as to Survey 20, Block G, G.C. & S.F. Ry. Co.

26. Volume 37, Page 322, Deed Records, Val Verde County, Texas, as to Survey 21, Block G, G.C. & S.F. Ry. Co.

27. Volume 37, Page 316, Deed Records, Val Verde County, Texas, as to Survey 22, Block G, G.C. & S.F. Ry. Co.

28. Volume 37, Page 324, Deed Records, Val Verde County, Texas, as to Survey 4, R.O. Bennett

4136-4113-3896.4

CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING 13 OF 116 PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST 7/12 20 24
TERESA ESTHER CHAPOY, COUNTY CLERK
BY: _____ DEPUTY

29. Volume 37, Page 324, Deed Records, Val Verde County, Texas, as to Survey 6, S.H. Larrimoore

30. Volume 37, Page 324, Deed Records, Val Verde County, Texas, as to Survey 8, J.C. Smith

31. Warranty Deed dated July 25, 1963 from Alma Oberkampf to the State of Texas, recorded in Volume 171, Pages 189-191, Deed Records, Val Verde County, Texas.

32. Right of Way Easement dated June 30, 1967, executed by Alma Oberkampf Roach to State of Texas, recorded in Volume 194, Pages 44-47, Deed Records, Val Verde County, Texas.

33. Easement dated April 4, 1960, executed by Alma Oberkampf Roach to Sinclair Oil & Gas Company, recorded in Volume 157, Pages 241-242, Deed Records, Val Verde County, Texas, as to Survey 2 and Survey 4.

34. Right of Way and Easement dated July 20, 1976, executed by Alma Oberkampf to C & K Petroleum, Inc., recorded in Volume 301, Pages 284-285, Deed Records, Val Verde County, Texas and corrected in Volume 303, Pages 63-64, Deed Records, Val Verde County, Texas, as to Surveys 22, 23, 24, 25.

35. Right of Way Road Easement dated March 1, 1977, executed by Alma Oberkampf Roach to Mobil Oil Corporation, recorded in Volume 313, Pages 254-257, Deed Records, Val Verde County, Texas, as to Survey 4, Survey 25, Survey 26, Survey 22, and Survey 23.

36. Road Easement dated May 13, 1977, executed by Alma Oberkampf Roach to Resources Investment Corporation, et al, recorded in Volume 315, Pages 283-286, Deed Records, Val Verde County, Texas, as to Survey 4, Survey 25, Survey 26, Survey 22, and Survey 23.

37. Easement and Right of Way dated August 24, 2005, granted by Jack Brewer to Rio Grande Electric Cooperative, Inc. recorded in Volume 969, Pages 340-341, Official Public Records, Val Verde County, Texas, as to Survey 26 and Survey 6.

38. Supplemental Easement and Right of Way dated March 31, 2011, executed by Jack Brewer, Jr., et als to Electric Transmission Texas, LLC, recorded in Clerk's Document No. 263770, Official Public Records, Val Verde County, Texas, as to Survey 15, Survey 16, Survey 17, and Survey 75.

39. Supplemental Easement and Right of Way dated March 24, 2011, executed by Jack Brew!3r, Jr., et als to Electric Transmission Texas, LLC, recorded in Clerk's Document No. 263771, Official Public Records, Val Verde County, Texas, as to Survey 15, Survey 16, Survey 17, and Survey 75.

40. Easement and Right of Way dated January 16, 1929, granted by T .A. Kincaid to Central Power and Light Company recorded in Volume 72, Pages 131, Deed Records, Val Verde County, Texas; Said Easement Assigned to Electric Transmission Texas, LLC by Assignment of Easements and Assumption Agreement dated March 26, 2010, recorded in Clerk's Document No. 00257110, Official Public Records, Val Verde County, Texas, as to Survey 15, Survey 16, Survey 17, and Survey 75.

41. Memorandum Giving Notice of Oil and Gas Lease executed by Jack Brewer, Jr., dealing in his sole and separate property, as Lessor, and R.D. Davis & Associates, Inc., as Lessee, dated June 12, 2006, recorded in Volume 1036, Pages 166-168, Official Public Records, Val Verde County, Texas.

4136-4113-3896.4


CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING 17 OF 118 PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST 7/12 20 24
TERESA ESTHER CHAROY, COUNTY CLERK
BY: _____ DEPUTY

42. Memorandum Giving Notice of Oil and Gas Lease executed by The Norman Frank Lourenco and Connie Jean Lourenco Family Trust, Jack Brewer, Jr. as Power of Attorney, as Lessor, and R.D. Davis & Associates, Inc., as Lessee, dated July 25, 2006, recorded in Volume 1036, Pages 169-171, Official Public Records, Val Verde County, Texas.

43. Oil and Gas Lease executed by Carmen Cecilia Cantu Chapman, as her sole and separate property, as Lessor, and Chesapeake Exploration Limited Partnership, as Lessee, dated September 27, 2006, recorded in Volume 1069, Pages 66-75, Official Public Records, Val Verde County, Texas.

44. Oil and Gas Lease executed by Cole Chapman, a/k/a Kurtis Cole Chapman, as his sole and separate property, as Lessor, and Chesapeake Exploration Limited Partnership, as Lessee, dated September 24, 2006, recorded in Volume 1069, Pages 76-85, Official Public Records, Val Verde County, Texas.

45. Oil and Gas Lease executed by Estate of Joseph B. Chapman, deceased by Candace Hillman Chapman Carta, a/k/a Candace H. Chapman Carta, sole heir at law, as Lessor, and Chesapeake Exploration Limited Partnership, as Lessee, dated September 27, 2006, recorded in Volume 1069, Pages 86-95, Official Public Records, Val Verde County, Texas.

46. Part of the property along the West property line is under record title, but outside of fence as shown on survey dated June 28, 2017 by Reynaldo Martinez, Jr., Registered Professional Land Surveyor, No. 5482.

47. Part of property along the East property line is under record title but outside of fence as shown on survey dated June 28, 2017 by Reynaldo Martinez, Jr., Registered Professional Land Surveyor, No. 5482.

48. Part of property along the South property line is under record title but outside of fence as shown on survey dated June 28, 2017 by Reynaldo Martinez, Jr., Registered Professional Land Surveyor, No. 5482.

49. Various Overhead Electrical line across property as shown on survey dated June 28, 2017 by Reynaldo Martinez, Jr., Registered Professional Land Surveyor, No. 5482.

50. Wind mills, Water wells, Water storage tanks and elevated water tank as shown on survey dated June 28, 2017 by Reynaldo Martinez, Jr., Registered Professional Land Surveyor, No. 5482.

51. Road Easements, Roadways, and State of Texas Right of Ways as shown on survey dated June 28, 2017 by Reynaldo Martinez, Jr., Registered Professional Land Surveyor, No. 5482.

Tract II:

52. All minerals reserved by State of Texas by Land Award and Receipt dated August 15, 1993, recorded in Volume 586, Pages 824-826, Official Public Records, Val Verde County, Texas.

53. Rights of Way of Public as to State Farm Highway 1024 and as set out in document recorded in Volume 194, Page 144, Deed Records, Val Verde County, Texas and as shown on survey dated June 28, 2017 by Reynaldo Martinez, Jr., Registered Professional Land Surveyor, No. 5482.

4136-4113-3896.4

CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING 15 OF 16 PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST 7/12 20 24
TERESA ESTHER CHAPOY, COUNTY CLERK
BY: _____ DEPUTY

54. Easements as described in instruments recorded in Volume 342, Pages 260-267, Volume 344, Pages 233-240, Volume 345, Pages 208-215, and Volume 348, Pages 219-226, all Deed Records, Val Verde County, Texas.

55. Oil & Gas Lease executed by Commissioner of the General Land Office, as Lessor, and Marathon Oil Company, as Lessee, dated April 7, 1981, recorded in Volume 390, Pages 155-160, Official Public Records, Val Verde County, Texas.

56. Part of property along the West property line is under record title but outside of fence as shown on survey dated June 28, 2017 by Reynaldo Martinez, Jr., Registered Professional Land Surveyor, No. 5482.

57. Easement dated April 4, 1960 granted by Alma Oberkampf Roach to Sinclair Oil & Gas Company, recorded in Volume 157, Pages 241-242, Deed Records, Val Verde County, Texas.

Tracts I & II:

58. All reservations of oil, gas, other minerals, executive and royalties collectively as stated in Deed dated August 17, 2017, filed for record August 17, 2017, in Clerk's Document No. 00303192, Official Public Records, Val Verde County, Texas, executed by Frankens HTI, Ltd. to Brazos Highland Properties, LP.

59. Rights to ingress and egress, with respect to Mineral interest, as described in Deed dated August 17, 2017, filed for record on August 17, 2017, in Clerk's Document No. 00303192, Official Public Records, Val Verde County, Texas.

60. Undivided Fifteen percent (15%) Mineral interest in and to any interest in and to all of the oil, gas and other minerals in, on, under and that may be produced from the property to Brazos Highland Properties, LP as reserved and excluded in Deed dated August 17, 2017, filed for record August 17, 2017, in Clerk's Document No. 00303192, Official Public Records, Val Verde County, Texas.

4136-4113-3896.4

**CERTIFIED COPY CERTIFICATE**
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING _1160_ OF _1_ PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST _7/12_ 20_24_
TERESA ESTHER CHANDY, COUNTY CLERK
BY: _____ DEPUTY

# EXHIBIT C-2

00334664

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

### GENERAL WARRANTY DEED

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | |
| | § | **KNOW ALL BY THESE PRESENTS:** |
| **COUNTY OF VAL VERDE** | § | |

THAT, Brazos Highland Properties, LP, a Delaware limited partnership (the "Grantor"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) in hand paid to Grantor by Blue Valley Solar, LLC, a Texas limited liability company (the "Grantee"), the receipt of which is hereby acknowledged by Grantor, and other good and valuable consideration paid and agreed and secured to be paid to Grantor by Grantee in the manner set forth below, the sufficiency of which consideration is hereby acknowledged by Grantor, has GRANTED, BARGAINED, SOLD, and CONVEYED and by these presents does GRANT, BARGAIN, SELL, and CONVEY unto said Grantee, its successors and assigns, subject to the Permitted Exceptions (as defined below), all of that certain real property located in Val Verde County, Texas, being more particularly described on Exhibit "A", attached hereto and incorporated herein by reference, together with all improvements thereon and all rights and appurtenances thereto, including any right, title and interest of Grantor, if any, in and to any adjacent streets, alleys, rights of way, rights of ingress and egress and any reversionary interests, if any, in any way belonging to the foregoing (the "Property").

This conveyance is made by Grantor and accepted by Grantee expressly subject to the liens securing payment of real estate ad valorem taxes for the current and all subsequent years, as well as to those matters set forth on Exhibit "B", attached hereto and incorporated herein by reference (the "Permitted Exceptions"). Real estate ad valorem taxes on the Property for the year 2022 have been prorated between Grantor and Grantee as of the date hereof and Grantor and Grantee have agreed to pay such taxes in accordance with the terms of that certain Purchase and Sale Agreement between Grantor and Grantee.

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anywise belonging, unto Grantee, its successors and assigns forever; and subject to the above described Permitted Exceptions, Grantor does hereby bind itself and its successors, to WARRANT AND FOREVER DEFEND all and singular the Property unto Grantee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

### [THE BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK]

**CERTIFIED COPY CERTIFICATE**
**STATE OF TEXAS, COUNTY OF VAL VERDE**
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING _1_ OF _7_ PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST _July 18_, 20_24_
TERESA ESTHER CHAPOY, COUNTY CLERK
BY _Mary Ellen Aguirre_ DEPUTY

*EXECUTION VERSION*

00334664

EXECUTED ~~effective~~ the 22nd day of April, 2022, but effective April 29th, 2022

**GRANTOR**:

**BRAZOS HIGHLAND PROPERTIES, LP,**
a Delaware limited partnership

By: _____
Name: Lingyun Sun
Title:   Vice Chairman and CEO

STATE OF TEXAS                §
                             §
COUNTY OF Harris             §

BEFORE ME, the undersigned authority, on this day personally appeared Lingyun Sun, the Vice Chairman and CEO of Brazos Highland Properties, LP, a Delaware limited partnership, known to me to be the person and officer whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purpose and consideration therein expressed, and in the capacity therein stated on behalf of said corporation.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this 22nd day of April, 2022.



| MELISSA CAO |
| Notary Public, State of Texas |
| Comm. Expires 07-31-2023 |
| Notary ID 130316308 |

_____
Notary Public, State of Texas

AFTER RECORDING RETURN TO:

Name: Erika Benson
Title:  Senior Director and Legal Counsel, Diode Ventures, LLC
Address: 11401 Lamar Avenue
Overland Park, KS 66211
Telephone: (913) 458-7056
Email: bensond@diodeventures.com

**CERTIFIED COPY CERTIFICATE**
**STATE OF TEXAS, COUNTY OF VAL VERDE**
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING  2  OF  7  PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST  July 18, 20 24
TERESA ESTHER CHAVOY, COUNTY CLERK
BY Mary Ellen Aguirre DEPUTY

00334664

### EXHIBIT "A"

### to General Warranty Deed

### BLUE VALLEY SOLAR – 1000.000 ACRES

**LEGAL DESCRIPTION:** BEING 1000.000 ACRES OF LAND LYING IN AND BEING SITUATED OUT OF SECTIONS 43 AND 44, BLOCK DB, C.C.S.D. & R:G.N.G. RR. CO. SURVEY, SECTION 44-1/2, JOHN DICKINON SURVEY AND SECTIONS 1, 2, 3 AND 4, B.S. & F. SURVEY, ALL IN VAL VERDE COUNTY, TEXAS AND BEING A PORTION OF THAT CERTAIN 18,044.825 ACRE TRACT CONVEYED AS TRACT I BY DEED RECORDED IN DOCUMENT NO. 00276087 IN THE OFFICIAL PUBLIC RECORDS OF VAL VERDE COUNTY, TEXAS: SAID 1000.000 ACRES OF LAND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS AND AS SURVEYED UNDER THE SUPERVISION OF SURVEYING AND MAPPING, LLC IN APRIL, 2022:

**BEGINNING** at an iron rod set in the east right of way line of Farm to Market Highway 1024 for the northwest corner hereof and from which an old stone mound found for the common corner of Section 3, Block S10, Mrs. H. Lawson Survey, Section 4, Block S10, M.M. Norman Survey, Section 45, Block DB, C.C.S.D. & R.G.N.G. RR. Co. Survey and said Section 44 bears North 64°06'06" East a distance of 8740.06 feet;

**THENCE** crossing said Sections 43, 44, 44-1/2 and 2 the following three (3) courses:

1. South 88°52'06" East a distance of 4040.72 feet to an iron rod set for the northeast corner hereof;
2. South 01°07'54" West a distance of 6211.73 feet to an iron rod set for an interior corner hereof;
3. South 88°52'06" East a distance of 2167.12 feet to an iron rod set in the east line of a transmission line easement 100 feet in width recorded in Document No. 0026615 of said Official Public Records for an angle point hereof;

**THENCE** along the east line of said easement the following two (2) courses:

1. South 13°00'58" East a distance of 799.72 feet to a point for an angle point hereof;
2. South 13°00'10" East a distance of 5552.52 feet to a point in the common line of said Section 1, B.S. & F. Survey and Section 1, Block N2, C.C.S.D. & R.G.N.G. RR. Co. Survey for an angle point hereof and from which a stone mound found for the common corner of Sections 1 and 3, Block N4, C.C.S.D. & R.G.N.G. RR. Co. Survey and said Sections 2 and 44-1/2 bears North 00°58'39" East a distance of 8365.25 feet;

**THENCE** South 00°58'39" West a distance of 2306.55 feet along said common line to a point at the intersection with the east right of way line of said Farm to Market Highway 1024 for the southeast corner hereof and from which a 1 inch iron pipe in concrete bears South 55°53'06" East a distance of 56.30 feet and a 4 inch iron pipe fence corner and gate post bears South 53°15'16" East a distance of 58.03 feet;

**THENCE** along said east right of way line the following eleven (11) courses:

1. North 42°41'48" West a distance of 561.43 feet to a 1/2 inch iron rod with cap marked "KOCH & KOCH" found for an angle point hereof;
2. North 44°15'48" West a distance of 6647.48 feet to a point for the point of curvature of a curve to the right;

**CERTIFIED COPY CERTIFICATE**
**STATE OF TEXAS, COUNTY OF VAL VERDE**
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING **3** OF **7** PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST ___July 18___ 20 24
TERESA ESTHER CHAPOY, COUNTY CLERK
BY: Mary Ellen Aguine DEPUTY

00334664

3. Thence along said curve turning to the right an arc length of 734.72 feet, a radius of 905.30 feet, and a chord bearing North 21°00'48" West a chord length of 714.72 feet to a point for the point of tangency of said curve and from which a 1/2 inch iron rod with cap marked" KOCH & KOCH" found bears North 01°21'32" East a distance of 70.60 feet;

4. North 02°14'12" East a distance of 1782.05 feet to a 1/2 inch iron rod with cap marked" KOCH & KOCH" found for an angle point hereof;

5. North 01°01'16" West a distance of 342.38 feet to a 1/2 inch iron rod with cap marked" KOCH & KOCH" found for an angle point hereof;

6. North 13°26'12" West a distance of 307.19 feet to a point for an angle point hereof and from which a 2 inch cedar post in fence bears North 28°03'02" west a distance of 4.46 feet;

7. North 16°40'07" West a distance of 3883.68 feet to a 1/2 inch iron rod with cap marked" KOCH & KOCH" found for the point of curvature of a curve to the right;

8. Thence along said curve turning to the right an arc length of 418.15 feet, a radius of 2749.56 feet, and a chord bearing North 12°18'43" West a chord length of 417.75 feet to a 1/2 inch iron rod with cap marked" KOCH & KOCH" found for the point of tangency of said curve;

9. North 08°02'52" West a distance of 1304.25 feet to a point for an angle point hereof;

10. North 11°04'12" West a distance of 411.08 feet to a 1/2 inch iron rod with cap marked" KOCH & KOCH" found for an angle point hereof;

11. North 44°17'20" West a distance of 1038.03 feet to **POINT OF BEGINNING** and containing 1000.000 acres of land, more or less.

Note: Bearings, distances, and acreage shown hereon are Grid, NAD83(2011), Texas South Central Zone and are based on NGS CORS/OPUS solutions. Iron rods set are 5/8 inch steel rebar with plastic caps marked "SAM, LLC".

**CERTIFIED COPY CERTIFICATE**
**STATE OF TEXAS, COUNTY OF VAL VERDE**
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING 4 OF 7 PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST July 18, 2024
TERESA ESTHER CHAPOY, COUNTY CLERK
BY Mary Ellen Aguirre DEPUTY

00334664

## EXHIBIT "B"

### to General Warranty Deed

Permitted Exceptions

1.      Right of Way Easement, its terms and conditions, dated December 9, 1927 executed by H. E. Guinn granted to Central Power & Light Company recorded in Volume 68, Pages 270-272, Deed Records, Val Verde County, Texas; Amendment and Supplement to Easement and Right of Way, its terms and conditions, dated __ , recorded in Clerk's Document No. 00266615, Official Public Records, Val Verde County, Texas, executed by and between The Nature Conservancy and Electric Transmission Texas, LLC. (Guinn - Blue Hills Ranch)

2.      Reservation of an undivided $1/2$ of the oil, gas, and minerals in and under Tract I, to be proportionately reduced if less than 100% of the oil, gas, and minerals are owned by the grantor, in that certain Special Warranty Deed, its terms and conditions, dated December 8, 1989 executed by Texas A & M University Development Foundation, et al recorded in Volume 520, Pages 51-74, Deed Records, Val Verde County, Texas, all its terms and conditions. Company makes no representation as to the present ownership of any such interests. (Guinn - Blue Hills Ranch)

3.      Easement and Right of Way, its terms and conditions, dated November 9, 1994 executed by Southwest Livestock & Trucking Company, Inc. granted to Rio Grande Electric Cooperative Inc. recorded in Volume 609, Pages 769-770, Pages Official Public, Val Verde County, Texas as to Survey 43, Block DB, CCSD & RGNG Ry. Co. (Guinn - Blue Hills Ranch)

4.      Memorandum of Oil and Gas Lease, its terms and conditions, effective September 19, 2006, executed by and between Rock Creek Ranch I, ltd., as Lessor, and Chesapeake Exploration Limited Partnership, as Lessee, recorded in Volume 1078, Pages 719-722, Official Public Records, Val Verde County, Texas. (affects Prossor, Blue Hills-Guinn)

5.      This item has been intentionally deleted.

6.      Overhead electrical lines and communication tower as shown on as shown on survey dated May 22, 2017 by Reynaldo Martinez, Jr., Registered Professional Land Surveyor, No. 5482, as to Survey 43, Abstract 162.

7.      All reservations of oil, gas, other minerals, executive and royalties collectively as stated in Deed dated June 14, 2017, filed for record June 14, 2017, in Clerk's Document No. 00302138, Official Public Records, Val Verde County, Texas, executed by Blue Hills Ranch, LLC to Frankens HTI, Ltd. Company makes no representation as to the present ownership of any such interests.

8.      Undivided Fifteen percent (15%) Mineral interest in and to any interest in and to all of the oil, gas and other minerals in, on, under and that may be produced from the property to Brazos Highland Properties, LP as reserved and excluded in Deed dated June 14, 2017, filed for record June 14, 2017, in Clerk's Document No. 00302139, Official Public Records, Val Verde County, Texas. Company makes no representation as to the present ownership of any such interests.

9.      Rights to ingress and egress, with respect to Mineral interest, as described in Deed dated June 14, 2017, filed for record on June 14, 2017, in Clerk's Document No. 00302139, Official Public Records, Val Verde County, Texas. Company makes no representation as to the present ownership of any such interests.

CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF VAL VERDE
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING __5__ OF __7__ PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST  July 18, 20 24
TERESA ESTHER CHAPOY, COUNTY CLERK
BY: Mary Ellen Aguirre DEPUTY

00334664

10.     This item has been intentionally deleted.

11.     ~~Easement granted to Big Bend Telephone Co. Inc., dated May 30, 2018, filed for record in Clerk's Document No. 00308389, Val Verde County, Texas~~. Intentionally deleted

12.     Mineral and Royalty Deed executed by *Blue Hills Ranch, LLC,* a Texas limited liability company, dated December 5, 2018, filed for record in Clerk's Document No. 00311115, Val Verde County, Texas. Company makes no representation as to the present ownership of any such interests.

13.     ~~Easement and Right of Way dated April 6, 2021, granted unto Rio Grande Electric Cooperative, Inc., a Texas corporation, filed for record in Clerk's Document No. 00328443, Val Verde County, Texas.~~ Intentionally deleted



**CERTIFIED COPY CERTIFICATE**
**STATE OF TEXAS, COUNTY OF VAL VERDE**
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING __6__ OF __7__ PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.
ATTEST __July 18__, 20__24__
TERESA ESTHER CHAPOY, COUNTY CLERK
BY: __Mary Ellen Aguirre__ DEPUTY

00334664

```
          ·FILED AND RECORDED
          OFFICIAL PUBLIC RECORDS
        On: May 03,2022  at  09:48A

        Document Number:           00334664
        Receipt# - 169570
        Amount                       46.00

       - Generosa Gracia Ramon
         County Clerk,Val Verde County

       By: Monica A.,Deputy
       Monica Marines

       —STATE OF TEXAS COUNTY OF VAL VERDE

          I·hereby certify that this instrument
        was filled on the date and time stamped
        ·hereon by me and was duly recorded
        in the OFFICIAL PUBLIC RECORDS
        of Val Verde County.

        May 03,2022     09:48A

        Generosa Gracia Ramon
        County Clerk,Val Verde County
       · By:- Moneca A
```

**CERTIFIED COPY CERTIFICATE**
**STATE OF TEXAS, COUNTY OF VAL VERDE**
THE DOCUMENT TO WHICH THIS CERTIFICATE IS AFFIXED
CONTAINING  7  OF  7  PAGES IS A FULL, TRUE AND
CORRECT COPY OF THE ORIGINAL FILE AND OF RECORD IN
MY OFFICE.

ATTEST  July 18  20 24
TERESA ESTHER CHAPOY, COUNTY CLERK
BY: Mary Ellen Aguirre  DEPUTY

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| GH AMERICA ENERGY LLC | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | |
| | § | |
| DOUGLAS FOHN, in his official capacity as | § | |
| Assistant General Counsel of the Electric | § | |
| Reliability Council of Texas, Inc. ("ERCOT"); | § | |
| HOLLY HEINRICH, in her official capacity | § | |
| as Legal/Regulatory Counsel of ERCOT; | § | |
| PABLO VEGAS, in his official capacity as | § | |
| Chief Executive Officer of ERCOT; PAUL | § | |
| FOSTER, in his official capacity as a member | § | |
| of the Board of Directors of ERCOT; BILL | § | |
| FLORES, in his official capacity as a member | § | |
| of the Board of Directors of ERCOT; | § | |
| CARLOS AGUILAR, in his official capacity as | § | CASE NO.1:24-CV-00648-DII |
| a member of the Board of Directors of | § | |
| ERCOT; LINDA CAPUANO, in her official | § | |
| capacity as a member of the Board of | § | |
| Directors of ERCOT; JULIE ENGLAND, in | § | |
| her official capacity as a member of the Board | § | |
| of Directors of ERCOT; ROBERT | § | |
| FLEXON, in his official capacity as a member | § | |
| of the Board of Directors of ERCOT; | § | |
| PEGGY HEEG, in her official capacity as a | § | |
| member of the Board of Directors of ERCOT; | § | |
| and JOHN SWAINSON, in his official | § | |
| capacity as a member of the Board of | § | |
| Directors of ERCOT, | § | |
| | § | |
| *Defendants*, | § | |
| | § | |
| ATTORNEY GENERAL KEN PAXTON, | § | |
| | § | |
| *Intervenor-Defendant.* | § | |

## DECLARATION OF HOLLY HEINRICH

**STATE OF TEXAS**          §
                                              §
**COUNTY OFTRAVIS**          §

- 1 -

1.      My name is Holly Heinrich. I have personal knowledge of the matters set forth in this Declaration.

2.      I am an attorney licensed to practice law in Texas, and I have been so licensed since November 2018.

3.      I began working at ERCOT as an attorney in its legal department on December 1, 2022. I am no longer employed at ERCOT. I resigned from ERCOT, and my last day of employment at ERCOT was June 21, 2024. I am currently employed as an associate at a law firm in Austin, Texas.

4.      While I was employed at ERCOT, my supervisor, to whom I reported, was Doug Fohn. Attached to this Declaration is a true and correct copy of an email that I sent to John Skibinski and Jerry Price at GH America Energy, LLC on May 2, 2024. I sent the email at Mr. Fohn's request.

5.      I declare under penalty of perjury of the laws of the State of Texas that the foregoing is true and correct.

Executed this 10th day of September 2024, in Travis County, Texas.

Holly Heinrich

- 2 -

| | |
|---|---|
| **From:** | Heinrich, Holly |
| **To:** | jskibinski@gha-group.com; jprice@gha-group.com |
| **Cc:** | Fohn, Doug; Fernandes, Jenifer |
| **Subject:** | RE: Notice of Cancelation - Blue Star Solar 24INR0146 |
| **Date:** | Thursday, May 2, 2024 11:41:55 AM |
| **Attachments:** | image001.png |

Good morning John,

Doug asked me to provide a response to your question. Please see below:

Section 5.2.2(2)-(3) of the ERCOT Planning Guide provides that an Entity is not eligible to <u>initiate or maintain</u> a Generator Interconnection Modification (GIM) if the Entity or any other owner of the project meets any of the company ownership (including affiliations) or headquarters criteria listed in Tex. Bus. & Com. Code Sec. 117.002 or Tex. Gov't Code Sec. 2275.0102, or if the real property to be utilized by or for the project is owned or controlled, in whole or in part, by an Entity that meets the prohibited company ownership (including affiliations) or headquarters criteria in those statutes.

Based on the above, if the Interconnecting Entity, property owner, or any affiliate of those entities meets the citizenship criteria under the above-mentioned state statutes and the Planning Guide, then the project would not be able to initiate or maintain any stage of a GIM, including by pursuing a Screening Study.

Sincerely,

Holly Heinrich
Legal/Regulatory Counsel
Electric Reliability Council of Texas, Inc.
8000 Metropolis (Building E), Suite 100
Austin, Texas 78744
(512) 275-7436 (Telephone)
holly.heinrich@ercot.com

**From:** John Skibinski <JSkibinski@gha-group.com>
**Sent:** Friday, April 26, 2024 1:02 PM
**To:** Fohn, Doug <Douglas.Fohn@ercot.com>
**Cc:** Jerry Price <jprice@gha-group.com>
**Subject:** FW: Notice of Cancelation - Blue Star Solar 24INR0146
**Importance:** High

**\*\*\*\*\* EXTERNAL Email \*\*\*\*\***

**Please be cautious and evaluate before you click on links, open attachments, or provide credentials. As a reminder, please report phishing emails via the Report Phishing button.**

**If the button is not available, then please forward to ReportPhishing@ercot.com**

Greetings Doug,

We are in the process of selling the Rodeo Ranch land that had a previous ERCOT Screening Study cancelled due to SB2116, for Blue Star Solar 24INR0146 below.

We would like to pursue at least the Screening Study for Blue Star Solar again so that we can prove the land is interconnectable and saleable to these SB2116 compliant potential customers.

With respect to another one of our Chinese properties leased by American Renewables, screening study applications were allowed for them twice – but they were warned by ERCOT they could not pursue the Full Interconnection Study – and we would abide by that as well.

So, the basic question is, what is ERCOT's position with our company wanting to submit just a Screening Study Application to obtain the report on the property's interconnection capability?

Best, John



**GH America Energy, LLC (GHAE)**
**John Skibinski |** Energy Projects Director
2800 Post Oak Blvd., Suite 5115
Houston, TX  77056  M: (979) 583-1544

---

**From:** Fohn, Doug <Douglas.Fohn@ercot.com>
**Sent:** Monday, October 3, 2022 4:11 PM
**To:** John Skibinski <JSkibinski@gha-group.com>
**Cc:** Seely, Chad <Chad.Seely@ercot.com>; Blevins, Bill <Bill.Blevins@ercot.com>; Teixeira, Jay <Jay.Teixeira@ercot.com>; Utley, Ben <Benjamin.Utley@ercot.com>; Gleason, Brandon <Brandon.Gleason@ercot.com>; Fohn, Doug <Douglas.Fohn@ercot.com>; Ruiz, Lissette <LISSETTE.RUIZ@ercot.com>
**Subject:** Notice of Cancelation - Blue Star Solar 24INR0146

GH America Energy, LLC (GH) –

ERCOT is hereby providing notice of cancelation for the following proposed Generation Resource project: INR Number 24INR0146, pursuant to the ERCOT Planning Guide, Section 5.2.6.  The basis for cancelation, as reflected in the attestation that was provided by GH for this project, is that the Interconnecting Entity (IE) and/or the Property Owner for the project met one or more of the foreign citizenship or headquarters criteria identified in the attestation.  The purpose of the attestation is to ensure compliance with the Lone Star Infrastructure Protection Act.

As reflected by the attached prior communications, ERCOT provided opportunities for GH to provide written confirmation to ERCOT, including supporting documentation as ERCOT may deem appropriate, that the IE and Property Owner for the project did not meet any of the criteria identified on page 1 of the attestation (such that GH could truthfully amend its response to the attestation to: "NONE of the following statements in paragraphs (A)-(C) are TRUE").    As of the deadline of September 30, 2022, GH did not remedy this compliance issue.  As a result, Generation Resource project INR Number 24INR0146 has been canceled in ERCOT's Resource Integration and Ongoing Operations (RIOO) System.

Feel free to contact me if you have any questions regarding this notice.

Douglas Fohn
Assistant General Counsel
Electric Reliability Council of Texas, Inc.
8000 Metropolis (Building E), Suite 100
Austin, Texas 78744
(512) 275-7447 (Telephone)
(512) 225-7079 (Facsimile)
douglas.fohn@ercot.com

# EXHIBIT E

**AGREEMENT AMONG
THE DEPARTMENT OF DEFENSE,
THE DEPARTMENT OF THE AIR FORCE, AND
GH AMERICA ENERGY, LLC,
ADDRESSING THE BLUE HILLS WIND PROJECT
NEAR COMSTOCK, TEXAS**

This is an agreement among the Department of Defense (DoD), acting through the Military Aviation and Installation Assurance Siting Clearinghouse, the Department of the Air Force (DAF), acting through the Deputy Assistant Secretary of the Air Force for Installations (collectively, the "DoD parties"), and GH America Energy, LLC (Project Owner).  Together, these three entities are referred to as "parties" and individually as a "party."  Any reference to "DoD parties" means both the DoD and DAF and does not indicate that one party acts for or on behalf of the other.  In this agreement, DoD does not include the United States Army Corps of Engineers when engaged in its civil works program, including any permitting actions.

This agreement is entered into pursuant to section 183a of title 10, United States Code (U.S.C), and part 211 of title 32, Code of Federal Regulations (CFR).

Attachments A, *Federal Aviation Administration Filings* and B, *Blue Hills Wind Project Map and Project Area Coordinates*, are attached to this agreement and made a part hereof.

For good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

### SECTION 1.  PURPOSE.

**A.  Objective.**  The objective of this agreement is to mitigate any potential adverse impact and to minimize risks to national security while allowing the Blue Hills Wind Project (Project) to proceed with development.

**B.  De-confliction.**  As the Project was originally filed, the wind turbines would conflict with the DAF's use of Military Training Routes SR-283 and SR-284 (the "MTRs") used by Laughlin Air Force Base (Installation).  The parties have focused on de-conflicting these activities and agree the terms below will allow the mutual goals of the parties to be met.

### SECTION 2.  DEFINITIONS.

**A.  Access.**  "Access" means either to enter a physical space or to remotely read, copy, edit, divert, release, alter the state of, or otherwise affect information technology systems (e.g., network, data, security, software, hardware).

**B.  Actual Curtailment Hours.**  [RESERVED]

1 of 13

AGREEMENT AMONG THE DEPARTMENT OF DEFENSE, THE DEPARTMENT OF THE AIR FORCE, AND GH AMERICA ENERGY, LLC,
ADDRESSING THE DEVELOPMENT OF THE BLUE HILLS WIND PROJECT NEAR COMSTOCK, TEXAS

**C. ASN.** Federal Aviation Administration Aeronautical Study Number.

**D. Banked Hours.** [RESERVED]

**E. CFIUS.** Committee on Foreign Investment in the United States.

**F. CFR.** Code of Federal Regulations.

**G. Curtailment.** [RESERVED]

**H. DAF.** The Department of the Air Force, a military department of the United States.

**I. Day.** A calendar day, unless indicated otherwise.

**J. DoD.** The Department of Defense, an executive department of the United States.

**K. FAA.** Federal Aviation Administration, an agency of the United States Department of Transportation.

**L. Fiscal Year.** [RESERVED]

**M. Hour.** [RESERVED]

**N. National Security or Defense Purpose.** [RESERVED]

**O. Project.** The Blue Hills Wind Project, which will consist of no more than 46 of the 51 wind turbines and no more than three (3) of the five (5) meteorological evaluation towers (METs) identified in Attachment A or by substitute ASNs submitted in accordance with Section 3.E.2 of this agreement.

**P. Project Owner.** GH America Energy, LLC, and its successors and assigns.

**Q. Siting Clearinghouse.** The Military Aviation and Installation Assurance Siting Clearinghouse established pursuant to 10 U.S.C. section 183a.

**R. U.S.C.** United States Code.

## Section 3.  Mitigation.

**A. In General.** This agreement is structured to ensure Project Owner may construct and operate the Project without adversely impacting DoD military operations and readiness. Project Owner agrees to limit the total number of Project wind turbines to no more than 46 constructed of the 51 filed with a maximum height of 700 feet above ground level (AGL) for each turbine. Project Owner agrees to limit the total number of METs to no more than three (3) constructed of the five (5) filed with a maximum height of 460 feet AGL for each MET. Project Owner agrees

2 of 13

to restrict the construction of the Project to the specific geographic coordinates listed in Attachment A. Project Owner agrees to limit construction of the Project wind turbines and METs to the designated Project Areas shown in Attachment B.

**B  Impact Analysis During Test Energy Phase.**  [RESERVED]

**C.  Voluntary Contribution.**  [RESERVED]

**D.  Amendment of Applications.**  [RESERVED]

**E.  Withdrawal of Objections.**

1.  Within 10 calendar days of the execution of this agreement, the DoD parties shall deliver to the FAA "No Objections with Provisions" for the ASNs corresponding to the wind turbine and MET locations listed on Attachment A. The "Provisions" will incorporate by reference this agreement, referring to it by its title, the date executed, and its signatories.

2.  If the Project Owner submits any substitute ASNs to FAA within 12 months of the execution of this agreement, the DoD parties agree to deliver to the FAA "No Objections with Provisions" for those substitute ASNs, provided that the substitute ASNs do not exceed the maximum height specified in Section 3.A, that the substitute ASNs are located within the siting parameters of the Project area specified in Attachment B of this agreement or any amendments to this agreement, that the total number of wind turbines constructed after substitution does not exceed 46 of the 51 filed wind turbines, and that the total number of constructed METs does not exceed three (3) of the five (5) filed METs and a statement is incorporated into FAA's OE/AAA system referencing this agreement, referring to it by its title, the date executed and its signatories. The "Provisions" will incorporate by reference this agreement, referring to it by its title, the date executed, and its signatories.

3.  All parties agree that, if Project Owner requests to extend the effective period of FAA's Determination of No Hazard to Air Navigation in accordance with 14 CFR section 77.35, then the DoD parties agree to deliver to the FAA "No Objections with Provisions" to such an extension as requested, provided that the affected ASNs are listed on Attachment A (as amended, if applicable, in accordance with Section 3.E.2), do not exceed the maximum height specified in Section 3.A, and are located within the siting parameters of the Project area specified in Attachment B of this agreement or any amendments to this agreement; that the total number of structures for the Project still do not exceed 46 of the 51 filed for wind turbines and three (3) of the five (5) filed METs, and a statement is incorporated into FAA's OE/AAA system referencing this agreement, referring to it by its title, the date executed and its signatories.

4.  The DoD parties agree not to object to the construction and operation of the Project before any federal, state, or local regulatory entity with jurisdiction over the Project (except as provided in sections 6.B and 10.H of this agreement); provided that Project Owner is in material compliance with the terms of this Agreement and that Project Owner has disclosed to the DoD parties in writing all material facts necessary to fully assess potential adverse

impacts and all material facts relevant to other federal, state, or local regulatory entity jurisdictional matters.

**F. Other Regulatory Actions.**  This agreement shall not prevent or limit the DoD parties from communicating in any form with any regulatory body or agency with jurisdiction or possible jurisdiction over matters affecting the Installation beyond the Project.

## SECTION 4.  CURTAILMENT.

[RESERVED]

## SECTION 5.  REVIEW OF BUSINESS ENTITIES.

**A. Protection of Defense Capabilities.**  It is a priority for the DAF to protect national defense capabilities and military operations, including military installations, research, development, testing and evaluation activities, and military readiness activities from compromise and exploitation that may occur due to an activity under foreign control or foreign influence operating in the vicinity of those national defense capabilities and military operations.

**B. Advance Notice.**

1. Project Owner shall provide advance written notice to the DAF of the following:

    a.  The names and foreign ownership (if applicable) of business entities having a direct ownership interest in the Project.

    b.  The names of the material vendors and business entities and foreign ownership (if applicable) with which Project Owner will potentially execute contracts to perform construction, supply turbines, or conduct operations activities at the location of the Project.

    c.  The names of any foreign entity or person being allowed to access the wind turbine structures and associated data systems.

2. For those entities or persons identified under paragraph 5.B.1.a and 5.B.1.b, the DAF agrees to identify to the Project Owner, no later than 30 days after the Effective Date of this agreement, any entity or person posing a security concern.  For those entities or persons identified under paragraph 5.B.1.c, the DAF agrees to identify to Project Owner, no later than 30 days after the receipt of the name of any foreign entity or person being allowed to access the wind turbines and associated data systems, any entity or person posing a security concern. Project Owner agrees to enter into negotiations with the DoD parties in order to mitigate any such concern.  Any such security concern must be resolved prior to allowing access to the site by such persons or representatives of such an entity or the use of wind turbines or other permanent on-site equipment manufactured by such a business entity.

4 of 13

3.  Project Owner agrees to provide advance written notice to the DAF of Project Owner's use of any material vendor not previously screened pursuant to this subsection. The term "material" used in this subsection means "significant, influential, or relevant." Project Owner shall allow the DAF 15 days following such a notice to conduct a security review and assess any security concern. Project Owner will provide advance written notice of a potential new material vendor but need not wait 15 days if an unexpected situation arises for which employing services or vendors immediately is prudent for the operation of the Project.

4.  Project Owner agrees to provide advance written notice to DAF of any change to the holders of direct ownership interest of this project or the Prime Contractors, where the new holder of a direct ownership interest would not be domiciled in a NATO country or a Major Non-NATO ally, as defined in 22 CFR Section 120.32. Project owner shall allow 30 days following such a notice, for the DAF to conduct a security review and assess any national security threat. Project Owner agrees to enter into negotiations with DAF in order to mitigate any such threat. Any such national security threat must be resolved prior to allowing access to the site by representatives of such a business entity.

**C.  Applicability.**  In the event the Project or any portion thereof becomes subject to a negotiated agreement between the Project Owner and CFIUS, the parties agree that the terms of such negotiated agreement shall apply in lieu of this Section 5.

### SECTION 6.  ASSIGNMENT.

**A.  Right to Assign.**  This agreement shall be binding upon the Project Owner and its successors and assigns. If Project Owner and its successors or assigns (assignors) elect to sell, convey, mortgage, assign, or otherwise transfer all or any part of its interests and obligations in the assets comprising the Project (assignment) to any third party (assignee), assignor shall cause such assignee to expressly acknowledge the existence of this agreement. The assignor shall provide a copy of this agreement to the assignee. The assignee shall provide new point of contact information (as in Section 8) to the DoD parties.

**B.  Notice to CFIUS of Assignment**  If Project Owner is subject to a negotiated agreement under CFIUS, no notice of prospective assignment to CFIUS under this subsection is required. If no such negotiated CFIUS agreement exists at the time of planned prospective assignment, and if the prospective assignee is a foreign person within the meaning of 31 CFR section 800.224, assignor and the proposed assignee shall jointly provide notice of the proposed transaction to CFIUS in accordance with applicable regulations (subpart D of 31 CFR part 800) and provide a copy of the notice to the DAF. Nothing in this agreement shall prohibit or limit DoD from objecting to the transaction within the context of a CFIUS review or investigation, nor limit communications with CFIUS during national security reviews and investigations, and, should mitigation result, during mitigation, tracking, and post-consummation monitoring and enforcement, pursuant to and in accordance with applicable statutes and regulations.

**C.  Effect of Assignment.**  Upon an assignment, assignor shall be relieved of any obligations or liabilities under this agreement to the extent that the assignee has assumed in writing such obligations or liabilities and provided that Project Owner has provided a copy of the assignment, including the assumption of obligations and liabilities, to the DoD parties.

## SECTION 7.  EFFECTIVE DATE AND EXPIRATION.

**A.  Effective Date.**  This agreement becomes effective on the date when all parties have signed it.

**B.  Expiration.**  This agreement shall expire and have no further force and effect upon the occurrence of the earlier of the following:

  1.  Construction of the Project has not commenced within the 36-month time period prescribed under 14 CFR sections 77.33 and 77.35.

  2.  The Project is decommissioned.

  3.  The Installation permanently ceases operations.

  4.  Termination of the agreement by written mutual agreement of the parties.

**C.  Actions Prior to Expiration.**  Any activities engaged in by the parties that occurred prior to expiration of this agreement shall remain valid and continue in effect, notwithstanding the expiration of the agreement.

## SECTION 8.  POINTS OF CONTACT AND NOTIFICATION.

**A.  Points of Contact (POCs).**  The following persons shall be the primary POCs for the parties for purposes of this agreement.  Any notice, request, or other communication to be provided pursuant to this agreement shall be delivered to the POCs.  Any party may change its POC by providing written notification of the change to the other parties at least 30 days in advance of the change taking effect.  POC changes take effect the sooner of all the receiving parties acknowledging receipt of the change notice or the expiration of the 30 days.

  1.  DoD – Executive Director, Military Aviation and Installation Assurance Siting Clearinghouse, 3400 Defense Pentagon, Room 5C646, Washington, DC 20301-3400

  2.  DAF – Director, Air Force Encroachment Management, Office of the Deputy Assistant Secretary of the Air Force, Installations, 1665 Air Force Pentagon, Suite 5E1000, Washington, DC  20330-1665, SAF.IEI.Encroachment@us.af.mil

  3.  Project Owner – GH America Energy, LLC, 2800 Post Oak Blvd. Suite 5115, Houston, TX 77056, (832) 917-6385

**B.  Notification.**  Any written notice shall be sent by registered or certified mail, postage prepaid, sent by a nationally recognized overnight delivery service that provides a receipt for delivery, or hand delivered.  A notice shall be deemed to be received when delivered to the recipient's address.

## SECTION 9.  BREACH.

If a party believes that another party has breached this agreement, it shall provide written notice of the breach within 30 days of discovery of the breach to all other parties and provide the breaching party a reasonable opportunity (but in all cases at least 30 days from delivery of such notice) to cure the breach, provided that failure to provide notice within such 30-day period only waives the rights with respect to the periods from after the expiration of such 30-day period and until the date when the notice was given.  If there is a dispute between the involved parties as to whether a breach occurred, the involved parties agree to attempt to resolve the dispute beginning with Project Owner and representatives of the DAF at the Installation.  Disputes may be elevated, on the part of the DoD parties, to the DAF headquarters and then to the Executive Director of the Siting Clearinghouse.  If the breach is not cured or resolved after this initial dispute resolution process, any party may seek to enforce this agreement.  Each party specifically reserves any and all rights or causes of action it may have both at law and in equity to require compliance with any provision of this agreement.  Each party reserves the right to enforce or refrain from enforcing against another party the terms of this agreement as it sees fit and failure to enforce does not act to excuse future breaches.

## SECTION 10.  GENERAL PROVISIONS.

**A.  Amendments.**  Any party to this agreement may request that it be amended, whereupon the parties agree to consult to consider such amendments.  Any amendment to this agreement shall become effective when signed by all of the parties unless its terms provide for a different effective date.

**B.  Integration.**  This agreement contains the entire agreement and understanding between the parties with respect to all of the subject matter contained herein, thereby merging and superseding all prior agreements and representations by the parties with respect to such subject matter.

**C.  Governing Law.**  This agreement shall be governed by and construed in accordance with the laws of the United States and the State of Texas, as may be applicable.

**D.  Interpretation.**  In the event an ambiguity or question of intent or interpretation arises, this agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this agreement.  Any reference to any Federal, state, interstate, local, or foreign

statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, as they may have been amended from time to time, unless the context requires otherwise.

**E. Headings and Titles.**  The headings or section titles contained in this agreement are inserted solely for convenience and do not constitute a part of this agreement between the parties, nor should they be used to aid in any manner in the construction of this agreement.

**F. Severability.**  If any term, provision, or condition of this agreement is held to be invalid, void, or unenforceable by a governmental authority and such holding is not or cannot be appealed further, then such invalid, void, or unenforceable term, provision, or condition shall be deemed severed from this agreement and all remaining terms, provisions, and conditions of this agreement shall continue in full force and effect.  The parties shall endeavor in good faith to replace such invalid, void, or unenforceable term, provision, or condition with valid and enforceable terms, provisions, or conditions which achieve the purpose intended by the parties to the greatest extent permitted by law.

**G. Waivers; Remedies Cumulative.**  There is no implied waiver of rights under this agreement.  No failure or delay on the part of a party in exercising any of its rights under this agreement or in insisting upon strict performance of provisions of this agreement, no partial exercise by either party of any of its rights under this agreement, and no course of dealing between the parties shall constitute a waiver of the rights of any party under this agreement, other than the requirement to raise a matter of breach within 30 days of discovery.  Any waiver shall be effective only by a written instrument signed by the party granting such waiver, and such waiver shall not operate as a waiver of, or estoppel with respect to, any subsequent failure to comply with this agreement.  The remedies provided in this agreement are cumulative and not exclusive of any remedies provided by law.

**H. CFIUS.**  Nothing in this agreement shall relieve Project Owner or its successors or assigns from complying with obligations arising from agreements created pursuant to 31 CFR part 800 (Mergers, Acquisitions, and Takeovers by Foreign Persons) nor prevent or limit the parties from communicating in any form with CFIUS agency members.

**I. Anti-Deficiency.**  For the DoD parties, this agreement is subject to the availability of appropriated funds and sufficient resources.  No provision in this agreement shall be interpreted to require obligation or payment of funds in violation of the Anti-Deficiency Act, 31 U.S.C. section 1341.

**J. Disclosure.**  The parties may freely disclose this agreement with any person or entity. DoD intends to post the agreement on the Siting Clearinghouse website.  Project Owner may mark that part of any document it believes to be proprietary or competition-sensitive that it wants DoD or the DAF to exempt from disclosure.  The DoD parties will only disclose any such marked information in accordance with the provisions of 5 U.S.C. section 552 (the Freedom of Information Act).

**K. No Third Party Beneficiaries.**  Nothing in this agreement, express or implied, is intended to give to, or shall be construed to confer upon, any person not a party any remedy or

claim under or by reason of this agreement.  This agreement shall be for the sole and exclusive benefit of the parties and their respective successors and assigns.

**L.  Full and Complete Satisfaction.**  The completion of the obligations of each of the parties under this agreement constitute the full and complete satisfaction of those obligations.

**M.  Other Federal Agencies.**  This agreement does not bind any Federal agency, other than the DoD parties, nor waive required compliance with any law or regulation.

**N.  Completion of Construction.**  Within 60 days of the completion of construction of the Project, Project Owner shall deliver to DoD copies of the FAA form 7460-2 for each ASN, including the final coordinates for each turbine erected.

**O.  Grid Operator Protocols.**  [RESERVED]

[<i>Continued on the following page</i>]

**P. Signature/Counterparts.** The parties represent and warrant that the signatories below have authority to sign on behalf of and bind each respective party, and that no other signature is required to bind that party. This agreement may be executed in several counterparts, each of which shall be deemed an original, all of which shall constitute but one and the same instrument.

**IN WITNESS WHEREOF**, the parties have executed and delivered this agreement.

**FOR THE DEPARTMENT OF DEFENSE:**

CRAMER.PAUL.  Digitally signed by
DAVID.11469065  CRAMER.PAUL.DAVID.1146
39  906539
Date: 2021.07.09 12:30:49
-04'00'

07/09/2021

_____        _____
Paul D. Cramer                                              Date
Performing the Duties of the
Assistant Secretary of Defense
(Sustainment)

**FOR THE DEPARTMENT OF THE AIR FORCE:**

MORIARTY.ROB  Digitally signed by
ERT.E.10132675  MORIARTY.ROBERT.E.1013
84  267584
Date: 2021.06.28 16:45:25
-04'00'

06/28/2021

_____        _____
ROBERT E. MORIARTY, P.E.                          Date
Deputy Assistant Secretary of the Air Force
(Installations)

**FOR GH AMERICA ENERGY, LLC:**

_____        _____
Mingyu Tang                                              Date
Vice President, Development

6/25/2021

**ATTACHMENT A:**
Federal Aviation Administration Filings

| ASN | City | State | Structure Type | AGL | Latitude | Longitude |
|---|---|---|---|---|---|---|
| 2020-WTW-2682 | Comstock | TX | Wind Turbine | 700' | 30.2198 | -101.3528 |
| 2020-WTW-2683 | Comstock | TX | Wind Turbine | 700' | 30.2216 | -101.3489 |
| 2020-WTW-2684 | Comstock | TX | Wind Turbine | 700' | 30.2187 | -101.3569 |
| 2020-WTW-2685 | Comstock | TX | Wind Turbine | 700' | 30.2166 | -101.3608 |
| 2020-WTW-2686 | Comstock | TX | Wind Turbine | 700' | 30.2128 | -101.3640 |
| 2020-WTW-2687 | Comstock | TX | Wind Turbine | 700' | 30.2124 | -101.3682 |
| 2020-WTW-2688 | Comstock | TX | Wind Turbine | 700' | 30.2074 | -101.3713 |
| 2020-WTW-2689 | Comstock | TX | Wind Turbine | 700' | 30.2071 | -101.3756 |
| 2020-WTW-2690 | Comstock | TX | Wind Turbine | 700' | 30.2049 | -101.3796 |
| 2020-WTW-2691 | Comstock | TX | Wind Turbine | 700' | 30.2234 | -101.3450 |
| 2020-WTW-2692 | Comstock | TX | Wind Turbine | 700' | 30.2255 | -101.3412 |
| 2020-WTW-2693 | Comstock | TX | Wind Turbine | 700' | 30.2296 | -101.3380 |
| 2020-WTW-2694 | Comstock | TX | Wind Turbine | 700' | 30.2318 | -101.3342 |
| 2020-WTW-2695 | Comstock | TX | Wind Turbine | 700' | 30.2421 | -101.3901 |
| 2020-WTW-2696 | Comstock | TX | Wind Turbine | 700' | 30.2445 | -101.3863 |
| 2020-WTW-2697 | Comstock | TX | Wind Turbine | 700' | 30.2426 | -101.3815 |
| 2020-WTW-2698 | Comstock | TX | Wind Turbine | 700' | 30.2370 | -101.3753 |
| 2020-WTW-2699 | Comstock | TX | Wind Turbine | 700' | 30.2387 | -101.3714 |
| 2020-WTW-2700 | Comstock | TX | Wind Turbine | 700' | 30.2366 | -101.3663 |
| 2020-WTW-2701 | Comstock | TX | Wind Turbine | 700' | 30.2355 | -101.3613 |
| 2020-WTW-2702 | Comstock | TX | Wind Turbine | 700' | 30.2033 | -101.4011 |
| 2020-WTW-2703 | Comstock | TX | Wind Turbine | 700' | 30.2015 | -101.3962 |
| 2020-WTW-2704 | Comstock | TX | Wind Turbine | 700' | 30.2006 | -101.3916 |
| 2020-WTW-2705 | Comstock | TX | Wind Turbine | 700' | 30.2009 | -101.3872 |
| 2020-WTW-2706 | Comstock | TX | Wind Turbine | 700' | 30.2194 | -101.4083 |
| 2020-WTW-2707 | Comstock | TX | Wind Turbine | 700' | 30.2267 | -101.4065 |
| 2020-WTW-2708 | Comstock | TX | Wind Turbine | 700' | 30.2289 | -101.4027 |
| 2020-WTW-2709 | Comstock | TX | Wind Turbine | 700' | 30.2270 | -101.3978 |
| 2020-WTW-2710 | Comstock | TX | Wind Turbine | 700' | 30.2290 | -101.3940 |
| 2020-WTW-2711 | Comstock | TX | Wind Turbine | 700' | 30.2457 | -101.3347 |
| 2020-WTW-2712 | Comstock | TX | Wind Turbine | 700' | 30.2479 | -101.3310 |
| 2020-WTW-2713 | Comstock | TX | Wind Turbine | 700' | 30.2545 | -101.3588 |
| 2020-WTW-2714 | Comstock | TX | Wind Turbine | 700' | 30.2581 | -101.3556 |
| 2020-WTW-2715 | Comstock | TX | Wind Turbine | 700' | 30.2623 | -101.3517 |
| 2020-WTW-2716 | Comstock | TX | Wind Turbine | 700' | 30.2663 | -101.3348 |
| 2020-WTW-2717 | Comstock | TX | Wind Turbine | 700' | 30.2675 | -101.3307 |
| 2020-WTW-2718 | Comstock | TX | Wind Turbine | 700' | 30.2633 | -101.3476 |
| 2020-WTW-2719 | Comstock | TX | Wind Turbine | 700' | 30.2020 | -101.3832 |
| 2020-WTW-2720 | Comstock | TX | Wind Turbine | 700' | 30.2277 | -101.3892 |

AGREEMENT AMONG THE DEPARTMENT OF DEFENSE, THE DEPARTMENT OF THE AIR FORCE, AND GH AMERICA ENERGY, LLC,
ADDRESSING THE DEVELOPMENT OF THE BLUE HILLS WIND PROJECT NEAR COMSTOCK, TEXAS

| ASN | City | State | Structure Type | AGL | Latitude | Longitude |
|-----|------|-------|----------------|-----|----------|-----------|
| 2020-WTW-2721 | Comstock | TX | Wind Turbine | 700' | 30.2464 | -101.3393 |
| 2020-WTW-2722 | Comstock | TX | Wind Turbine | 700' | 30.2439 | -101.3438 |
| 2020-WTW-2723 | Comstock | TX | Wind Turbine | 700' | 30.2663 | -101.3392 |
| 2020-WTW-2724 | Comstock | TX | Wind Turbine | 700' | 30.2664 | -101.3434 |
| 2020-WTW-2725 | Comstock | TX | Wind Turbine | 700' | 30.2645 | -101.3758 |
| 2020-WTW-2726 | Comstock | TX | Wind Turbine | 700' | 30.2662 | -101.3719 |
| 2020-WTW-2727 | Comstock | TX | Wind Turbine | 700' | 30.2677 | -101.3680 |
| 2020-WTW-2728 | Comstock | TX | Alt. Wind Turbine | 700' | 30.2049 | -101.4060 |
| 2020-WTW-2729 | Comstock | TX | Alt. Wind Turbine | 700' | 30.2373 | -101.3574 |
| 2020-WTW-2730 | Comstock | TX | Alt. Wind Turbine | 700' | 30.2390 | -101.3535 |
| 2020-WTW-2731 | Comstock | TX | Alt. Wind Turbine | 700' | 30.2456 | -101.3487 |
| 2020-WTW-2732 | Comstock | TX | Alt. Wind Turbine | 700' | 30.2267 | -101.3841 |
| 2020-WTW-4649 | Comstock | TX | MET | 460' | 30.2048 | -101.3760 |
| 2020-WTW-4650 | Comstock | TX | MET | 460' | 30.2006 | -101.3996 |
| 2020-WTW-4651 | Comstock | TX | MET | 460' | 30.2261 | -101.3370 |
| 2020-WTW-4652 | Comstock | TX | Alt. MET | 460' | 30.2089 | -101.3656 |
| 2020-WTW-4653 | Comstock | TX | Alt. MET | 460' | 30.2186 | -101.3494 |

AGREEMENT AMONG THE DEPARTMENT OF DEFENSE, THE DEPARTMENT OF THE AIR FORCE, AND GH AMERICA ENERGY, LLC,
ADDRESSING THE DEVELOPMENT OF THE BLUE HILLS WIND PROJECT NEAR COMSTOCK, TEXAS

## ATTACHMENT B:
Blue Hills Wind Project Map and Project Area Coordinates



| Point | Latitude | Longitude |
|-------|----------|-----------|
| Point 1 | 30.2111 | -101.3267 |
| Point 2 | 30.1915 | -101.3854 |
| Point 3 | 30.1911 | -101.4115 |
| Point 4 | 30.2410 | -101.4115 |
| Point 5 | 30.2698 | -101.3782 |
| Point 6 | 30.2699 | -101.3283 |