UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

GH AMERICA ENERGY LLC,                    §
                                          §
           Plaintiff,                     §
                                          §
v.                                        §          1:24-CV-648-RP
                                          §
PABLO VEGAS, *in his official capacity as Chief*   §
*Executive Officer of the Electric Reliability Council of*   §
*Texas, Inc.*, et al.,                      §
                                          §
           Defendants.                    §

## ORDER

Before the Court is Defendants Douglas Fohn ("Fohn"), in his official capacity as Assistant

General Counsel of the Electric Reliability Council of Texas ("ERCOT"), Holly Heinrich

("Heinrich"), in her official capacity as Legal/Regulatory Counsel of ERCOT, Pablo Vegas

("Vegas"), in his official capacity as Chief Executive Officer of ERCOT, Paul Foster, Bill Flores,

Carlos Aguilar, Linda Capuano, Julie England, Robert Flexon, Peggy Heeg, and John Swainson's, in

their official capacities as members of the Board of Directors of ERCOT (together, the "ERCOT

Board Defendants") (all collectively, "Defendants") Motion to Dismiss, (Dkt. 26), and Plaintiff GH

America Energy, LLC's ("GHAE") Motion for Leave to File a Second Amended Complaint, (Dkt.

42). Having reviewed the parties' briefs and the relevant law, the Court issues the following order.

### I. BACKGROUND

#### A. ERCOT and Texas's Energy Grid

This is a challenge to the Texas Lone Star Infrastructure Protection Act ("LSIPA"), which

prohibits entities controlled by citizens of certain foreign countries from accessing or controlling

Texas's critical infrastructure, including the electric grid. (Mot. Dismiss, Dkt. 26, at 1).

1

Texas's electric grid is unique. "While all the other states in the Union have extensive interconnections with neighboring states, nearly 90% of Texas is covered by a single isolated grid with limited connections to external power supplies," *Texas v. EPA*, 829 F.3d 405, 431 (5th Cir. 2016), making it "the U.S. mainland's only *intrastate* electrical grid," *CPS Energy v. ERCOT*, 671 S.W.3d 605, 611 (Tex. 2023).[1] Unlike in the U.S. mainland's two other grids, "electricity is distributed entirely within a single State" in the Texas Interconnection. *New York v. FERC,* 535 U.S. 1, 6 (2002). The "isolat[ion]" of Texas's grid "from the nation's electricity system" reflects a "conscious decision" by Texas policymakers to ensure "independence from federal regulation." *Phillips v. ERCOT (In re Entrust Energy, Inc.),* 101 F.4th 369, 391 (5th Cir. 2024).

In Texas, the generation, transmission, and retail distribution of energy have been "unbundled," and (with a few exceptions not relevant here) energy is generated, transmitted and/or distributed, and sold for retail use by distinct entities. *Texas*, 829 F.3d at 432. ERCOT manages Texas's intrastate grid and wholesale electricity market using statutory authority delegated to it by the Public Utility Commission of Texas ("PUCT") to "establish, adopt, and enforce a variety of policies, rules, guidelines, standards, procedures, protocols, and other requirements to govern the operations of market participants." *CPS Energy,* 671 S.W.3d at 626 (citing Texas Public Utility Regulatory Act ("PURA") §§ 39.151(d), (i), (j), (*l*)). All aspects of ERCOT's finances and operations are subject to the PUCT's control, and the State of Texas selects ERCOT's governing board. *Id.* at 623–26.

### B. The Lone Star Infrastructure Protection Act

The Texas Legislature enacted LSIPA in June 2021. (Mot. Dismiss, Dkt. 26, at 4). The official Bill Analysis explains that LSIPA "ban[s] [companies having *inter alia* Chinese ownership] from connecting physically/remotely into Texas critical infrastructure due to acts of aggression

---

[1] The grid shares its name with its governing board, ERCOT. *Texas*, 829 F.3d at 431. Throughout this order, the Court will refer to the grid as the "electric grid" and "ERCOT grid" interchangeably.

towards the United States, human rights abuses, intellectual property theft, previous critical infrastructure attacks, and ties to other hostile actions performed against the State of Texas and the United States."[2] Specifically, LSIPA prohibits entities from (1) entering into an agreement that would grant "direct or remote access to or control of critical infrastructure in this state"; with (2) any company that is (a) majority owned by individuals who are citizens of China, Iran, North Korea, Russia, or a designated country; (b) majority owned by a company that is owned or controlled by citizens of, or the government of, China, Iran, North Korea, Russia, or a designated country; or (c) headquartered in China, Iran, North Korea, Russia, or a designated country. Tex. Bus. & Commerce Code § 117.002; *see also* Tex. Gov't Code § 2275.0102.5. LSIPA defines "critical infrastructure" to include the Texas "electric grid." *See* Tex. Bus. & Commerce Code § 117.001(2).

Using its delegated rulemaking authority, *see* PURA § 39.151(d), ERCOT revised its Planning Guide in April 2022 to comply with LSIPA. (Mot. Dismiss, Dkt. 26, at 4); *see* ERCOT Planning Guide § 5.2.2(c)–(d). In 2023, the Texas Legislature—recognizing the need "to protect our grid from hostile foreign powers" and "harden[] the security of the Texas power grid . . . to prevent exposure from attacks on the electric grid"—specifically commanded ERCOT to ensure that Market Participants and would-be Market Participants meeting any of LSIPA's criteria are not granted access to the ERCOT grid. (Mot. Dismiss, Dkt. 26, at 4).

### C. Federal Regime

GHAE alleges that LSIPA is preempted by the federal regime that regulates foreign investments related to critical infrastructure, primarily carried out by the Committee on Foreign

---

[2] Tex. Sen. Rsch. Ctr., Bill Analysis, S.B. 2116 (2021).

Investment in the United States ("CFIUS").[3] (2d Am. Compl.,[4] Dkt. 42-1, at 18–19). CFIUS has the authority to administer Section 721 of the Defense Production Act of 1950, which grants the President the authority to block proposed or pending foreign mergers, acquisitions, or takeovers of persons engaged in interstate commerce in the United States that threaten to impair the national security. *See* 50 U.S.C. § 4565. Section 721's implementing regulations create an essentially voluntary system of notification by the parties to an acquisition. 31 C.F.R. pt. 800. Despite the voluntary nature of the CFIUS regime, GHAE asserts that firms have largely complied because foreign transactions eligible for Section 721 review remain indefinitely subject to possible divestment or other actions if the parties fail to notify CFIUS. (Resp. Mot. Dismiss, Dkt. 27, at 2).

In 2007, Congress passed the Foreign Investment and National Security Act of 2007, Pub. L. No. 110-49, 121 Stat. 246 ("FINSA"), giving Congress further oversight over CFIUS. FINSA solidified CFIUS as a permanent federal agency by codifying it and granting it statutory authority, including the authority to certify to Congress that a transaction that had been reviewed had no unresolved national security issues and providing Congress with confidential briefings and annual reports. (Resp. Mot. Dismiss, Dkt. 27, at 4).

In 2018, Congress passed the Foreign Investment Risk Review Modernization Act of 2018, Pub. L. No. 115-232, § 1701 *et seq.*, 132 Stat. 1636 ("FIRRMA") to further amend Section 721. FIRRMA expanded the kinds of transactions over which CFIUS has jurisdiction, or "covered transaction[s]." 50 U.S.C. § 4565(a)(4). Under FINSA, covered transactions included mergers, acquisitions, and takeovers that could result in foreign control of a "United States business." *Id.* FIRRMA expanded CFIUS's jurisdiction to include certain real-estate transactions and certain non-

---

[3] GHAE also alleges that LSIPA is preempted by the statutes surrounding the Office of Foreign Assets Control and the Cybersecurity Infrastructure Security Agency, (SAC, Dkt. 42-1, at 5, 7), but because GHAE's arguments almost exclusively rely on the CFIUS regime, the Court will address that regime only.
[4] For reasons explained *supra* section III.A, this order cites the Second Amended Complaint, for which GHAE has filed a pending motion for leave to file.

controlling investments in "United States businesses" involving critical technology, critical infrastructure, or sensitive personal data. *Id.*

To initiate review by CFIUS, any party to the covered transaction may submit to CFIUS a written notice of the transaction. 50 U.S.C. § 4565(b)(1)(C)(i)(I); 31 C.F.R. § 800.501–.502. Receipt of the notice, or unilateral initiation of review, triggers a review period during which CFIUS "determine[s] the effects of the transaction on the national security of the United States" and considers 11 statutorily prescribed factors. 50 U.S.C. § 4565(b)(1)(A), (F), (f)(1)–(11); 31 C.F.R. § 800.503. Among those is "the potential national security-related effects on United States critical infrastructure, including major energy assets." 50 U.S.C. § 4565(f)(6).

At the end of its review, CFIUS may decide to "conclude[] action" on the transaction. 50 U.S.C. § 4565(b)(3). In that circumstance, all regulatory action with respect to the transaction "shall be concluded," and "[a]n official at the Department of the Treasury shall promptly advise the parties to such a transaction in writing of a determination to conclude action." 31 C.F.R. § 800.508(d). This is a "safe harbor" provision that allows a transaction to "proceed without the possibility of subsequent suspension or prohibition under section 721." 73 Fed Reg. 74569 (Dec. 8, 2008).

Alternatively, CFIUS may refer the transaction to the President for further action. 50 U.S.C. § 4565(*l*)(2); 31 C.F.R. § 800.508(b). The President "may suspend or prohibit any covered transaction that threatens to impair the national security of the United States." 50 U.S.C. § 4565(d)(1). The President may also "direct the Attorney General of the United States to seek appropriate relief, including divestment relief, in the district courts of the United States, in order to implement and enforce this subsection." 50 U.S.C. § 4565(d)(3).

Finally, Section 721 authorizes CFIUS to "enter into . . . any agreement or condition with any party to the covered transaction to mitigate any risk to the national security of the United States that arises as a result of the covered transaction." 50 U.S.C. § 4565(*l*)(3)(A)(i). CFIUS must

determine, after conducting a "risk-based analysis," that such a mitigation agreement will "resolve[]" the national security concerns posed by the transaction," will be "effective," will "allow for compliance with the terms of the agreement or condition in an appropriately verifiable way," and will "enable effective monitoring of compliance with and enforcement of the terms of the agreement or condition." 50 U.S.C. § 4565(*l*)(3)(C), (4)(A). CFIUS may decide to require a mitigation agreement even if it "concludes action" on a transaction.

### D. GHAE's Lawsuit

GHAE is a Texas LLC that is a subsidiary of Xinjiang Guanghui Industry Investment (Group) Company, Ltd. ("Xinjiang"), which is located in the People's Republic of China, and is in turn majority owned by Sun Guangxin, a Chinese citizen. (Mot. Dismiss, Dkt. 26, at 5). On December 3, 2015, Xinjiang and GH America Investments Group, Inc. ("GH America"), an oil-and-gas business unit affiliated with Xinjiang, gave notice to CFIUS regarding a proposed transaction by which Xinjiang and GH America, through a subsidiary, would acquire assets of several U.S. companies (the "GH Transaction"). (SAC, Dkt. 42-1, at 8). CFIUS designated the notice as "CFIUS Case 15-138" and assigned it to the Department of Defense ("DOD") as its "Monitoring Agency." (*Id.*).

After conducting a national security review, CFIUS determined that the GH Transaction presented a national security risk. (*Id.* at 9). CFIUS informed Xinjiang and GH America that, to enable CFIUS to "conclude action" under Section 721 on the GH Transaction, they would be required to enter into a mitigation agreement to mitigate the national security risks. (*Id.* at 9). Consequently, on February 29, 2016, Xinjiang and GH America submitted to DOD a mitigation agreement entitled "Letter of Assurance" ("LOA") to mitigate the national security risks presented by the GH Transaction, and DOD concluded action on the transactions. (*Id.* at 9).

6

From 2016 through 2018, Xinjiang and GH America, through their landowning subsidiaries Brazos Highland Properties, LLP ("BHP") and Harvest Texas, LLC ("HT"), acquired approximately 131,290 acres of land in Val Verde County, Texas. (*Id.* at 9–10). In December 2018, Xinjiang and GH America formed Plaintiff GHAE as their renewable-energy project development business, and GHAE began investing in wind and solar resource, geotechnical, electrical, and grid-connection consulting studies for projects on BHP and HT lands. (*Id.* at 10). Xinjiang, GH America, and GHAE then informed the Military Aviation and Installation Assurance Siting Clearinghouse branch of DOD that they were entering the wind and solar renewable-energy markets. (*Id.*). GHAE also filed an official project notification with the Siting Clearinghouse regarding its "Blue Hills Wind Project." (*Id.*). DOD objected to the Blue Hills Wind Project proposal because it contemplated developments that would be located approximately 70 miles from the Laughlin Air Force Base in Val Verde County. (*Id.*).

After a mitigation review, the parties agreed that all GH America, GHAE, BHP, and HT business pursuits and lands would be subject to an amendment to the LOA ("First Amendment"). (*Id.* at 10–11). Specifically, DOD, Xinjiang, and GH America agreed that the 2016 LOA—which covered only Xinjiang, GH America, and their oil-and-gas projects—should be amended to also include GHAE, BHP, and HT, their wind-energy and other renewable-energy projects, as well as the relevant land holdings. (*Id.* at 11). The First Amendment requires that GHAE notify DOD before "executing an agreement with respect to the operation of . . . any oil, gas, wind, or other renewable energy project located within the United States." (Pl.'s Ex. B, Dkt. 27, at 47). The First Amendment also added a new provision, by which Xinjiang, GH America, GHAE, and BHP acknowledged that the establishment and the operation of wind and other renewable-energy sources near military installations might have a potential impact on U.S. national security interests, and that DOD retained the right to deny any proposed construction if there was a national security risk that could

7

not be mitigated. (*Id.* at 11–12). The parties executed the First Amendment in December 2020, and GHAE subsequently began capital investment in the development of the Blue Hills Wind Project. (*Id.* at 9–10, 12).

When LSIPA took effect in 2021, GHAE had pending ERCOT interconnection requests for: (1) the Blue Hills Wind Project, as well as two other projects, the (2) the Blue Valley Solar Project, and (3) the Blue Star Solar Project. (Resp. Mot. Dismiss, Dkt. 27, at 13–14). Before a proposed generation resource may connect to the ERCOT grid, it must comply with the Generator Interconnection or Modification ("GIM") process. (Mot. Dismiss, Dkt. 26, at 5). The GIM process requires, among other things, an attestation that the project complies with LSIPA. (*Id.*). In December 2021, Defendant Fohn, the Assistant General Counsel of ERCOT, sent GHAE a request for information asking GHAE to execute the attestation form. (2d Am. Compl., Dkt. 42-1, at 14–15). The following month, GHAE informed ERCOT that it was majority owned by Xinjiang, a company located in China. (*Id.* at 15). Following a notice of "potential cancellation" sent by Fohn on February 22, 2022, GHAE sold the Blue Hills Wind and Blue Valley Solar Projects, allegedly "at a substantial loss." (*Id.*).

In October 2022, Fohn notified GHAE that ERCOT had cancelled the Blue Star Solar Project. (*Id.*). About a year and a half later, in April 2024, GHAE asked ERCOT whether it could pursue a screening study for the Blue Star Solar Project. (*Id.* at 16). GHAE wanted to establish that the land for the project was interconnectable and saleable to LSIPA-compliant potential customers, making the underlying property more marketable. (*Id.*). Defendant Heinrich, who at the time was an employee of ERCOT's legal department, "responded that ERCOT would not permit GHAE to pursue" that study. (*Id.*). GHAE alleges that LSIPA was the "sole" reason ERCOT denied the interconnection request and the screening study, and it alleges that the decisions were "authorized

and approved by" Defendant Vegas, ERCOT's CEO, and the ERCOT Board Defendants. (*Id.* at 15–17).

GHAE filed the instant action on June 11, 2024, (Compl., Dkt. 1), initially suing ERCOT itself, Vegas, the ERCOT Board Defendants, and three other members of ERCOT's Board who serve *ex oficio* by virtue of their roles at other Texas agencies. (*Id.*). On August 12, 2024, this Court granted Texas Attorney General Ken Paxton's unopposed motion to intervene as a Defendant. (Text Order dated 8/12/2024).

Defendants then moved to dismiss. (Dkt. 13). Rather than responding, GHAE filed its First Amended Complaint ("FAC") on August 26, 2024, which removed ERCOT and the *ex oficio* board members while adding Fohn and Heinrich as Defendants. (Mot. Dismiss, Dkt. 26, at 6–7). All individual Defendants are sued in their official capacities. (*Id.*). In the FAC, GHAE brought claims under the Supremacy Clause and the Equal Protection Clause. (FAC, Dkt. 19). First, the FAC asserted that LSIPA is preempted by the federal laws surrounding CFIUS. (*Id.* at 17–19). Second, the FAC asserts that LSIPA was "enacted with the direct purpose and intent to discriminate against persons based on race, ethnicity, alienage, and national origin, and in particular entities owned or controlled by Chinese persons such as GHAE." (*Id.* at 21). Under *Ex parte Young*, GHAE seeks an injunction preventing ERCOT from enforcing LSIPA against it, such as by denying the Blue Star Solar Project's interconnection request or screening study request. (*Id.* at 19). Under Section 1983, GHAE seeks damages for the "losses it sustained in being compelled by ERCOT's prospective cancellation . . . of two of GHAE's projects." (*Id.* at 21).

Defendants once again moved to dismiss, arguing that GHAE's preemption claims are procedurally deficient because (1) there is no Section 1983 cause of action under the Supremacy Clause and, alternatively, GHAE fails to plead a *Monell* claim; (2) GHAE's *Ex parte Young* claims must be dismissed because *Ex parte Young* is unavailable if the statute allegedly having the

preemptive effect implicitly precludes private enforcement, Defendants are not proper *Ex parte Young* defendants, and GHAE seeks retrospective relief beyond what *Ex parte Young* permits; (3) and GHAE's preemption claims fail on the merits. (Mot. Dismiss, Dkt. 26, at 1). As to GHAE's Section 1983 equal protection claim, Defendants argue (1) GHAE fails to plead a valid *Monell* claim; (2) Plaintiff is a Texas LLC that does not belong to a protected class; and (3) LSIPA survives rational basis review. (*Id.*).

The Court held a hearing on the motion to dismiss on July 22, 2025. (Min. Entry., Dkt. 38). In the hearing, GHAE requested leave to amend its complaint to add allegations that GHAE's ultimate owner, Mr. Guangxin, "has residences in the United States" or an "immigration status" that would place him "within the scope of the Constitution." (Oral Arg. Tr. 42:3–10). Accordingly, the Court ordered GHAE to file a motion for leave to amend, (Order, Dkt. 39), and GHAE filed the motion on August 5, 2025, (Mot. Leave, Dkt. 42). The proposed Second Amended Complaint ("SAC") makes the following changes: (1) clarifies that GHAE seeks prospective relief because it intends to submit additional interconnection requests; (2) clarifies that GHAE's Equal Protection Clause claim is based on national-origin discrimination against "GHAE's ultimate owners"; and (3) removed prior requests for damages. (*Id.* at 1–2). Defendants responded that they did not oppose GHAE removing its Equal Protection Clause claims based on race, alienage, or ethnicity, and removing its damages claims. (Resp. Mot. Leave, Dkt. 44, at 2). However, Defendants maintain that the remaining claims must be dismissed. (*Id.*).

Since the hearing, GHAE has also filed a notice of supplemental authority, which calls the Court's attention to *Jones Eagle LLC v. Ward*, No. 4:24-CV-00990-KGB, 2024 WL 5112477 (E.D. Ark. Dec. 9, 2024). In that case, another district court preliminarily enjoined Arkansas laws banning citizens of China (among other nations) from purchasing agricultural land or crypto-mining facilities

10

in Arkansas. (Dkt. 41). Defendants responded to the notice of supplemental authority on August 7, 2025. (Dkt. 43).

## II. LEGAL STANDARDS

### A. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject-matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject-matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

### B. Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for

entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey,* 540 F.3d at 338. "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

### III. DISCUSSION

### A. Motion for Leave to Amend

Defendants do not oppose GHAE nonsuiting its damages claims and its Equal Protection Clause claims based on race, ethnicity, and alienage. (Dkt. 44, at 8). Defendants do, however,

contend that GHAE's proposed amendments to its *Ex parte Young* and national-origin-discrimination claims are futile. (*Id.* at 3, 7). Defendants urge the Court to either (1) deny GHAE's motion for leave to file the SAC as futile, making the FAC the operative complaint, then consider Defendants' motion to dismiss as addressed to the FAC; or (2) grant GHAE's motion for leave to the file the SAC, making the SAC the operative complaint, then consider Defendants' motion to dismiss as addressed to the SAC, even though an amended complaint would ordinarily moot a pending motion to dismiss. (*See id.* at 9). Defendants prefer the second option.

The Court agrees. Granting the motion for leave would clarify which claims GHAE still stands by. The Court would no longer need to address the claims GHAE has voluntarily nonsuited, therefore saving judicial resources. (*Id.*). Further, mooting the motion to dismiss would lead to unnecessary delay and repetitive briefing on the issues already before the Court. (*Id.* at 10). Recent Fifth Circuit precedent makes clear that, even if the Court opts to grant the motion for leave, it may still properly adjudicate Defendants' motion to dismiss on the remaining claims:

> [Plaintiff-appellant] contends that the district court erred in dismissing his claims against the city. He describes the dismissal as "sua sponte" because, although the city moved to dismiss and [appellant] responded on the merits, [appellant] amended his complaint while the city's motion was pending. That amendment, to [appellant], "nullified" the pending motion to dismiss. Therefore the court could not have done what it claimed to do—dismiss [appellant's] claims on motion by the city—and must have acted sua sponte.
>
> [Appellant] is mistaken. As explained in a treatise, and reiterated by several district courts in this circuit, "defendants should not be required to file a new motion to dismiss simply because an amended pleading was introduced while their motion was pending." Rather, "[i]f some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading." Accordingly, the court acted within its discretion when it considered the city's motion before dismissing the amended complaint.

*Rountree v. Dyson*, 892 F.3d 681, 683–84 (5th Cir. 2018); *see also Collins v. Am. Auto Brokers*, No. SA-25-CV-00253-XR, 2025 U.S. Dist. LEXIS 82180, at *2 & n.1 (W.D. Tex. Apr. 30, 2025) (following

13

*Rountree* and adjudicating defendant's motion to dismiss the plaintiff's original complaint post-pleading amendment because "[t]he [p]laintiff's amended complaint is based on the same . . . theory as the original complaint."); *Abboud v. Lotta Dough, LLC*, 2025 U.S. Dist. LEXIS 35547, No. 1:24-CV-00482, at *3 n.2 (W.D. Tex. Feb. 27, 2025) ("The Court recognizes that Plaintiff's filing of an amended complaint may render moot a pending motion to dismiss . . . . But the Court declines to deny this motion as moot because Plaintiff's amended complaint relies on the same vicarious-liability theory as her original complaint.").

Here, the SAC largely follows the FAC, with a few small amendments. The arguments for dismissing the FAC largely apply to the SAC as well. Accordingly, the Court will grant GHAE's motion for leave and consider Defendants' motion to dismiss, (Mot. Dismiss, Dkt. 26), as addressed to the SAC, (Dkt. 42-1), the operative complaint.

### B. Preemption

GHAE argues that LSIPA is preempted by the CFIUS regime. (Am. Compl., Dkt. 19, at 18–19). Defendants respond that (1) GHAE has no cause of action under Section 1983; (2) GHAE's *Ex parte Young* claims must be dismissed; and (3) GHAE's preemption claims fail on the merits. The Court finds that GHAE's conflict and field preemption claims fail on the merits and will decline to address any purported procedural deficiencies in GHAE's SAC.

When addressing any type of preemption, courts are guided by two principles. "First, the purpose of Congress is the ultimate touchstone in every preemption case," and that intent "primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1094 (11th Cir. 2021) (internal quotation marks omitted) (first quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009); then quoting *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1186 (11th Cir. 2017)). "Second, we assume that 'the historic police powers of the States are not superseded unless that was the clear and manifest purpose of

Congress.'" *Id.* at 1095 (quoting *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 939–40 (11th Cir. 2013)). "This principle particularly applies in a case in which Congress has legislated in a field which the States have traditionally occupied." *Id.* (cleaned up) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Both the U.S. Supreme Court and Fifth Circuit have long recognized the States' ability to regulate utilities as "one of the most important of the functions traditionally associated with the police power of the States." *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 365 (1989); *see also ERCOT v. Just Energy Tex., L.P. (In re Just Energy, Inc.)*, 57 F.4th 241, 252 (5th Cir. 2023).

1. Conflict Preemption

Conflict preemption exists where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. General Elec. Co.,* 496 U.S. 72, 79 (1990). GHAE argues that LSIPA stands as an obstacle to federal law governing foreign investments in the United States. As the Supreme Court has explained, this claim requires a substantial showing. *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607, (2011) ("Our precedents 'establish that a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act.'" (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 110 (1992) (Kennedy, J., concurring in part and concurring in judgment)). The Court concludes that there is no conflict preemption.

First, because CFIUS has jurisdiction over only a limited set of transactions, LSIPA does not impede CFIUS's goals. Under the statute, CFIUS has jurisdiction over:

> (i) "Any merger, acquisition, or takeover . . . by or with any foreign person that could result in *foreign control of any United States business . . . .*
>
> (ii) . . . "[T]he purchase or lease by, or a concession to, a foreign person of private or public real estate that is located in the United States . . . in close proximity to a United States *military installation or another facility or property of the United States Government* that is sensitive for reasons relating to national security;

15

. . .

(iii) Any other *investment . . . by a foreign person in any unaffiliated United States business* that owns, operates, manufactures, supplies, or services critical infrastructure; produces, designs, tests, manufactures, fabricates, or develops one or more critical technologies; or maintains or collects sensitive personal data of United States citizens that may be exploited in a manner that threatens national security;

(iv) Any change in the *rights that a foreign person has with respect to a United States business* in which the foreign person has an investment, if that change could result in foreign *control of the United States business*; or an investment described in clause (iii).

(v) Any other transaction, transfer, agreement, or arrangement, the structure of which is designed or intended to evade or circumvent the application of this section . . . .

50 U.S.C. § 4565(a)(4)(B)(i)-(v) (emphasis added).

As seen here, three out of the five categories of "covered transaction" involve a "U.S. business," 50 U.S.C. § 4565(a)(4)(B)(i), (iii), (iv), which is defined as a "person engaged in *interstate* commerce in the United States." 50 U.S.C. § 4565(a)(13) (emphasis added). Another category of covered transaction, added only recently under FIRRMA, are certain real-estate transactions, but only those "in close proximity to a United States military installation or another facility or property of the United States Government." 50 U.S.C. § 4565(a)(4)(B)(ii). Finally, the last category of covered transaction is a catch-all that allows CFIUS to exercise jurisdiction over any transaction designed to evade the existing definitions of "covered transaction"; it does not substantially expand CFIUS's jurisdiction into areas not already covered. 50 U.S.C. § 4565(a)(4)(B)(v). In sum, CFIUS does not have jurisdiction over intrastate activities. Nor does it have jurisdiction over real-estate transactions everywhere in Texas—its main concern is interference with military or activities or federal properties.

The Court concludes that, given the limited definitions of "covered transactions," LSIPA does not stand as an obstacle to the CFIUS regime. The Supreme Court has explained that, in

16

considering preemption, "it would be reasonable to consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted." *Am. Ins. Assn v. Garamendi*, 539 U.S. 396, 420, (2003). The state interest here is strong. *See Just Energy Texas*, 57 F.4th at 252 ("[B]ecause the electricity grid is entirely intrastate, the management of the market is 'a matter of particular importance to the state.'" (internal quotation marks omitted)). Because the ERCOT grid operates wholly within the state of Texas, it is prone to unique security risks. *See also* Oral Arg. Tr. 35:23–36:1 ("Number one, you have access to these systems that you could use to upload viruses and the like and that would be unique to Texas' intrastate grid."). Even if the federal government determines that a transaction does not pose a national security risk, it could pose a risk specific to the ERCOT grid because ERCOT cannot rely on other states' electric grids were it to fail. Moreover, if one power plant in the ERCOT grid were to close, the state may be "vulnerable to sudden power shortages" because "each power plant provides a larger fraction of the grid's total power than individual power plants" in the continental United States's other electric grids. *Texas*, 829 F.3d at 431. Given this strong state interest, this Court will require a serious conflict before finding LSIPA preempted.

The Court does not find that a serious conflict exists in this case because the CFIUS statute is limited in scope. LSIPA, as applicable here, is narrowly concerned with protecting Texas's intrastate electric grid. Texas's regulation of its grid is an exercise of its "historic police powers," which are "not to be curtailed by federal law unless Congress indicates a clear and manifest purpose to do so." *Tex. Midstream Gas Seivs., LLC v. City of Grand Prairie,* 608 F.3d 200, 210 (5th Cir. 2010) (internal quotation marks omitted); *see Just Energy,* 57 F.4th at 251–52 (holding that utility regulation through ERCOT is an exercise of such a traditional state power). Because LSIPA merely controls who may access Texas's grid—an intrastate activity, in an area of traditional state power—there is no conflict preemption.

17

Second, LSIPA does not conflict with the CFIUS safe harbor. GHAE asserts that the safe harbor guarantees entities the right to proceed with projects that have been reviewed by CFIUS,[5] so LSIPA conflicts with the safe harbor because it makes it "impossible for GHAE to 'proceed.'" (Mot., Dkt. 27, at 25). However, the safe harbor merely provides that "the transaction can proceed without the possibility of subsequent suspension or prohibition under section 721." 73 Fed Reg. 74569 (Dec. 8, 2008). This language merely insulates entities from further CFIUS review—it does not give them the right to proceed with transactions without further federal or state regulatory review. GHAE's reading of the safe harbor would lead to absurd results because GHAE would have no obligation to follow, for example, local building codes, or even grid regulations. (Reply Mot. Dismiss, Dkt. 29, at 6). Because the safe harbor does not protect GHAE from further state regulation, LSIPA does not conflict with the objectives of the safe harbor.

GHAE relies principally on *Crosby v. National Foreign Trade Council,* 530 U.S. 363 (2000). In that case, the Supreme Court struck down a California law that imposed economic sanctions on Burma by barring "state entities from buying goods or services from any person . . . doing business with Burma." *Id* at 367. The Court held that the law was an obstacle to and "undermine[d] the intended purpose and 'natural effect' of," Congress's own sanctions regime targeting Burma. *Id.* at 373–74. However, *Crosby* does little work here. In that case, the state law was designed to put "economic pressure" on the Burmese regime—that is, to engage in foreign policy. *Crosby*, 530 U.S. at 376. California's sanctions regime meant "the President ha[d] less to offer" in negotiations with the regime "and less economic and diplomatic leverage as a consequence." *Id* at 377. As such, the

---

[5] Notably, GHAE concedes that CFIUS has not approved the Blue Star Solar Project, nor has GHAE even submitted the project to CFIUS. (Oral Arg. Tr. 41:23–24). The Blue Star Solar Project is the only project that GHAE still owns and therefore the only project as to which GHAE is seeking injunctive and declaratory relief. (2d. Am. Compl., Dkt. 42-1, at 21–22). Though GHAE's FAC requested damages associated with being forced to sell the Blue Hills Wind and Blue Valley Solar Projects, GHAE has voluntarily nonsuited any damages claims. (Mot. Leave, Dkt. 42).

California law was preempted because it involved a "uniquely federal area[] of regulation": the foreign affairs power. *See Whiting*, 563 U.S. at 604. Here, LSIPA does not seek to influence any foreign nation, only to secure the electric grid. *Crosby* does not apply.

In addition to their statutory arguments, the parties also disagree whether CFIUS has jurisdiction over this particular transaction. If CFIUS does not have jurisdiction, then no actual conflict exists, and preemption is "ordinarily not to be implied." *See English*, 496 U.S. at 90 ("The Court has observed repeatedly that pre-emption is ordinarily not to be implied absent an 'actual conflict.'" (quoting *Savage v. Jones,* 225 U.S. 501, 533 (1912))). Defendants argue that CFIUS does not have jurisdiction over GHAE's interconnection request because the proposed project is a "greenfield investment" in which a foreign person builds a new U.S. business from the ground up. If a foreign corporation "incorporat[es] a newly formed subsidiary" and "construct[s] . . . a plant to make a new product," it "will not have acquired a U.S. business, and its greenfield investment is not a covered control transaction." 31 C.F.R. § 800.301(e)(7). Moreover, the CFIUS statute covers only investments in *existing* U.S. businesses. 50 U.S.C. § 4565(a)(4)(B). Here, Defendants argue CFIUS has no jurisdiction over the Blue Star Solar Project because Xinjiang and GH America created GHAE as a Texas LLC to develop the new solar energy project. (Mot. Dismiss, Dkt. 26, at 15–16).

GHAE disagrees, pointing to the language of the LOA. As GHAE alleges, when Xinjiang, GH America, and GHAE informed DOD that they would be entering the renewable-energy market, DOD agreed that the parties' "expansion into the wind, solar, and other renewable energy project markets" warranted an amendment to the LOA, and that the LOA, as amended, applies to "any oil, gas, wind, or other renewable energy project." (2d. Am. Compl., Dkt. 42-1, at 10–11). As an "Acquiring Part[y]" in the LOA, GHAE is obligated to notify DOD prior to "executing an agreement with respect to the operation of" any "renewable energy project located within the United States," which would include any interconnection agreement. (*Id.*).

19

However, it remains unclear whether the statute gives CFIUS jurisdiction over Blue Star Solar Project. The SAC alleges only that GHAE submitted the Blue Hills Wind Project to DOD; DOD objected to the project because it is located within approximately 70 miles of the Laughlin Air Force Base; and, to mitigate national security risks, the parties agreed that GHAE would report any renewable-energy projects, which presumably includes the Blue Star Solar Project, to DOD. (*Id.*). GHAE never alleges that the Blue Star Solar Project is a "covered transaction" under the statute. (*See id.*). GHAE may be implying that the transaction is covered because of its proximity to the Laughlin Air Force Base, but CFIUS gained jurisdiction over real-estate transactions in February 2020, *see* 31 C.F.R. 800.104, years after Xinjiang, GH America, BHP, and HT bought the land, (*see* 2d. Am. Compl., Dkt. 42-1, at 9–10).

Therefore, though GHAE is obligated to submit the Blue Star Solar Project interconnection request to CFIUS, CFIUS's jurisdiction over the project may come from the First Amendment's agreed-upon terms, not the CFIUS statute. Counsel for GHAE seemed to concede as much in oral argument—he explained that the Blue Star Solar Project is within CFIUS's jurisdiction because CFIUS "established that [GHAE] was a covered transaction way back in 2016 or '17 and since that time, [GHAE projects have] been covered by a mitigation agreement, which has been amended and has been expanded to cover everything else [the affiliates have] launched into." (Oral Arg. Tr. 39:23–40:7). This statement suggests that the Blue Star Solar Project is subject to CFIUS review only through the LOA, not the statute.[6] Because preemption is determined by the language of the federal

---

[6] GHAE argues in its response to the motion to dismiss that there is a "covered real estate transaction involved" because "CFIUS plainly considered GHAE's renewable energy development activities to be an extension of the same covered transaction that gave rise to the LOA in the first place." (Resp. Mot. Dismiss, Dkt. 27, at 27 n.17). Moreover, GHAE argues that its lease over BHP lands is covered because it is a lease of "covered real estate," 31 C.F.R. § 802.301, near the Laughlin Air Force base. Finally, GHAE argues that CFIUS bringing GHAE into the fold of the LOA through the First Amendment is consistent with the directive that any form of "transaction, transfer, agreement, or arrangement" be deemed "covered" if it would otherwise "circumvent the application of" the regulations. 31 C.F.R. § 800.213(d).

statute, it is immaterial that CFIUS has jurisdiction pursuant to an agreement between the parties rather than the statute itself.

GHAE further argues that CFIUS's jurisdiction over this transaction is evinced by *Ralls Corp. v. CFIUS*, where the President blocked a transaction "almost identical to the pursuit of renewable projects here." (Oral Arg. Tr. 20:9–16). However, that case involved a "covered transaction" because appellant was a Chinese-owned company that had purchased American limited-liability companies previously formed to develop windfarms. *Ralls Corp. v. CFIUS*, 758 F.3d 296, 301 (D.C. Cir. 2014). Here, however, Xinjiang and GH America created GHAE to pursue renewable-energy projects—the transaction did not involve any investment in an existing U.S. business. (*See* SAC, Dkt. 42-1, at 10). Accordingly, *Ralls* does not support GHAE's position that the CFIUS statute covers the transaction at issue here.

At the very least, it is unclear whether the statute gives CFIUS jurisdiction over GHAE's interconnection request. Regardless, the preemption analysis turns on a comparison of the language of the federal statute and the state statute. *See Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 938 (11th Cir. 2013) ("We use our judgment to determine when state law creates an unconstitutional obstacle to federal law, and this judgment is informed by examining the federal statute as a whole and identifying its purpose and intended effects." (internal quotation marks omitted)). Having already done so, the Court finds the question of whether CFIUS has jurisdiction over this interconnection request less important. In sum, because the goal of the CFIUS regime is to review interstate transactions and real-estate transactions near military installations and other federally

---

However, GHAE alleges none of this in either the FAC or the SAC, despite Defendants raising the potential deficiency in their motion to dismiss. Regardless, even if it is unclear whether the statute gives CFIUS jurisdiction over GHAE's transaction, the Court ultimately concludes that this question is not as important to the preemption analysis. *See supra*, at 21.

owned properties, LSIPA does not interfere with CFIUS's objectives. GHAE has not met the "high threshold" for showing conflict preemption. *Whiting*, 563 U.S. at 607.

### 2. Field Preemption

Field preemption exists only where a federal statutory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or that it "touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *McCraw,* 90 F.4th 770, 796 (5th Cir. 2024). "Field preemption of state law is disfavored," and "courts should hesitate to infer field preemption unless plaintiffs show that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress." *Id.* at 795–96 (quoting *City of El Cenizo v. Texas,* 890 F.3d 164, 176 (5th Cir. 2018)).

Here, the Court concludes that nothing in the CFIUS statutes suggests an intent to create a pervasive regulatory scheme. CFIUS is merely authorized to conduct a national-security review of certain transactions, during a short time frame, after which the case is either closed (concluding CFIUS review only) or, if there exists an unmitigated national-security risk, the case is transferred to the President for final action. 50 U.S.C. §§ 4565(b)(1)(A), (b)(2)(A)–(B), (f); *Ralls,* 758 F.3d at 303. Accordingly, the Court does not find LSIPA to be preempted by the CFIUS regime.

In addition to its field-preemption argument based on the CFIUS scheme, GHAE also asserts preemption under a subset of field preemption called the "dormant foreign affairs preemption." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1072 (9th Cir. 2012) (en banc). This doctrine provides that "even in the absence of any express federal policy, a state law still may be preempted under the foreign affairs doctrine if it intrudes on the field of foreign affairs without addressing a traditional state responsibility." *Id.*

22

The Court concludes that the dormant foreign affairs preemption doctrine does not apply here. First, it is unclear whether the doctrine is still in force today. GHAE explains that the Supreme Court applied the dormant foreign affairs doctrine in *Zschernig v. Miller*, 389 U.S. 429 (1968), and drew upon it in *American Insurance Association v. Garamendi*, 539 U.S. 396 (2003). In *Zschernig*, the Supreme Court reviewed an Oregon statute prohibiting inheritance by a nonresident alien absent showings that the foreign heir would take the property without confiscation by his home country and that American citizens would enjoy reciprocal rights of inheritance. The Supreme Court found that this statute "has a direct impact upon foreign relations" and allowed Oregon "to establish its own foreign policy." 389 U.S. at 441. It held that the statute was preempted as "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress." *Id.* at 432. GHAE argues that, by prohibiting Chinese persons from accessing the ERCOT grid, LSIPA similarly encroaches into the field of foreign policy.

However, *Zschernig* was decided in 1968, and the Supreme Court has not applied the doctrine since. Though the Supreme Court "drew upon" the doctrine in *Garamendi* in 2003, it did not actually apply it. Instead, after a discussion of both conflict preemption and dormant foreign affairs preemption, it ultimately struck down the state law on conflict-preemption grounds. *Garamendi*, 539 U.S. at 420–27. GHAE has cited only one circuit court that has applied the dormant foreign affairs doctrine in recent years, and no Fifth Circuit case doing so. (*See* Resp. Mot. Dismiss, Dkt. 27 (citing *Movsesian*, 670 F.3d 1067)). Moreover, the Court finds the notion that a state law may be preempted even in the absence of federal policy, *see id.* at 1072, is out of step with more recent, text-first preemption cases, which disclaim a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Whiting,* 563 U.S. at 607.

Regardless, the dormant foreign affairs doctrine applies only to a state law that "has no serious claim to be addressing a traditional state responsibility." *Movsesian,* 670 F.3d at 1071, 1075.

LSIPA, as applied to the regulation of the ERCOT grid, applies to a traditional state responsibility: utility regulation. *See Just Energy,* 57 F.4th at 252. To be sure, the Court should not stop its inquiry after determining the general subject area of the statute—it should instead inquire into "real purpose of the state law." *Movsesian,* 670 F.3d at 1075. Even in areas at the core of state police power, "regulations must give way if they impair the effective exercise of the Nation's foreign policy." *Zschernig,* 389 U.S. at 441.

Here, the Court concludes that the "real purpose" of LSIPA is to protect the ERCOT grid. As explained above, the unique nature of the grid makes it prone to special security risks. Moreover, LSIPA governs only a narrow set of transactions meant to ensure the security of the grid. Individuals and corporations affected by LSIPA are free to invest in any other aspect of the Texas economy. Because LSIPA, as applied here, affects only the ERCOT grid, the Court finds that the real purpose of the law is a traditional state responsibility and is not preempted under the dormant foreign affairs doctrine.

On August 1, 2025, GHAE filed a notice of supplemental authority, drawing this Court's attention to *Jones Eagle LLC v. Ward,* No. 4:24-CV-00990-KGB, 2024 WL 5112477 (E.D. Ark. Dec. 9, 2024), *appeal docketed,* No. 25-1047 (8th Cir. Jan. 13, 2025), which was decided after GHAE prepared its briefing in this case. (Notice Suppl. Auth., Dkt. 41). In *Jones,* the Arkansas court preliminarily enjoined Arkansas laws banning citizens of China (among other nations) from purchasing agricultural land or crypto-mining businesses in Arkansas. *Id.* The court found that the Arkansas laws were likely conflict-preempted and field-preempted under the foreign affairs doctrine, and because they conflicted with the "regime for screening foreign investment transactions" by CFIUS under FIRRMA. *Id.* at *16–18.

However, *Jones* is not binding on this Court, and it is an interlocutory order that is the subject of a pending appeal. *Jones* is also distinguishable. As explained, the preemption analysis is

driven by a comparison of the language of the challenged state statute to the federal statutes with which a conflict is alleged. Therefore, the Arkansas district court's analysis is specific to the Arkansas laws at issue.

This Court comes to the opposite conclusion when considering the language of LSIPA. First, the ERCOT grid presents a unique state interest. Both the U.S. Supreme Court and Fifth Circuit have recognized the states' ability to regulate utilities as "one of the most important of the functions traditionally associated with the police power of the States," and the Fifth Circuit has recognized that the intrastate nature of the grid reflects Texas policymakers' desire to ensure "independence from federal regulation." *New Orleans Public Service, Inc.*, 491 U.S. at 365; *In re Entrust,* 101 F.4th at 391. LSIPA's narrow prohibition on certain foreign entities being given access to this intrastate grid more cleanly falls within Texas's core police power function than Arkansas's blanket ban on property ownership.

Second, *Jones* partly relied on its conclusion that *Zschernig* is "controlling." *Jones*, 2024 WL 5112477, *19. In *Zschernig*, the Supreme Court found the state law preempted even though the states "have traditionally regulated the descent and distribution of estates"—that is, the ownership of real property. *Id.* Based on this holding, the *Jones* court concluded it did not matter whether the Arkansas laws—which also govern the ownership of real property as applied to the plaintiff in that case— were within the state's police power. *Id.* Under the dormant foreign affairs doctrine, federal policy can preempt state laws that govern real property. *See id.* Though the *Jones* court's reasoning is of course not limited to that particular subject area, *Zschernig* has less force here because LSIPA does not regulate real property. It is less clear whether the dormant foreign affairs doctrine preempts state law regulating utilities within a state.

Finally, Defendants note that a different district court came to the opposite conclusion after reviewing a similar statute prohibiting foreign landownership in Florida, and did so for many of the

same reasons this Court also finds persuasive. *See Shen v. Simpson*, 687 F. Supp. 3d 1219 (N.D. Fla. 2023), *appeal docketed*, No. 23-12737 (11th Cir. Aug. 23, 2023). On appeal, however, the Eleventh Circuit granted two of the five plaintiffs temporary injunctive relief based on its view of a substantial likelihood of success on the preemption claim. *See Order Granting Motion for Preliminary Injunction Pending Appeal in Part*, No. 23-12737 (11th Cir. Feb. 1, 2024). Of course, that order "does not bind the merits panel," which heard oral argument in April 2024 and has not issued an opinion. *Id.* In any case, the order would not be binding on this Court and may have little persuasive value because it would analyze a different statute in a different policy area. In sum, GHAE's notice of supplemental authority does not change the Court's conclusion that LSIPA is neither field- nor conflict-preempted by the CFIUS regime or under the dormant foreign affairs doctrine.

### C. Equal Protection Clause

Defendants argue the equal-protection claims should be dismissed because GHAE does not belong to a protected class, and its ultimate owners have no constitutional rights. The Court concludes that GHAE does not have a valid Equal Protection Clause claim.

GHAE initially brought equal-protection claims based on race, ethnicity, alienage, and national origin, but it was unclear whether GHAE was asserting claims on behalf of itself or on behalf of its owners. (*See* FAC, Dkt. 19, at 10). During oral argument, GHAE requested leave to amend its complaint to add allegations that GHAE's ultimate owner, Mr. Guangxin, "has residences in the United States" or an "immigration status" that would place him "within the scope of the Constitution." (Oral Arg. Tr. 42:3–10). However, the SAC alleges none of these facts. GHAE's amendments merely narrowed its claim to national-origin discrimination and clarified that the claim is brought on behalf of GHAE's ultimate owners. (SAC, Dkt. 42-1, at 21 ("Because GHAE's ultimate owners are being discriminated against based on their national origin, and GHAE has been harmed by that discrimination, GHAE has a cognizable discrimination claim under Section 1983.")).

These allegations do not substantively differ from those in the FAC, and they do not resolve its deficiencies. The Supreme Court has held:

> [I]t is long settled as a matter of American constitutional law that *foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution* . . . . Second, it is long settled as a matter of American corporate law that separately incorporated organizations are separate legal units with distinct legal rights and obligations.

*Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*, 591 U.S. 430, 433, 435 (2020) (emphasis added).

Here, GHAE does not allege that its ultimate owners are U.S. citizens, residents, or currently present in the United States, despite recognizing during oral argument that this was a potential problem. As foreign citizens outside the United States, GHAE's ultimate owners have no constitutional rights and thus face no unconstitutional discrimination. Had GHAE's ultimate owners filed suit from China alleging unconstitutional discrimination against them, their claims would be dismissed because the Supreme "Court has not allowed foreign citizens outside the United States or such U.S. territory to assert rights under the U.S. Constitution." *Agency for Int'l Dev.*, 590 U.S. at 434.

GHAE's motion argues that a corporation may assert a discrimination claim if the corporation falls within the statute's "zone of interests," citing *White Glove Staffing, Inc. v. Methodist Hosps. of Dallas*, 947 F.3d 301, 306 (5th Cir. 2020). In that case, the Fifth Circuit held that a staffing company that lost a contract after providing an African American staffer had statutory standing to file a section 1981 race-discrimination claim. *Id.* In doing so, it explained the company was within "§ 1981's zone of interest," and the company's "claimed injuries were proximately caused by violations of § 1981." GHAE also cites *Triad Assocs., Inc. v. Chicago Hous. Auth.*, No. 87 C 5096, 1992 WL 349655, at *9 (N.D. Ill. Nov. 13, 1992), in which the court held a corporation that alleged discrimination because its shareholders were Caucasian was "within the zone of interests protected by" section 1983. *Id.*

27

However, nothing in these cases suggests that the corporations' claims are based on discrimination against individuals who were not present in the United States, U.S. residents, or U.S. citizens. In *White Glove Staffing*, the company asserted the claims on behalf of an African American staffer. 947 F.3d at 307–08. In *Triad*, the corporation had standing because it was the only entity that could "assert the rights" of its shareholder. 1992 WL 349655, at *9–10. Implicit in this reasoning is the notion that the shareholders themselves had rights protected by the Constitution. Here, by contrast, GHAE's noncitizen, non-resident, non-present owners have no rights under the Constitution, and GHAE fails to argue otherwise in either its response to Defendants' motion to dismiss or in its motion for leave to file the SAC. GHAE cannot show that its claims are within the zone of interests protected by section 1983 or that it has been injured by a violation of section 1983 because, by its terms, section 1983 applies only to a "citizen of the United States or other person within the jurisdiction thereof." 42 U.S.C. § 1983. In sum, GHAE fails to show that its owners can vindicate rights under the Equal Protection Clause or that it falls within the zone of interests protected by the statute. Accordingly, GHAE's equal-protection claims are dismissed.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that GHAE's Motion for Leave to a File Second Amended Complaint, (Dkt. 42), is **GRANTED**, and Defendants' Motion to Dismiss Plaintiff's Complaint, (Dkt. 26), is **GRANTED**. GHAE's Second Amended Complaint is **DISMISSED** without prejudice.

The Court will enter final judgment by separate order.

**SIGNED** on September 16, 2025.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

28